HEATHER E. WILLIAMS, Bar #122664
Federal Defender
BENJAMIN A. GERSON, NY Bar # 5505144
Assistant Federal Defender
Designated Counsel for Service
2300 Tulare Street, Suite 330
Fresno, CA  93721-2226
Telephone: (559) 487-5561
Fax: (559) 487-5950

Attorneys for Defendant
DAVID NUNN

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  6:20-PO-00742-HBK |
| Plaintiff, | NOTICE OF MOTION AND MOTION TO DISMISS FOR INVALID REGULATION APA §706(multiple) |
| vs. | |
| DAVID NUNN | |
| Defendant. | JUDGE: Hon. Helena Barch-Kuchta |

**TO: SEAN ANDERSON, YOSEMITE NATIONAL PARK LEGAL OFFICER**

**PLEASE TAKE NOTICE** that as soon as this matter can be heard before the Honorable

United States Magistrate Judge Helena Barch-Kuchta, Benjamin A. Gerson, Assistant Federal

Defender, counsel for the defendant, David Nunn, hereby moves the court to dismiss Count Two

of the complaint finding the underlying regulation, 36 C.F.R. § 2.17(a), to be arbitrary and

capricious.

Dated:  April 26, 2021                    HEATHER E. WILLIAMS
                                          Federal Defender

                                          */s/ Benjamin A. Gerson*
                                          BENJAMIN A. GERSON
                                          Assistant Federal Defender
                                          Attorney for Defendant
                                          David Nunn

1

**Table of Authorities**

2

**Supreme Court Opinions**

3

4

*Burlington Truck Lines v. United States,*
    371 U.S. 156 (1962) ........................................................................................11

5

*Citizens to Preserve Overton Park v. Volpe,*
    401 U.S. 402 (1971) ................................................................................. 1, 8, 15

6

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance,*
    463 U.S. 29 (1983) ................................................................................... passim

7

8

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1942) ........................................................................................... 9

9

*S.E.C. v. Chenery Corp.,*
    332 U.S. 194 (1947) .................................................................................... 9, 10

10

11

12

**Federal Court Opinions**

13

*Hell's Canyon Alliance v. U.S. Forest Service,*
    227 F.2d 1170 (9th Cir. 2000) ...................................................................... 10

14

*Home Box Office, Inc. v. FCC,*
    567 F.2d 9 (D.C.C. 1977) ..............................................................................10

15

*International Ladies Garment Worker Union v. Donovan,*
    722 F.2d 795 (D.C.C. 1983) .......................................................................... 11

16

17

*Providence Yakima Med. Ctr. v. Sebelius,*
    611 F.3d 1181 (9th Cir. 2010) ...................................................................... 11

18

*Northwest Coalition for Alternatives to Pesticides (NCAP) v. U.S.E.P.A.,*
    544 F.3d 1043 (9th Cir. 2008) 544 F.3d 1043 (9th Cir. 2008)........................12, 13, 14

19

20

*Nat'l Wildlife Fed'n v. Burford,*
    871 F.2d 849(9th Cir. 1989)................................................................................16

21

22

**United States Code**

23

*Title 5 United States Code*
    § 553 ............................................................................................... passim
    § 706 ............................................................................................... passim

24

25

26

27

28

    -i-

*Title 21 United States Code*

   §346a(b) ........................................................................................................ 12

*Title 54 United States Code*

   § 10010 ...................................................................................................... 1, 8, 14

**Code of Federal Regulations**

*Title 36 Code of Federal Regulations*

   § 2.2 (1967)...............................................................................................7

   § 2.17 .............................................................................................1, 7, 9, 13

**Federal Register**

46 F.R. 53419 Oct. 29, 1981 ...............................................................................11

31 F.R. 16651, Dec. 29, 1966 ...........................................................................7, 13

48 F.R. 30252 Jun. 30, 1983 .........................................................................7, 8, 13, 14

**Other**

*In the Matter of Fed. Water Serv. Corp. Util. Operators Co. Fed. Water & Gas Corp.*, S.E.C. Release No. 5584 (Feb. 8, 1945)………………………………………………………..9

Cally Carswell, *Deaths Renew Calls for National Parks to Rescind Jumping Bans,* High Country News, Jul. 20, 2015 (available at https://www.hcn.org/issues/47.12/deaths-renew-calls-for-national-parks-to-rescind-base-jumping-bans)(last accessed April 26, 2021)..................4, 5, 6, 15

Andrew Becker, *Squaw Man Found Dead After Illegal Yosemite BASE Jump*, Sierra Sun, December 19, 2001 (available at https://www.sierrasun.com/news/squaw-man-found-dead-after-illegal-yosemite-base-jump/)(last accessed April 26, 2021)…………………………………..5

John Branch, *Lost Brother in Yosemite*, N.Y. Times June 11, 2016 (available at https://www.nytimes.com/2015/06/14/sports/dean-potter-final-yosemite-jump.html )(last accessed April 26, 2021)…………………………………………………………6

Matt Gerdes, *The Great Book of BASE*, (3d ed. 2018). ...................................... passim

Sunshine Superman (Magnolia Pictures 2014)…………………………………………4, 17

Janet Reitman, *Last Base*, ESPN The Magazine, Feb. 21, 2000, available at https://www.espn.com/espn/story/_/page/Mag15lastbase/frank-gambalie-lived-died-base-jumping-espn-magazine-archives (last accessed April 26, 2021) ………………………...5

Craig Vetter, *Terminal Velocity*, Outside Magazine, Apr. 1, 1999 (https://www.outsideonline.com/1914776/terminal-velocity-death-master-gravity).....................6

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

3

**INTRODUCTION**

4

David Nunn is charged with violating 36 C.F.R. 2.17(a) for BASE jumping in Yosemite

5

National Park.  BASE jumping is a sport in which participants parachute from a land based

6

object, rather than an aircraft. Specifically, the objects to which the acronym BASE refers -

7

buildings, antennas, spans, earth. Yosemite National Park has long been recognized as a premier

8

location for BASE jumping because of its high cliffs, safe landing areas, and ease of access.  The

9

National Park Service ("NPS") has banned BASE jumping by interpreting the prohibition on

10

"aerial delivery" by parachute into the national park to apply to BASE jumpers.  *See,* 36 CFR

11

§2.17(a)

12

Mr. Nunn now moves the court to dismiss count two as the underlying regulation

13

promulgated by the National Park Service is arbitrary and capricious within the meaning of the

14

Administrative Procedure Act 5 U.S.C. § 706(2).  First, as a matter of notice and comment

15

rulemaking under 5 U.S.C. § 553(c) the regulation was promulgated without a statement of basis

16

and purpose which supports a "reasoned analysis" upon which to base agency action. *Motor*

17

*Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance*, 463 U.S. 29

18

(1983). Second, the National Park Service's interpretation of the regulation as an informal

19

adjudication violates *Citizens to Preserve Overton Park Volpe*, 401 U.S. 402 (1971) because the

20

NPS has demonstrated that it can accommodate similar activities, *i.e.*, hang gliding and rock

21

climbing, in a way that is consistent with the National Park Organic Act, 54 U.S.C. § 10010 *e.t*

22

*seq.,* but arbitrarily bans BASE jumping out of animus towards the sport.

23

24

**I.      FACTUAL BACKGROUND**

25

**A.  Mr. Nunn's BASE Jump**

26

Mr. Nunn is alleged to have BASE jumped from El Capitan in Yosemite National Park on

27

July 21, 2020.  The complaint alleges that Mr. Nunn admitted to jumping from El Capital at

28

approximately 6:00 in the morning.  During his descent his parachute failed to properly deploy

1    and he went into an uncontrolled spin.  Mr. Nunn was unable to recover and collided with a slab

2    of low angle cliff near the bottom of El Capitan.  He then tumbled backwards onto the rocky

3    ground below, suffering serious injuries to his back.  A hiker later encountered Mr. Nunn and

4    called Yosemite search and rescue and the park rangers.  The park rangers encountered Mr.

5    Nunn bloodied with his parachute equipment nearby.  Mr. Nunn was transported by air

6    ambulance to a nearby hospital.  Several weeks later Mr. Nunn returned to Yosemite to retrieve

7    his vehicle and inquire about equipment that had been collected by park staff.  Upon appearing at

8    the ranger headquarters to retrieve his equipment, he was issued the instant citation.

9        **B.  BASE Jumping Mechanics**

10            BASE jumping is a sport in which a parachutist leaps from a ground based structure and

11   deploys a specially designed parachute to control his descent.  While similar in principle to

12   parachuting from an aircraft, the substantially shorter period of free fall creates a

13   commensurately lower margin for error.  At first glance BASE jumping appears to be a daredevil

14   stunt.  However, thanks to the efforts of a worldwide community, BASE jumping can accurately

15   be described as a highly technical sport, with each jump the result of considerable planning and

16   calculation. *See generally*, Matt Gerdes, *The Great Book of BASE*, (3d ed. 2018).  BASE is an

17   acronym for building, antenna, span, and earth, the four ground based structures from which a

18   base jumper may "exit", the technical name for the point from which a BASE jump is initiated.

19   The basic progression of a BASE jump is somewhat obvious: jump, fall, deploy, land. Gerdes,

20   *supra.*  However, each of these steps involves many complex factors that are topics of active

21   discussion and development in the BASE jumping community.

22            The jump, or "exit" requires careful planning. Modern BASE jumpers are known to use

23   sophisticated simulation software to predict a flight path and avoid obstacles, the primary

24   consideration in low altitude flight.  This is especially important when using a wingsuit, a

25   coverall with webbing stitched between the legs and between the torso and arms, which provides

26   lift and allows the BASE jumper to glide.  Other factors include accounting for adequate distance

27   from the object (in particular cliffs), the effect of weather, air density at elevation, and thermal

28   air currents depending on the time of day. *See,* Gerdes.  Preparation must also include careful

1    body orientation after leaving the exit as it is crucial to ensure tracking away from the cliff, and

2    proper deployment of the canopy.  Unlike parachuting from an aircraft where a parachutist has

3    time to use the apparent wind generated by free fall to orient himself, a BASE jumper must be in

4    the proper position from the moment of the exit.

5          Deployment is a matter of highly specialized equipment:  the canopy, what a layperson

6    thinks of as a parachute; a container, the bag resembling a backpack in which the canopy is

7    stored; and the pilot chute ("PC"), a small parachute which is deployed first, the drag of which

8    pulls the canopy out of the container by a long cord, known as a bridle.  There are many

9    technical discussions about deployment at terminal and sub-terminal velocities, the length of the

10   bridle and size of the PC, and the effects of turbulence created by the aerodynamic properties of

11   a wingsuit.  Gerdes, *supra,* 41-52.  BASE jumpers have amassed a collective knowledge of when

12   to employ (and deploy) every combination of canopy, PC, and bridle.

13         The canopy itself is specially designed to have a low stall speed and greater ability to

14   track to a desired heading.  The ability to properly navigate once the canopy is deployed is

15   viewed as an essential skill in BASE jumping.  The primary goal is to avoid collision with the

16   cliff wall or other obstacles, and the secondary goal is to execute an extremely accurate landing.

17   Gerdes, *supra* at 14 ("[l]earn to land in consistently in the spot you choose in all conditions").

18   BASE jumpers are typically understood to have invested considerable time in becoming master

19   parachutists from aircraft.  The generally accepted figure is that a BASE jumper should complete

20   150-200 parachute jumps from an aircraft before his first BASE jump. *Id.*  The reasoning is that

21   BASE jumpers must be able control their body position and tracking during the free fall to

22   ensure proper canopy deployment and to execute extremely precise maneuvers to land in a

23   specific, highly targeted area.  Practice from aircraft allows for a larger margin of error and also

24   assists in collecting flight data which may be used to simulate a planned BASE jump.  BASE

25   jumpers use specialized software that maps flight data onto ground topography so that a BASE

26   jumper can plan a jump as safely as possible avoiding obstacles.

27   / / /

28   / / /

### C.  History of Base Jumping Regulation in Yosemite National Park

BASE jumping in Yosemite National Park has been fraught with tension between park authorities and BASE enthusiasts for nearly 40 years.  In the early 1980s, Carl Boenish sparked the modern era of parachuting from El Capitan.  Matt Gerdes, author of the premier treatise on BASE jumping describes early interactions with the Park Rangers at the time:

> "Even Yosemite Park Rangers, who have since developed a worldwide
> reputation as the world's foremost BASE haters and most
> bloodthirsty BASE police, didn't know what to think when people
> first began to regularly parachute from the cliffs inside the
> park.  Was this illegal?"

*The Great Book of BASE* at 3.  Boenish was widely reported to have antagonized the park rangers and performed stunts upon exiting a jump point such as using a skateboard of pogo stick to launch himself over the cliff edge.  Cally Carswell, *Deaths Renew Calls for National Parks to Rescind Jumping Bans*, High Country News, Jul. 20, 2015 (available at https://www.hcn.org/issues/47.12/deaths-renew-calls-for-national-parks-to-rescind-base-jumping-bans)(last accessed April 26, 2021).  While Yosemite appears to have allowed BASE jumping for a short period of approximately 90 days by means of a rudimentary permit system, it was then banned and has been deemed illegal ever since. Bill Wendt, the head park ranger at the time stated "There were just too many free spirits, and we had to shut them down". *Id. See also* Sunshine Superman (Magnolia Pictures 2014). Unfortunately this pattern has been widely repeated.

> "The pattern of puzzlement, recognition, and prohibition has
> repeated itself around the world countless times since the early
> 80s, and once BASE jumping was grandiosely banned from America's
> premier National Parks and National Recreation Areas, it went from
> being a crazy stunt to being a "crime" in some places, in just a
> few short years"

The Great Book of BASE at 4 (quotations in original).

The history of prohibition in Yosemite is both idiosyncratic and tragic.  Many in the BASE jumping community attribute preventable deaths to the overzealous efforts of the park rangers.  Indeed, for a sport which is rarely reported on except in the case of accidents, much ink has been spilled on the topic of BASE jumping enforcement in Yosemite. On June 9, 1999, Frank Gambalie successfully BASE jumped from El Capitan and landed safely in El Cap Meadow roughly 3000 feet below.  Park rangers who had been made aware of his jump in advance gave chase as soon as he touched down.  Gambalie ran and attempted to escape by swimming across the Merced River, only to be swept downstream and drowned in the swift current.  Gambalie's father later said of a meeting with the Park Rangers "I told them, look, my son broke the law, he made a bad decision.  But there's something wrong with all of this.  The law is made to protect people, not drive them to where they feel they have no choice".  Janet Reitman, *Last Base,* ESPN The Magazine, Feb. 21, 2000, (available at https://www.espn.com/espn/story/_/page /Mag15lastbase/frank-gambalie-lived-died-base-jumping-espn-magazine-archives)(last accessed April 26, 2021).  The account of Gambalie's fatal jump reveals the "rangers have a reputation for zealously pursuing jumpers". *Id.* See also, Andrew Becker, *Squaw Man Found Dead After Illegal Yosemite BASE Jump*, Sierra Sun, December 19, 2001 (available at https://www.sierrasun.com/news/squaw-man-found-dead-after-illegal-yosemite-base-jump/)(last accessed April 26, 2021).

In a related incident, Jan Davis BASE jumped from El Capitan in October 1999 along with four others to protest the rangers' treatment of Frank Gambalie, which they attributed to his death.  Anticipating that the Rangers would be waiting for her at the landing site to arrest her and confiscate her equipment, a common penalty, and not wanting to lose her own equipment, Davis borrowed a parachute.  Unfamiliar with the borrowed parachute, she failed to deploy in time and suffered a fatal impact.  Cally Carswell, *Deaths Renew Calls for National Parks to Rescind Jumping Bans,* High Country News, Jul. 20, 2015 (available at https://www.hcn.org/issues/47.12 /deaths-renew-calls-for-national-parks-to-rescind-base-jumping-bans)(last accessed April 26, 2021).  Again, the BASE jumping community pointed to overzealous enforcement as a factor.

Perhaps one of the most troubling instances of overzealous enforcement surrounds Dean

Potter, an extremely well known and respected resident of Yosemite.  In the mid-1990s a rock climber named Dan Osman was testing the limits of free falling by setting up lengths of climbing rope hundreds of feet long on the cliffs of Yosemite.  Osman would then jump with the rope attached to his climbing harness and free fall until the climbing rope arrested his fall.  Tragically, Dan Osman died when one of his ropes failed in a dusk jump.  Craig Vetter, *Terminal Velocity*, Outside Magazine, Apr. 1, 1999 (https://www.outsideonline.com/1914776/terminal-velocity-death-master-gravity).  Because of the late hour, Yosemite Search and Rescue ("YOSAR") could not recover Osman's body and Dean Potter, then a member of YOSAR, was dispatched to locate the body in the dark and camp next to it for the night to ward off any animals that may attempt to scavenge Osman's corpse.  Despite Potter's commitment to the Yosemite community and willingness to undertake such a gruesome task, Potter opened his account of BASE jumping in Switzerland with

> "I am considered a criminal in my hometown of Yosemite,
> California, for pursuing the dream of human-body-flying.  The
> United States is supposed to be the Land of the Free but I have to
> cross borders to be emancipated and explore man's fundamental
> desire to soar"

Dean Potter, *A Line for the People*, *in* The Great Book of BASE (Matt Gerdes 3d 2018).  Dean Potter was killed in a BASE jumping accident in Yosemite in 2015, a contributing factor was the variable light of a dusk jump in an effort to avoid apprehension by the park rangers.   Cally Carswell *Deaths Renew Calls for National Parks to Rescind Jumping Bans,* High Country News, Jul. 20, 2015 (available at https://www.hcn.org/issues/47.12/deaths-renew-calls-for-national-parks-to-rescind-base-jumping-bans)(last accessed April 26, 2021). *See also*, John Branch, *Lost Brother in Yosemite*, N.Y. Times June 11, 2016 (available at https://www.nytimes.com /2015/06/14/sports/dean-potter-final-yosemite-jump.html)(last accessed April 26, 2021).

While Yosemite's absolute ban and draconian enforcement of BASE jumping is often viewed as a contributing factor in tragic fatalities in the sport it is also idiosyncratic in that it is out of step with other locales popular for BASE jumping.  The Bureau of Land management, a

1   parallel agency within the Department of the Interior, has not taken the position that BASE

2   jumping is illegal.  Carswell, *supra.*  New River Gorge National Park has a permitted BASE

3   jumping day.  *See generally*, New River Gorge Bridge – New River Gorge National Park and

4   Preserve, https://www.nps.gov/neri/planyourvisit/nrgbridge.htm (last visited April 26, 2021).  In

5   Lauterbrunnen, Switzerland, another area popular for BASE jumping, the Swiss mountain rescue

6   association REGA will sell rescue insurance to BASE jumpers, and the main points of contention

7   are the burgeoning popularity and that landing zones not interrupt farming operations.  Gerdes,

8   *supra* at 57-59.

9

10      **II.      LEGAL BACKGROUND**

11          **A.  Prior Regulations**

12      The National Park Service promulgated a regulation prohibiting the delivery by parachute

13   of a person into the park in 1966.  *See*  31 F.R. 16651, Dec. 29, 1966; 36 C.F.R. § 2.2(b)

14   (1967)(" [e]xcept in extreme emergencies involving the safety of human life or threat of serious

15   property loss, the air delivery of any person or thing by parachute, helicopter, or other means

16   without prior written permission of the Superintendent is prohibited").  It is worth noting that the

17   promulgation of that rule was subsequent to the enactment of the current version of the

18   Administrative Procedures Act ("APA") rulemaking statute, enacted September 6, 1966.  Pub. L.

19   89-554, Sept. 6, 1966.  The announcement of the final rule in the Federal Register on December

20   29, 1966 contained effectively no statement of basis or purpose as required by § 553 of the APA,

21   and included only a summary of minor changes in the language of the regulations.  That

22   regulation remained unchanged until superseded by an almost identical regulation in 1983.

23          **B.  Current Regulations**

24      On June 30, 1983, the National Park Service ("NPS") promulgated the current regulations

25   governing the national parks.  48 F.R. 30252 Jun. 30, 1983.  Pursuant to the Administrative

26   Procedure Act, 5 U.S.C. §553(c) the NPS published a "statement of basis and purpose"

27   describing the content of public comments received and agency rulemaking thereon.  See 48 F.R.

28   30252 – 30275.  In the statement of basis and purpose concerning 36 C.F.R. § 2.17 the NPS

1    made findings based on the comments submitted that recovery of downed aircraft required

2    National Transportation Safety Board approval, and, quixotically, that hovercraft would not be

3    allowed in parks without a special permit.  The Department also made several findings of import

4    to the instant case.  First, "aircraft", meaning any device, whether powered or powerless, used for

5    human flight would be governed by incorporating Federal Aviation Administration Rules when

6    operating on the lands and waters of the national parks.  The Department readily admitted it had

7    no authority to regulate the flight of aircraft above national parks.  Second, the statement of basis

8    and purpose specifically addressed hang gliding.  The Park Service acknowledged that hang

9    gliding may be appropriate and desirable, with the flight of hang gliders posing "minimal

10   impact".  The NPS explicitly stated that launching and landing sites "may require protection

11   from overuse", and that reasonable limits may be required to accomplish the goals of park

12   preservation. *Id.* However, neither the statement of basis and purpose nor the ensuing regulations

13   establish any regulations for hang gliding in the park.  Third, the statement of basis fails to

14   specifically address any other type of powered or unpowered aircraft.  Finally, the statement of

15   basis and purpose includes a residual clause, without support, whereby all aircraft operations are

16   prohibited, absent special permits, which shall be established by a park superintendent following

17   notice and comment rulemaking procedures. 48 F.R. 30252.

18

19   **III.    LEGAL STANDARD**

20       The National Park Service Organic Act delegates authority to regulate national parks to the

21   director of the National Park Service "to conserve the scenery, natural and historic objects, and

22   wild life in the System units and to provide for the enjoyment of the scenery, natural and historic

23   objects, and wild life in such manner and by such means as will leave them unimpaired for the

24   enjoyment of future generations". 54 U.S.C. § 10010 *et seq*.  An agency's action may be set

25   aside if it is found to be arbitrary and capricious. 5 U.S.C. §706(2).  See also, *Citizens to*

26   *Preserve Overton Park v. Volpe,* 401 U.S. 402 (1971)("The agency's action in promulgating such

27   standards therefore may be set aside if found to be "arbitrary, capricious, an abuse of discretion,

28   or otherwise not in accordance with law").

IV.     ARGUMENT

**1. Section 2.17(a) Prohibiting Parachuting Is Arbitrary and Capricious**

**A. Final Rules Must Be Supported by Reasoned Decision Making**

The regulation in question, 36 C.F.R. § 2.17(a), is the product of "informal" notice and comment rulemaking. *See,* 5 U.S.C. § 553.  The National Park Service ("NPS") published proposed rules and invited comment in the Federal Register.  47 F.R. 11598, Mar. 17, 1982.  The final rules and statement of basis and purpose were adopted on June 30, 1983. 48 F.R 30252.  As such the regulation may be found unlawful if it is "arbitrary and capricious".  5 U.S.C. §706(2)(A).  A key component of notice and comment rulemaking is the "statement of basis and purpose" which is to be published with the final rule and creates a record of the agency's deliberations on the rule. 5 U.S.C. §553(c).

The United States Supreme Court has long held that agency decisions must be supported by a record which sets forth clearly the grounds on which it acted.  *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 (1947)("*Chenery II*").  In *Chenery II*, the Securities and Exchange Commission denied a reorganization plan submitted by the Federal Water Service Corporation, a private holding company ("Federal") for the second time.  The first denial came in the preceding case, *S.E.C. v. Chenery Corp.*, 318 U.S. 80 (1942)("*Chenery I*"). In *Chenery I*, the Court remanded because the SEC had denied the original reorganization plan by means of an order in which the agency had not made the factual basis and deliberations of the decision clear enough to support the outcome or enable adequate judicial review. 318 U.S. at 94 ("…the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted by clearly disclosed and adequately sustained.")  When *Chenery II* arrived in the Supreme Court five years later, the Court upheld the SEC's denial of the reorganization plan because the agency supplied sufficient evidence to support the outcome.  The S.E.C.'s decision spanned 25 pages and reviewed Federal's outstanding stock, equity interests and fiduciary duties to arrive at the ultimate denial. See *In the Matter of Fed. Water Serv. Corp. Util. Operators Co. Fed. Water & Gas Corp.*, S.E.C. Release No. 5584 (Feb. 8, 1945).  The Court held that the level of factual detail and analysis set forth in the order was satisfactory:

1    "If the administrative action is to be tested by the basis upon

2    which it purports to rest, that basis must be set forth with such

3    clarity as to be understandable. It will not do for a court to be

4    compelled to guess at the theory underlying the agency's action;

5    nor can a court be expected to chisel that which must be precise

6    from what the agency has left vague and indecisive."

7    *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  It is worth noting that the agency's resulting

8    order promulgated a new rule with prospective effect.  As such, the Supreme Court required that

9    when a rule is promulgated, it must be supported by reasoned analysis on the record.

10        The requirement of reasoned analysis to support an agency rule has long permeated the

11   decisions of the circuit courts.  In *Home Box Office, Inc. v. FCC,* the Court of Appeals for the

12   D.C. Circuit held "the concise and general statement that must accompany the rules finally

13   promulgated must be accommodated to the realities of judicial scrutiny, which do not

14   contemplate that the court itself will, by a laborious examination of the record, formulate in the

15   first instance the significant issues faced by the agency and articulate the rationale of their

16   resolution. The record must enable us to see what major issues of policy were ventilated by the

17   informal proceedings and why the agency reacted to them as it did." 567 F.2d 9, 35 (D.C.C.

18   1977) (*Internal citations omitted*).  See also, *Hell's Canyon Alliance v. U.S. Forest Service*, 227

19   F.2d 1170, 1182 (9th Cir. 2000)("A court should not supply a reasoned basis for the agency's

20   action that the agency itself has not given").

21        An agency rule which is not supported by the record may be overturned as arbitrary or

22   capricious under 5 U.S.C § 706(2).  In *Motor Vehicle Manufacturers Association v. State Farm*

23   *Mutual Automobile Insurance* the Court held that rules promulgated through the notice and

24   comment process of the Administrative Procedure Act 5 U.S.C. §553, including a rescission or

25   change of a rule, must supply a reasoned analysis.  463 U.S. 29 (1983).  In that case, the National

26   Highway Traffic Safety Administration rescinded a requirement that automatic crash restraints

27   be installed in cars produced from 1982 onwards.  The agency's reasoning for the rescission

28   rested on unsupported judgements that passive restraint systems, such as automatic safety belts

1    and inflatable air bags, could not be predicted to reduce injuries in automobile crashes.  The

2    agency summarily concluded their ineffectiveness without considering alternatives or presenting

3    facts to support that conclusion. See, 46 F.R. 53419 Oct. 29, 1981.  The Court held that such a

4    judgement, absent deeper analysis of alternatives or factual support for the conclusion,

5    invalidated the rescission of the existing rule.  The Court held "an agency rule would be arbitrary

6    and capricious if the agency has relied on factors which Congress has not intended it to consider,

7    entirely failed to consider an important aspect of the problem, offered an explanation for its

8    decision that runs counter to the evidence before the agency, or is so implausible that it could not

9    be ascribed to a difference in view or the product of agency expertise". 463 U.S. at 43. See also

10   *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)("the agency must examine the

11   relevant data and articulate a satisfactory explanation for its action including a "rational

12   connection between the facts found and the choice made.")  The Ninth Circuit Court of Appeals

13   has adopted this standard.  *See generally*, *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d

14   1181 (9th Cir. 2010).

15        **B. Final Rules Lacking Reasoned Analysis Must Be Invalidated**

16        In *International Ladies Garment Worker Union v. Donovan,* ("*ILGWU")* the Court of

17   Appeals for the District of Columbia held that new rules promulgated by the Secretary of Labor

18   were arbitrary and capricious for lack of reasoned analysis. 722 F.2d 795 (D.C.C. 1983).  In that

19   case, the Secretary rescinded regulations the prohibited garment workers and knitters of

20   outerwear from working at home to produce textile goods.  The existing regulation prohibiting

21   homework was based on research showing that enforcement of minimum wage and hour laws,

22   child labor laws, and workplace sanitation laws were effectively unenforceable. *Id.* at 802.  The

23   Secretary justified the rescission on the "finding" that prohibiting homework curtailed

24   employment opportunities and earning power.  *Id.* at 805.  Applying *Motor Vehicles*

25   *Manufacturers Association, supra*, the court held that the rescission must be justified by the

26   rulemaking record.  Upon examination the court found major deficiencies in the rulemaking

27   record.  First, the Secretary failed to consider any alternative to total rescission of the rule.  The

28   court noted that there may be less expansive solutions that total rescission, such as an alleviation

1    of some of the burdensome regulations for homeworkers in rural environments who may

2    otherwise be precluded from work altogether. Indeed the Secretary cited difficulties in

3    transportation for rural workers as one of the reasons to rescind the restrictions, but failed to

4    consider an alternative which addressed that problem specifically, rather than a blanket

5    rescission which did not account for the effect on urban workers.  The court held that this

6    "artificial narrowing of options" rendered the rule arbitrary and capricious. *Id.* at 817.  In *ILGWU*

7    the court of appeals relied on the reasoning in *Motor Vehicle Manufacturers Association, supra,*

8    that abandoning regulation without considering alternative solutions is arbitrary and capricious.

9    Alternative should be considered in the rulemaking process, and even if not implemented, that

10   reasoning should be explained to show how the agency arrived at the ultimate rule. *Id.* at 818.

11       Second, the Secretary summarily noted that an enforcement regime to guarantee minimum

12   wages to homeworkers was "feasible" but offered no support. The court of appeals noted that

13   while the agency is entitled to make predictions, they must be adequately reasoned on the record.

14   *ILGWU* at 819-822.  Conversely, the Secretary failed to consider difficulties in enforcement,

15   presenting not discussion of the balance between challenges and feasibility. *Id.* at 823.  Finally,

16   the Secretary reasoned that lifting restrictions on homeworkers would relieve an existing barrier

17   to employment.  *Id.* at 826.  The court of appeals disagreed, noting that the Secretary's reasoning

18   failed to consider economic injury to factory workers or present evidence that the current

19   restrictions actually foreclosed on employment.

20       The Ninth Circuit has adopted the rule in *ILGWU*.  In *Northwest Coalition for Alternatives*

21   *to Pesticides (NCAP) v. United States Environmental Protection Agency*, 544 F.3d 1043 (9th Cir.

22   2008) the Environmental Protection Agency ("EPA") promulgated tolerances for pesticides

23   through the rulemaking process set forth in the Federal Food Drug and Cosmetic Act 21 U.S.C. §

24   346a(b), and published them in the Federal Register. 544 F.3d 1046.  The rules concerning

25   pesticide tolerances are governed by the Food Quality Protection Act, Pub L. No. 104-170, 110

26   Stat 1489.  These rules establish a very high, "tenfold" margins of safety that must be met when

27   considering pesticide tolerances for infants and children. *Id.* In a final rule for certain pesticides,

28   the EPA allowed a lower, threefold tolerance.  In explaining its final rule, the EPA's stated

reasons relied on a computer model of pesticide exposure in drinking water.  The EPA's

technical explanation of its measurement and modelling, and decision to rely on the highest

measured value, was satisfactory to the court.  However, the court held that despite the EPA's

adequate explanation of its measurement techniques, it failed to adequately describe the link

between the measurements and the decision to enforce only a threefold safety margin, rather than

a tenfold margin. *Id.* at 1051. Judge Pregerson held "In sum, the Final Order does not provide

enough information to demonstrate a rational connection between the factors that the EPA

examined and the conclusions it reached." *Id.*  Absent a reasoned analysis, which is by all

accounts a technical and demanding standard, a rule promulgated by an administrative agency

cannot stand.

### C. Section 2.17(a) Lacks Reasoned Analysis And Is Arbitrary and Capricious.

In the instant case, the regulation which prohibits delivery of a person by parachute is

arbitrary and capricious.  An administrative rule which is the byproduct of notice and comment

rulemaking pursuant to 5 U.S.C. § 553 *must* be supported by a reasoned analysis which draws a

connection between the facts and the choice made. *NCAP*, 544 F.3d 1043 (9th Cir. 2008).  In

promulgating the rule set forth in 36 C.F.R. 2.17(a) the NPS offered exactly zero factual analysis

as to the prohibition on parachuting in either the 1983 rule or the preceding 1966 rule. *See,* 31

F.R. 16651, Dec. 29, 1966; 48 F.R. 30252, Jun. 30, 1983.  As detailed*, supra* at 10-11, the

reasoning underpinning regulation of aircraft within the park is exceedingly thin.  The dearth of a

record of the agency's reasoned analysis alone renders the regulation arbitrary and capricious.

Further, the blanket ban on "aircraft" as defined in 36 C.F.R. 1.4(a) runs afoul of the rule

set for the in *Motor Vehicle Manufacturers* and *ILGWU*.  By grouping powered and unpowered

aircraft into a single regulation, the National Park Service commits the same error failing to

properly differentiate regulatory needs and consider alternatives to blanket prohibition. Likewise,

the requirement articulated in *NCAP* that an agency must demonstrate a rational connection is

clearly missing.

Not all aircraft are created equal.  As set forth in *ILGWU*, an agency must consider the

1    effects of different factual scenarios. *ILGWU* at 817.  In that case, a catch-all rescission was

2    aimed at a perceived barrier to employment for rural homeworkers, however the court found that

3    the stated reasoning did not consider the effects on urban workers. *Id.*  In considering regulating

4    aircraft in the national parks, the NPS must assess the impact in light of the organic act.  That act

5    states in relevant part that the national parks shall be regulated "to conserve the scenery, natural

6    and historic objects, and wild life in the system units and to provide for the enjoyment of the

7    scenery, natural and historic objects, and wild life in such manner and by such means as will

8    leave them unimpaired for the enjoyment of future generations". 54 U.S.C. § 100101.  Applying

9    a catch-all regulation stumbles into the same trap as *ILGWU*, in that it fails to account for various

10   factual realities when viewed in light of the organic act.  Clearly the impact of commercial jet

11   operations has a very different impact on a park setting than propeller driven bush planes, which

12   again have a vastly different impact than parachutists.  It is easy to imagine the negative impact

13   that the noise, landing strips, and fueling infrastructure of a large scale aircraft operation may

14   have on the park.  Likewise it is easy to imagine the negligible impact that a hang glider may

15   have, launching silently from a cliff and touching down at a landing zone some minutes later.  In

16   fact, the one small piece of reasoning in the rulemaking process recognizes that hang gliding

17   "may be an appropriate activity".  48 F.R. 30252 Jun. 30, 1983.  To group all "aircraft" together,

18   even though a Boeing 747 and a BASE jumper are strikingly different, is the identical error to

19   artificially narrowing the options in *ILWGU.*   A single, blanket regulation which fails to

20   differentiate between different factual circumstances within the context of the organic act, and

21   proceeds to ban all activity without justification is impermissible as arbitrary and capricious.

22   *ILGWU; Motor Vehicle Manufacturers*.

23        Relatedly, the NPS failed to consider alternatives to total prohibition.  Because

24   parachuting, and in particular BASE jumping, are highly technical, the NPS should have engaged

25   in a more detailed analysis.  Notwithstanding the fact that the current regulation dates from the

26   birth of the modern sport of BASE jumping, many technical details about parachuting generally

27   were available at the time of the regulation.  A plausible alternative would have been to

28   designate specific take off and landing zones, specify certain times and dates where parachuting

was permitted, and conducted an application process to ensure adequate skill and experience. Ancillary activities to mitigate park impact, such as traffic control, are well within the purview of the NPS and are regularly conducted in other contexts.

Should the NPS wish to prohibit BASE jumping or parachuting entirely, they are well within their discretion, but the NPS must demonstrate a rational analysis justifying the prohibition. *NCAP.* Looking to the organic act, the NPS must demonstrate a rational connection between banning base jumping and leaving the park unimpaired for future generations. This is no small feat as Yosemite has an ice rink, a golf course, the world's foremost rock climbing community which routinely places steel bolts and pitons in the rock face, and unmitigated traffic pumping tons of exhaust into Yosemite Valley. *See* Cally Carswell, *Deaths Renew Calls for National Parks to Rescind Jumping Bans*, High Country News, Jul. 20, 2015 (available at https://www.hcn.org/issues/47.12/deaths-renew-calls-for-national-parks-to-rescind-base-jumping-bans)(last accessed April 26, 2021).


**2. Informal Adjudications Prohibiting Parachuting Are Arbitrary and Capricious**

**A. Informal Adjudications Must be Supported by Reasoned Decision Making**

In *Citizens to Preserve Overton Park v. Volpe*, the Supreme Court held that informal agency adjudications –orders which are not the result of trial type procedures nor notice and comment rulemaking-are subject to judicial review and may be found arbitrary and capricious. 401 U.S. 402 (1971). Because orders resulting from informal adjudications by agency personnel are not required to be published or formalized, ascertaining the record of the adjudication is difficult. *Id.* In *Overtone Park,* the Secretary of Transportation sought to construct an interstate highway through Overton Park in Memphis, Tennessee. The Secretary's decision hinged on whether 1) there was no feasible alternative and 2) all possible options to minimize harm to the park were included in the project. *Id.* at 411. Because this decision was within the Secretary's discretion, the formal record of the decision was decidedly thin. However, as with cases involving rulemaking and trial-type procedures, the Supreme Court required that even informal adjudications be supported by an administrative record. *See, S.E.C. v. Chenery Corp.*, 332 U.S.

194, 196 (1947); *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance,* 463 U.S. 29 (1983). Although a highly formalized record was not required. *Overton Park* was ultimately remanded or continued fact finding to establish an administrative record and determine if the Secretary's decisions were outside of the scope of the enabling statute. *Id.* In remanding the Supreme Court acknowledged that an either and evidentiary hearing or production of a complete administrative record may suffice, but cautioned that "post hoc" reasoning deserves particular scrutiny. *Id*. at 420-421.

The Ninth Circuit has adopted the rule set forth in *Overton Park,* that agency action may be reviewed as arbitrary and capricious under 5 U.S.C. 706(2) to determine whether the decision was based on relevant factors required by statute. *See, Nat'l Wildlife Fed'n v. Burford,* 871 F.2d 849(9th Cir. 1989)("[b]ecause the challenged action amounts to an informal agency decision that falls neither under the APA's rule-making provisions, nor under its public adjudication provisions, we apply the arbitrary, capricious or abuse of discretion review standard"). Applying the standard from *Overton Park,* the court of appeals held that the Department of the Interior's decision to enter into coal mine leasing bids was not arbitrary and capricious, although not "supremely wise". *Id.* at 856. The court of appeals rested on a complete administrative record and findings of the district court, and found that a key consideration was whether the Department of the Interior made an unexplained policy change. *Id.*

**B. Informal Adjudications Prohibiting BASE Jumping Are Arbitrary and Capricious**

In the instant case, the history of BASE jumping enforcement in Yosemite reveals some equivocation on the part of the park rangers. *Supra* at 6. Because the 36 C.F.R. 2.17(a) did not directly address BASE jumping, the park rangers, led by Bill Wendt, had to make a decision about enforcement. While accounts of the agency action are anecdotal, it appears that BASE jumping was first considered to be a stunt, but slowly became criminalized. The accounts of early park ranger enforcement point to an agency adjudication that was not within the bounds of the organic act, and had little to do with preserving the park for the enjoyment of future generations. Clearly the rangers contemplated a legal path for BASE jumping. It was observably low impact, and was similar in many ways to hang gliding, which the NPS admitted

1    may be a reasonable activity in the statement of basis and purpose.  The rangers initiated a

2    rudimentary permit system, which was then revoked, although there seems to be no record of

3    adverse effects on the park leading the revocation.

4        Rather, the head park ranger, Bill Wendt, appeared to disagree with BASE jumping in

5    principle, but not because of an articulable impact on the park, stating "[t]here were just too

6    many free spirits, and we had to shut them down" and "I started the permit system, and I ended

7    it". *See,* Sunshine Superman (Magnolia Pictures 2014).  Widespread accounts of hostility

8    towards BASE jumpers support the conclusion that enforcement was not directed at protecting

9    park resources, but at stemming a sport thought to be objectionable or controversial, especially

10   since many alternatives existed to manage the impacts on the park. Indeed, a *prima facie* case

11   exists that the park can, and has, managed similar impacts. Concerns about cliff dwelling

12   peregrine falcons being disturbed by rock climbers are already addressed by a park policy of

13   closing certain climbing routes during nesting season. *See* Climbing Closures, Yosemite National

14   Park https://www.nps.gov/yose/planyourvisit/climbingclosures.htm (last visited April 26, 2021).

15   Similarly, the Yosemite had a permitted hang gliding allowance for several years under a special

16   use permit.  *See* Exhibit A. That program included an extensive checklist of park impacts,

17   designated take off and landing points, and thorough instructions for permit holders.  Similarly

18   New River Gorge National Park permits BASE jumping with a permit during a one day event

19   known as bridge day.  The permit is sponsored by the Fayette County, WV, chamber of

20   commerce.  *See*, Exhibit B, New River Gorge National Park Permit Application.

21       While it is clear that an administrative record of 40 years ago may not exist, *Overton Park*

22   authorized the reviewing court to conduct a searching inquiry, including testimony, to ascertain

23   the nature of the agency action.  It appears clear from the outset that the decision to ban BASE

24   jumping was motivated by animus, rather than reasoned decision making as to how to reconcile

25   the activity with the goals of the organic act.

26   / / /

27   / / /

28   / / /

1

**CONCLUSION**

2          The statement of basis and purpose supplies no reasoned analysis to prohibit parachuting in

3    the national park.  Likewise, agency informal adjudications to ban BASE jumping but allow

4    activities with similar impact is arbitrary and capricious. For the aforementioned reasons Mr.

5    Nunn now moves the court to grant relief and dismiss count two of the complaint.

6

7    Dated:  April 26, 2021                          HEATHER E. WILLIAMS
                                                      Federal Defender
8

9                                                     */s/ Benjamin A. Gerson*
                                                      BENJAMIN A. GERSON
10                                                    Assistant Federal Defender
                                                      Attorney for Defendant
11                                                    David Nunn

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28