```
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
 2

 3     UNITED STATES,
               Plaintiff,
 4                                      Yosemite, California
       vs.                              No. 6:20-po-00742-HBK-1
 5                                      Tuesday, October 12, 2021
       DAVID A. NUNN,                   11:12 a.m.
 6            Defendant.
       _____/
 7

 8

                          TRANSCRIPT OF PROCEEDINGS
 9                             MOTION HEARING
       BEFORE THE HONORABLE HELENA M. BARCH-KUCHTA, MAGISTRATE JUDGE
10
                              ---oOo---
11

12

       APPEARANCES:
13
         For the Government:            UNITED STATES ATTORNEY'S
14                                      OFFICE
                                        2500 Tulare Street,
15                                      Suite 4401
                                        Fresno, CA  93721
16                                      By:  JEFFREY A. SPIVAK
                                        Assistant U.S. Attorney
17

18       For the Defendant:            OFFICE OF THE FEDERAL
                                        DEFENDER
19                                      2300 Tulare Street, Suite 330
                                        Fresno, CA  93721
20                                      By:  BENJAMIN ASA GERSON
                                        Attorney at Law
21

22       (Appearances continued on following page)

23

24

       Proceedings recorded by electronic sound stenography;
25     transcript produced by official court reporter
```

1    APPEARANCES (Continued):

2    Court Recorder:                Kirstie Dunbar-Kari
                                    U.S. District Court
3                                   2500 Tulare Street
                                    Fresno, CA  93721
4
     Transcribed by:                Thresha Spencer, CSR, RPR
5                                   U.S. District Court
                                    501 I Street
6                                   Sacramento, CA  95814

7

8

9                        ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    YOSEMITE, CALIFORNIA, Tuesday, October 12, 2021, 11:12 a.m.

2                              --o0o--

3    (In open court.)

4              THE COURT:  Good morning, everyone.  So we're here

5    today for the oral argument on the motion to dismiss that's

6    been filed in U.S. v. Nunn, case number 6:20-po-742.

7         Just for housekeeping purposes, Mr. Gerson, obviously, this

8    is your motion so I'll let you go first.

9         I'll give the government the opportunity then to respond,

10   and then obviously if you would like to, you know, reply to

11   that, I'll give you an opportunity to reply.

12        Any other documents that the parties intend to produce

13   other than what's already been submitted and attached to the

14   briefs?

15             MR. GERSON:  No, Judge, unless you'd like an official

16   briefing at the end.

17             THE COURT:  Okay.

18             MR. SPIVAK:  Your Honor, I have one case that I might

19   reference.  Can I provide a copy to your courtroom deputy?

20             THE COURT:  Okay.  Yeah, why don't you do it at the

21   time.  Are you going to raise it in connection with your

22   argument?

23             MR. SPIVAK:  I will cite to it, yes, your Honor.

24             THE COURT:  Okay.  So how about when you then

25   respond, then make it at that point, okay?

1          MR. SPIVAK:  Yes, your Honor.

2          THE COURT:  Okay?

3          THE CLERK:  Do you want to have the parties state

4    their names?

5          THE COURT:  Absolutely.  Can you call the case?

6          THE CLERK:  Calling case number 6:20-po-742, United

7    States versus David A. Nunn.

8          MR. GERSON:  Good morning, your Honor.  For Mr. Nunn,

9    Benjamin Gerson with the Federal Defender's Office.  I believe

10   Mr. Nunn does join us by the public line today.  He's listening

11   in, but I don't think he can respond.

12         THE COURT:  Does the government want to enter their

13   appearance for the purposes of the record?

14         MR. SPIVAK:  Good morning, your Honor.  Jeff Spivak

15   and Sean Anderson for the United States, and also attending by

16   phone is a legal intern from the Park Service, Kala Peterson.

17   She's been involved in the case.  She's listening in.

18         THE COURT:  Okay, thank you.

19      And, Mr. Gerson, do you want to identify this person over

20   here?

21         MR. SPIVAK:  Excuse me, your Honor.  So with me today

22   is (inaudible).  He will be joining the Federal Defender's

23   Office, taking over the Yosemite docket.  He's here to observe

24   today.

25         THE COURT:  Okay, welcome.

1              UNKNOWN SPEAKER:  Good morning.

2              THE COURT:  Okay.  Do you want to start, Mr. Gerson?

3              MR. GERSON:  Yes, your Honor.

4              THE COURT:  Okay.

5              MR. GERSON:  Your Honor, the motion to be filed

6    attached to Mr. Nunn's case largely has to do with substantive

7    challenges to the rate of the underlying regulation was

8    initially promulgated by the Park Service, specifically that

9    there are certain procedural steps that are necessary and

10   (inaudible) well-mitigated both in the United States Supreme

11   Court as well as the circuit court.

12        The government, in their response, didn't respond to the

13   substantive argument that didn't raise there may be possible

14   procedural bars, and so I think that logically we proceed on

15   that point, first to address the procedural bar, the

16   (inaudible).

17        The issue that the government, which I think is probably

18   the primary issue moving forward, is whether or not Mr. Nunn,

19   A, has exhausted his administrative remedy for challenging this

20   as an affirmative defense to lead to the criminal case

21   currently brought against him, and, second, whether or not he

22   had waived any challenges based on the 60-year statute of

23   limitations because he had a prior conviction with the same

24   crime in 1998.

25        So, forgive me, this is a little bit basic and I could fast

1   forward if you want, but I do want to try to give a complete

2   picture.

3       The Administrative Procedures Act doesn't allow for a

4   judicial review.  There's a presumption in favor of judicial

5   review in challenging all agency actions.

6       There is a case, and I apologize, Mr. Spivak is more

7   considerate than I am.  He brought copies for the Court and not

8   what I consider (inaudible).  It is 434-US-275, 1978.

9           THE COURT:  Do it again?  34?

10          MR. GERSON:  I'm sorry, 434-US --

11          THE COURT:  434, uh-huh.

12          MR. GERSON:  Yes.  *United States v. Porter*, 275.

13          THE COURT:  Okay.

14          MR. GERSON:  Which involved a statutory preclusion to

15  the administrative regulation.  So the general rule that we're

16  working from is that given a presumption in favor of judicial

17  review for agency action, Congress can, in the enabling

18  statute -- not the administrative regulation -- the enabling

19  statute passed by the legislature preclude or at least limit

20  the jurisdiction of certain administrative regulations.

21      So in that case -- that was (inaudible) plaintiff and had

22  been cited and brought -- had a criminal prosecution brought

23  against him by the Environmental Protection Agency for

24  disbursing asbestos into the air.

25      They claim that that was not within the EPA's ability to

1   regulate emissions, right, asbestos not be able to (inaudible)

2   an emission standard, and emission standards being precluded by

3   Congressional statute based on judicial review.

4        The unimportant part of that case is that, you know, they

5   meant to skirt the issue.  The Supreme Court did rule in their

6   favor, finding asbestos is not an emission.  The more important

7   part is that Justice Powell wrote a concurrence to that opinion

8   making very clear that Congressional --

9            THE CLERK:  Excuse me, I'm so sorry, can you speak

10  just a little bit closer to your mic?  I just got a message in.

11  Thank you.

12            MR. GERSON:  Sure.  So in that case the guidance from

13  the Court, I don't think this is an issue that's been fully

14  litigated in the Supreme Court or in any of the other circuit

15  courts, is that even given Congressional limitations or

16  jurisdictional preclusions to challenging administrative

17  action, they have to be extremely narrowly construed;

18  otherwise, they implicate very serious due process concerns,

19  particularly notice.

20       The average person is not on notice, all is published in

21  the Federal Register, they don't know, you know, an obscure

22  publication that some industry insiders, they pay attention to

23  very closely, but the average person certainly does not pay

24  attention to it.  The average lawyer probably doesn't pay

25  attention to it.

1        Having some kind of jurisdictional preclusion or a time

2   limit that's only published in the Federal Register really goes

3   to the notice requirement of due process.  I understand that in

4   that case it's largely dicta, it comes in the form of

5   concurrence but it doesn't guide the rest of the public case

6   here.

7        You know, that is it seems extremely unlikely that we would

8   have what the government is asking for where a person engaged

9   in a prior criminal prosecution would somehow waive their right

10  on subsequent criminal prosecution to have judicial review of

11  the agency action in the underlined regulation, okay?

12           THE COURT:  So you're citing the *Adamos* case in

13  connection with their procedural argument that his failure to

14  raise this previously when he was charged with this offense

15  precludes him from raising it and/or the statute of limitations

16  that they're utilizing for challenging, is that --

17           MR. GERSON:  That's correct.  So the government's

18  position is that in 1998, Mr. Nunn was cited, he had six years,

19  I guess, pending that criminal prosecution, obviously

20  complicated because he pled guilty to raise that challenge but

21  did not.

22        And my position would be based on the unlitigated issue, it

23  seems fairly predicable especially given the concurrence in

24  *Adamos* that those kinds of restrictions really run afoul of due

25  process rights.

1          And even if there are statutory preclusions, you know, the

2     enabling statute given by Congress, they have to be extremely,

3     extremely narrow.

4               THE COURT:  Uh-huh.

5               MR. GERSON:  Here, you know, the government is kind

6     of reading this in because the enabling act, you know,

7     (inaudible) for the National Park Service doesn't include any

8     of those Congressional restrictions on jurisdiction or on time

9     limits or on anything else, and so it would go straight to the

10    District Courts as the court of first instance, as we are now,

11    without any other Congressionally-intended restrictions on it.

12         The government's legal reading of these statute of

13    limitations, I think, is severely impacted by the due process

14    rights that the average person is not going to be on notice,

15    that they only have six years of challenges, and there's sort

16    of hoops they have to jump through.

17         And that's also in addition to the fact that his criminal

18    case now, as we pointed out in our brief, is a completely

19    subsequent act, it's completely separate.

20              THE COURT:  Uh-huh.

21              MR. GERSON:  And, you know, whether or not we want to

22    frame that as -- you know, the government is arguing we need to

23    frame it as a residue (inaudible) argument, as a collateral

24    estoppel argument, as a procedural default argument.  None of

25    those really apply because the issue was never really fully

1    litigated, which is the key component of all of those

2    doctrines, it was never fully litigated in the first instance.

3              THE COURT:  Right.  Right.

4              MR. GERSON:  You know, and I can't imagine any other

5    criminal act where you could commit one crime, choose your

6    defense strategy, and in the future be precluded based on your

7    choices in that case.

8              THE COURT:  I guess absent there being a waiver in

9    the future, I don't suggest that you -- the government's

10   implying the bill was in that plea agreement a waiver that he

11   is precluding from ever waiving -- any raising ever defenses

12   that he might subsequently have in the future.

13             MR. GERSON:  I would assume not, although I don't

14   think we have the transcripts of that particular hearing handy.

15   It would be interesting research projects.

16       The other issue that the government raises rests primarily

17   on the case of *Backlin*, which is whether or not -- you know,

18   the second part of that test, I think we've addressed those,

19   the statute of limitations apply.  Our position is that it does

20   not in this case.

21       We are well within the administrative non-conduct of this

22   summer or this year, excuse me, last summer.

23       The question is whether or not he's administered or

24   exhausted these appeals in order to get to review in the

25   District Court.

1      Our position is that there were no administrative appeals

2  to exhaust.  The history of the park services regulation of

3  base jumping goes back nearly 40 years to the early 1980s.

4  There was based on our research, a very rudimentary permit

5  system at the time I think it only existed for three or

6  four months, and at the time the Chief Ranger Bill White had

7  decided to summarily cancel the permit system and ban base

8  jumping altogether.

9      And the quote that he's given in a very good documentary on

10  the issue is he that didn't want to increase spirits in the

11  park, right?  So the definition of arbitrary capricious

12  decision making which is the second part of our argument here.

13      But the point is that while there was a permanent system,

14  it no longest exists.  There was no way to apply for a permit.

15  If you were denied, there's no way to appeal a permit.  And

16  then after your appeal is timely within the statute of

17  limitations, bring it to the District Court.

18          THE COURT:  So just run me through what you

19  understand, if indeed there was a permitting system, you

20  believe he would have had to have done for purposes of

21  exhaustion?  And do you concede that there is an exhaustion

22  requirement prior to him challenging?

23          MR. GERSON:  You know, no, I do agree with the whole

24  new *Backlin* that there is an exhaustion requirement.

25          THE COURT:  Okay.

1           MR. GERSON:  The exhaustion requirement, I think, is

2    met because we can jump straight to a final administrative --

3    final agency action.  And the commercial fisherman case, I'm

4    sorry I don't remember the exact attachment for it, so I can

5    come back to that.

6       But to answer your question, *Backlin*, I think, lays it out

7    very clearly where you can apply for a permit from the park

8    service or the forest service or whoever is governed by Title

9    36, they can deny and you can appeal it through their

10   mechanism, and that at the end of that then you're entitled to

11   bring it either as a lawsuit or as a defense to criminal

12   prosecution as long as you're within the statute of

13   limitations, you're entitled to that because you've exhausted

14   your administrative remedies.

15      In this case the administrative remedies are exhausted.

16   There is no permit system, there is no way to apply for it,

17   there's no way to appeal it.  I mean, I don't think that a

18   single person even knows who you would send your application

19   based on to in the park, and the park's own action basically

20   said, "We got rid of the permit system."

21           THE COURT:  Where does the park's action say they got

22   rid of it?  Is it in that documentary that you're talking about

23   or --

24           MR. GERSON:  That's correct.  That's the best

25   information that we have.  So Bill White, who was the head

1  ranger in the early 1980s when this first became a thing, I

2  guess, initially thought this was entertaining, and my

3  understanding is that he's still with us and lives in Mariposa.

4          THE COURT:  Uh-huh.

5          MR. GERSON:  He said he initially thought it was

6  based on explore -- it was entertaining or a stunt or whatever,

7  and instituted a rudimentary permit system, or kind of keep

8  track of people and regulate it a little bit.  It has gained

9  popularity, people try to do more adventurous jumps and they're

10  using things like pogo sticks and launch the (inaudible), given

11  the nature of our extreme sports culture analyses, not very

12  serious.

13     He decided, in his words, there were too many free spirits

14  in the park and he ended the permit system summarily, and that

15  was, you know, an internal decision on his part as head of law

16  enforcement in Yosemite National Park.  And, to my

17  understanding, there's never been a permit system since then.

18          THE COURT:  Okay.  So -- and I want to bring this up

19  out front, I don't want to, you know, hit you from left field,

20  basically.

21     So in reviewing the compendium, because I looked at the

22  superintendent's compendium, and I did note that there is --

23  that particular provision is listed as one for which a permit

24  can be applied for.

25     Are you aware of that?

1          MR. GERSON:  Judge Oliver did that, and my

2   understanding given the nature based on being in the park is

3   that no (inaudible) has been aware of that, because every

4   single -- based on what seems to be illegal, I think if that

5   was available, it would have circulated through the base

6   jumping community and become, you know, common knowledge.

7      So my understanding is that even if it is listed in the

8   compendium, there's probably some artifact.  I can't imagine

9   that based on the permit it would ever be granted.

10          THE COURT:  Okay.  I'm just -- just for purposes, so

11   you're aware, I'm looking at -- I had printed out the

12   compendium that was signed by Ms. Maldoon (phonetic) dated the

13   26th of March, 2020.  And under -- on page 21 under 36 CFR

14   section 1.67, which is the permitting statute of the CFR, it

15   says, "The following is a compilation of those activities for

16   which require a permit from the superintendent."

17      And then if you go down to section 2.17, aircraft and air

18   delivery A3, "Delivery or retrieval of a person or object by

19   parachute, helicopter, or other airborne means."

20          MR. GERSON:  Judge, there have been many, many cases

21   of base jumping in the park, and I've been in touch with one of

22   the authors cited in our brief extensively, the premier

23   (inaudible) on base jumping, and that book I'd be happy to

24   share with the Court if you weren't able to get a copy.

25      It's full of anecdotes about what he calls the blood

1  thirsty nature of Yosemite Park Rangers in which every

2  permeatation (phonetic) possible to stop base jumping, rescue

3  people and then land, et cetera, et cetera, so I don't think

4  that that information has ever been published.  Again, it is a

5  notice issue where the average person has access to the

6  Yosemite compendium, just so there's not anything -- I mean,

7  for example, I believe the hang gliding permitting process is

8  advertised on the website, (inaudible), which does allow BASE

9  jumping as part of a specific BASE jumping day, has that

10 information available on the website.

11     I'm not sure that's published in an internal agency manual

12 really meets the criteria needed in a process that has to be

13 exhausted.

14          THE COURT:  Okay.  Okay.  Go ahead.

15          MR. GERSON:  So our position, Judge, is that given

16 the exhaustion requirement that's brought in *Backlin*, the

17 National Park Service's practice of an absolute ban on BASE

18 jumping where, you know, total ban and total enforcement has

19 been the practice for nearly 40 years, really falls well within

20 the category of an empirical approach to final agency action

21 which gets you the exhaustion requirement.

22     And so the case -- I apologize I have a brief, let me get

23 that for you.  Was the *San Francisco Herring Fishermen v.*

24 *National Park Service* -- I'm sorry, excuse me -- the *Department*

25 *of the Interior*, that's 946 F.3 564, it's in our final reply

1    brief.

2        Basically, the Court of Appeals says that empirical action

3    on the part of the agency can be assessed to be filed in the

4    action.

5        And so in that case commercial fishermen had been asking

6    for many years to fish in the Golden Gate recreation area, and

7    the Park Service had time after time denied them, refused to

8    negotiate, refuse to come to the table, refused to do any kind

9    of permit system.

10       And the Ninth Circuit Court of Appeals, based on the

11   agency's intransigent that was empirically final agency action,

12   which I think is the same factual scenario that we're looking

13   at right now.

14       You know, so I think that that satisfies the requirement

15   that I think the government correctly puts forth under *Backlin*,

16   Mr. Nunn meets both of them, and is entitled judicial review of

17   the underlying regulation.

18           THE COURT:  So now getting to the underlying

19   regulation.

20           MR. GERSON:  Getting to the underlying regulation.

21   So I want to make clear just at the outset, this is an

22   as-applied challenge, we're just asking you to throw out the

23   entire regulation.  We're just asking you to hold the

24   government to its burden, and that it has to be specific as

25   applies to BASE jumping.

1          And so, you know, the fundamental rule here is that

2     agencies can't just make rules willy-nilly, they have to apply

3     what is called a reasoned analysis in a statement of basis and

4     purpose.

5          The issue in the Federal Register setting forth these

6     things is really devoid of any kind of statement based purpose

7     except for on Yosemite (inaudible) hang gliding made it in

8     there, hovercraft made it in there, I'm not quite sure why.

9          But really fails to discuss, you know, a lot of the

10    technical issues surrounding aircraft use in the park.  The

11    D.C. Circuit, which is, you know, the primary court for

12    administrative law challenges --

13              THE COURT:  Uh-huh.

14              MR. GERSON:  -- made clear in the case, which was the

15    garment manufacture's union that blanket prohibitions without a

16    reasoned analysis are arbitrary and capricious.

17         And so in that case you can't just lump together all air

18    crafts.  And so in that case the issue was whether people

19    employed in garment manufacturers could work from home as

20    opposed to commuting to a factory floor.

21         And the issue from the Department of Labor standpoint was

22    the enforcement of wage and hour laws.  However, that would be

23    more expedient for some workers and probably for industry to

24    have people work from home if they're doing sewing and knitting

25    type work.

1      When the Department of Labor repealed that requirement,

2   everybody show up to work, because that makes it easier to

3   enforce wage and hour laws, the D.C. circuit basically said,

4   "You can't lump everybody together."

5      In fact, a small subset of these workers, those who work

6   from home, not those who live in a city where it's easy for

7   them to come to a factory, and you have to give some kind of

8   reason analysis to differentiate these things.

9      And so to grand, you know, group all aircraft together

10  falls into the same type of error where it's not that all

11  aircraft are created equal -- and, you know, there's certainly

12  a strong argument that we don't have to read deeply into it,

13  but some aircraft activity is going to run against the national

14  park's mission of preserving the park for future generations.

15  So we can't have jet planes landing in a natural park, we can't

16  have lifts or increased helicopter activity or things like

17  this.

18      But that's very different from hang gliders, parachutists,

19  you know, BASE jumpers which have really negatively low impact.

20  And I think the parks own studies have shown that because they

21  did do environmental impact assessment when they instituted a

22  hang gliding permit system based -- showing that it had an

23  impact and it could be managed on certain days and it was a

24  process to go through.

25      You know, so that's kind of the first error from

1  administrative law point of view that the -- you know, that it

2  is arbitrary and capricious.

3      The second error I think is that -- which falls into

4  Overton Park analysis, is that that internal agency decision to

5  suspend BASE jumping, to take away the permit system in the

6  early '80s by a chief law enforcement ranger, you know, is

7  really -- is also subject to the same kind of reasoned analysis

8  judicial review.

9      So in order to say there's too many free spirits in the

10 park or I don't like this activity or it's controversial does

11 not go through that even though the process of making that

12 decision is exempt from notice of common rule making where

13 trial-type procedures set out in the APA, that kind of

14 day-to-day decision making is made in the park, which probably

15 covers much of the daily life of the park.  He's still subject

16 to that kind of analysis where you have to say, "Why is this,

17 you know, why is this banned?"  We want the government to

18 answer the question why.

19     And, you know, the goal here is not so much, you know, we

20 want BASE jumping or we want anarchy in the park or we want

21 people jumping off cliffs.  Is that we're really asking the

22 Court to hold the government to effort to just ask the Park

23 Service to use specific reasons, specific analysis as to why

24 they want one thing banned and one thing not banned.

25     Hang gliding is very similar but it's allowed, so what's

1    the difference?  You know, the Supreme Court is very clear that

2    it is not up to the Court to answer that question when the

3    government doesn't put that on the record, and so that's the

4    question that we would like the government to answer.

5        And if they do do that and they do it correctly, you know,

6    the state of administrative law is they're entitled to an

7    enormous amount of deference.  So really it's in their favor to

8    do it, we're just asking the Court hold them to that burden.

9              THE COURT:  Okay.  And your claim is that they didn't

10   do it when they adopted the regulation back at the --

11             MR. GERSON:  That's correct.  And so -- right.  So

12   the two --

13             THE COURT:  Because your reference is under the

14   Federal Register, and I printed that out exactly what was

15   discussed in connection with each of these, is that there's no

16   mention at all as to BASE jumping.  And the only comment that

17   2.17 aircraft and air delivery, the only mention as to either

18   is to hovercrafts or to hang gliding.

19             MR. GERSON:  That's right.  And not only is it

20   mentioned, because I think leaving it out is one problem, but

21   also giving some kind of explanation as to what the rational

22   is.

23       And so the Park Service has even gone so far as to say,

24   aircraft of a certain way, aircraft of a, you know, certain

25   wingspan, aircraft that are fixed wing as opposed to rubber

1   wing, aircraft that are, you know, canopies, you know, have

2   different regulations attached to them and differentiate it.  I

3   think that would get them much closer to the burden of giving

4   us reasoned analysis and why certain things were banned.

5       I understand that the Park Service, you know, they're not

6   required to use notice of common rule making, they chose to,

7   they kind of bound themselves to the mass by doing this.  And,

8   you know, 1.6 -- CSR section 1.6 is kind of the internal rule

9   making process that they've established for themselves.

10      And again, it's not -- it is almost the same defect where

11  we don't see this reasoned analysis as to why it is banned or

12  not banned.  Again, I would just point out that in terms of

13  1.6, just coming back to that briefly, I think the major

14  difference between publishing the compendium versus the hang

15  gliding examples and the hang gliding has gone through the

16  enormous review process, it has an open permitting process, it

17  has a mechanism to appeal it where this, you know, BASE jumping

18  permit allowance in 1.6 of the compendium is really

19  (inaudible).  I'm the attorney on the case and I haven't even

20  seen it.  So it certainly falls in the same kind of notice

21  defect, just as Powell points out about due process.

22              THE COURT:  Okay.  All right.

23              MR. GERSON:  Judge, we appreciate an opportunity to

24  reply, and, of course, extend that courtesy to the government.

25              THE COURT:  Okay, thank you.

1            MR. GERSON:  Thank you.

2            MR. SPIVAK:  Good morning, your Honor.

3            THE COURT:  Good morning, Mr. Spivak.  Welcome to

4   Yosemite.

5            MR. SPIVAK:  I'm sorry?

6            THE COURT:  I said welcome to Yosemite.

7            MR. SPIVAK:  Thank you so much.  Thank you for having

8   us in person.

9       I've handed the Court a copy of *United States v. Albers*,

10   226 F.3d 989, that's a Ninth Circuit published case, 2000.

11   As -- to the best of my understanding, it's sort of the leading

12   case or perhaps the only real case on the regulation 2.17

13   that's at issue here today.

14            THE COURT:  Right.  But isn't *Albers* really a case

15   dealing with the facial attack as the vagueness as to -- and I

16   don't think Mr. Gerson's argument is that he's not challenging,

17   unless --

18            MR. SPIVAK:  Yes.

19            THE COURT:  -- correct me if I'm wrong, I don't think

20   Mr. Gerson is saying that 2.16(c)(3) is facially vague, that it

21   doesn't encompass within the language itself BASE jumping which

22   is what *Albers* is really talking to, isn't it?

23            MR. SPIVAK:  Yes, your Honor.  I think that's right.

24            THE COURT:  Right.  So I don't think -- so you're not

25   talking -- Mr. Gerson, correct me if I'm wrong, I don't want to

1   speak for you, but you're not arguing that 2.16(c)(3) is

2   facially vague, you're challenging under arbitrary and

3   capricious the adoption of the regulation and the underlying

4   contract (inaudible) side as to (inaudible).  The statute

5   itself was statute was facially --

6              MR. GERSON:  That's correct.  I don't think we debate

7   that based off if it involves a parachute or delivery into the

8   park, it is really a question of why the park wants to prohibit

9   that.

10             MR. SPIVAK:  I think the other thing that *Albers*

11  stands for is that, at least as late as the date of this case,

12  late '90s, maybe the year 200, it was published that Park

13  Service had taken the position that BASE jumping fell under

14  2.17.  And so if you go to the six year statute of limitations

15  issue, I will get to.

16             THE COURT:  Okay.

17             MR. SPIVAK:  There's also, I don't know for what

18  degree it is helpful and probably not for today's hearing,

19  there is some comments from the Ninth Circuit in the last

20  paragraph as to the danger of this activity.

21             THE COURT:  Okay.

22             MR. SPIVAK:  So in looking at the briefing of the

23  parties, I think two things are happening.  The first is that

24  this is a super complicated legal issue, I'd call it creative

25  and difficult, and I think also I would say is that the briefs

1    scratch on a lot of issues.  And that, with all respect to the

2    defendant's brief and the government's brief, I don't think

3    they're as clear to the Court as they probably could be.

4         And I think for that -- you know, because of that -- I

5    apologize, the briefing, I think, could have been more clear.

6    It is a complicated issue, we consulted.  We're in kind of the

7    criminal division, we consulted the civil, and I said, "Yes, we

8    do APA, but not criminal.  That's criminal."

9         And criminal says, "No they're civil for APA."  Of course

10   it's got this administrative law component.

11        And so the only case -- and, of course, it is the

12   defendant's motion, it is the defendant's burden.  They notably

13   cited to no criminal cases.  The only case cited to by the

14   parties that is criminal is *Backlin*.  And because we think

15   *Backlin* is controlling, our opposition brief essentially said

16   "We think *Backlin* ends the discussion both on exhaustion and

17   statute of limitations, and we'd ask the Court to stop there.

18        If the Court disagrees and thinks, "No, we think we do need

19   to get to the merits of the action," we would ask additional

20   leave of the Court.

21        I'm sorry, I know Mr. Gerson is departing, although I

22   understand he's going to keep the case, leaves to supplement

23   the record.  Because there's, obviously, the administrative

24   record for the adoption of the regulation in the '80s, there's,

25   I guess, the sort of de facto application, the citations to

1    what the chief ranger or the superintendent was saying about

2    BASE jumping, none of that's in the record.

3        And so if the Court finds that *Backlin* isn't controlling,

4    we'd ask to kind of supplement the briefs, supplement the

5    record, and then we can have kind of a more wholesome

6    discussion on the adoption of regulation and all that.

7        And I think that, and I apologize to the Court, maybe we

8    should have done that upfront, and I think it wasn't until we

9    kind of got preparing for argument, really, why there's

10   probably a lot more here that the Court should have.

11            THE COURT:  So let me just ask you, Mr. Spivak, does

12   the government concede Mr. Nunn has standing to challenge,

13   because he has been charged -- now your argument is that he's

14   previously been charged, so somehow his past charge somehow

15   precludes him in the future from challenging the statute.

16       Let's presume Mr. Nunn had not previously been charged.

17   Let's just -- I want you to take that as fact, had not

18   previously.  Would you concede that Mr. Nunn for the first time

19   facing, you know, this charge would have standing and then

20   challenge that regulation under the APA?

21            MR. SPIVAK:  Can I get the assumption there one more

22   time?  If he hadn't been charged in 1998 --

23            THE COURT:  Setting aside the fact that he previously

24   has been charged with the same offense in the past, okay, let's

25   say he had not been previously charged in the past, this is his

1    first charge for this offense.  Do you concede that if brought

2    within six years of that charge, he then has standing to

3    challenge, and he can challenge it in this form before he has a

4    conviction on it?

5                   MR. SPIVAK:  No.  I think the six-year ban would

6    still apply because the final agency action was in 1983.

7                   THE COURT:  So you're saying the six years is the

8    agency action?

9                   MR. SPIVAK:  Is the agency action.  And --

10                  THE COURT:  So then an individual who may have been

11   born before an agency action would forever lose an opportunity

12   to challenge an agency decision that ultimately may cause them

13   injury?  I mean, isn't the core of standing that you're

14   injured, and that there's a nexus between the action and the

15   injury, and that you -- you're prevailing remedies that injury,

16   right?  That's the core standing, right?

17                  MR. SPIVAK:  I think so, your Honor.  I don't know

18   standing law --

19                  THE COURT:  Yeah.

20                  MR. SPIVAK:  -- but I think that is the crux of it.

21                  THE COURT:  Right.

22                  MR. SPIVAK:  And so I think where the Court is going

23   is, "Well, how is that fair?"

24                  THE COURT:  Huh.

25                  MR. SPIVAK:  I think my first response is, "Well,

1  there's lots of law.  There's lots of laws, and that's just the

2  way it is, and that's what 28 U.S.C. Section 2410 says.  You

3  have six years from the right the action first accrues.

4          THE COURT:  So I guess what -- and does that statute

5  define when the action accrues, when the right accrues?

6          MR. SPIVAK:  Generally, and this is page 8 of the

7  government's brief at lines -- the paragraph is the bottom

8  paragraph on page 8, line 21.  "For the purposes of a suit

9  challenging agency action under APA, the right of action

10  generally accrues on the date of the final agency action."

11  This is a citation to a Ninth Circuit case.

12      "If a person wishes to challenge a mere procedural

13  violation in the adoption of a regulation, and I'll tell the

14  Court just to pause, I don't quite understand.  On the one hand

15  you hear argument from the defendant that seems to be, "Oh, it

16  was arbitrary and capricious at the time of the adoption,"

17  which I think was in 1983.  And then it kind of shifts to, "No,

18  we're not trying to strike the regulation, we're bringing an

19  as-applied challenge," and I don't really know what an

20  as-applied challenge is or even if that is a term under the APA

21  as applied.

22      So now I'm thinking, well, then does that mean the agency

23  action is what?  I don't know.  I don't know what the agency

24  action is that the defendant complains about because it seems

25  to shift a little bit.

1    But continuing on.  "If a person wishes to challenge a mere

2    procedural violation in the adoption of a regulation or other

3    agency action, the challenge must be brought within six years

4    of the decision."  And citation to *Wind River*.

5        "And then if the challenger can test the substance of an

6    agency action, they may do so later than six years," *Wind*

7    *River*.

8        And I think what the Court -- what the Ninth Circuit is

9    alluding to there is the idea -- two things.  What *Wind River*

10   says, continuing on, is that "The government should not be

11   permitted to avoid all challenges to its action simply because

12   the agency took the action long before anybody discovered the

13   true state of affairs.

14       So I think that's the one scenario, like they passed this

15   regulation, six years passes, it's in some kind of archive and

16   nobody's ever seen it.  Well, maybe we shouldn't use that

17   six-year limitation.

18       But I think what *Albers* says or illustrates, and I think

19   defendant conceded it, is that this has been an open issue

20   known to everybody in this area, and particularly in the BASE

21   jumping community for years.  I think defense argument was that

22   there's been essentially, I think he said, "total ban for

23   40 years."

24       So you have open knowledge of the ban, you have litigation,

25   published Ninth Circuit litigation around whether BASE jumping

1   is subject to this ban, you have defendant's own 1998

2   conviction for the ban -- for this ban, and so under that we

3   think, yeah, this six year statute -- statute of limitations

4   applies.

5       I talked about *Backlin* at the start, and if I could just

6   cite just two sentences, I think it's two sentences, because

7   (inaudible) is at page 1,000.

8       And this is, as the Court probably recalls, this is two

9   defendants, their cases were consolidated, they were doing

10  mining on forest service land, they wanted to live there --

11              THE COURT:  Right.

12              MR. SPIVAK:  -- and dispute, is the house part of the

13  mining operation is it not, back and forth.

14              THE COURT:  Okay.

15              MR. SPIVAK:  Ultimately, the Forest Service says,

16  "No, you can't do this, get out."  One defendant kind of

17  appeals it up to the administrator, the other doesn't.

18      And so what the Ninth Circuit says about this, the only

19  case that I found in the Ninth is the intersection between APA

20  and criminal law.

21              THE COURT:  Uh-huh.

22              MR. SPIVAK:  What the Ninth says is, "We therefore

23  hold that the APA for the person in *Backlin's* condition at

24  least two options for obtaining judicial review of the disputed

25  agency action."  Two options.

1    "One, you may file suit in District Court under the APA, or

2    you may challenge the agency's decision in a subsequent

3    criminal proceeding."

4        But this is the important sentence, "In either case, he

5    must act within the six-year limit."

6            THE COURT:  So is that six years from the criminal

7    action?

8            MR. SPIVAK:  That -- that is from the administrative

9    denial, as best I understand it.  And so --

10           THE COURT:  But wouldn't -- the Court is saying you

11   have two opportunities, right, you have A or B?

12           MR. SPIVAK:  Right.

13           THE COURT:  But B, by virtue of itself, right, the

14   criminal activity of what -- if that was passed that day,

15   you're saying that that must be within, so what's that

16   referring to, I guess?  That's what I'm asking you.  Do you see

17   what I'm saying?

18           MR. SPIVAK:  Yes.

19           THE COURT:  That modifier, is it referring to

20   everything's within six years, or six years from the date of

21   each of those actions that final agency action or the date of

22   that criminal conviction?  Do you see what I'm saying?

23           MR. SPIVAK:  Right.  I do.  I do.

24           THE COURT:  So wouldn't that -- sort of the

25   implication addressing the fact that it can't be from the

1    agency action if their Court is saying you have one of two

2    things, why wouldn't they have just said, "It's agency action,

3    it doesn't matter?"  Why would it give the option of number

4    two?

5              MR. SPIVAK:  Yeah, that's an interesting point.  And

6    I think -- I guess that's right.  I mean, I think you're right.

7       Now, the problem is, is that in that case there was agency

8    action.

9              THE COURT:  Uh-huh.

10             MR. SPIVAK:  So there was a decision made, and there

11   was a record of sort of -- it kind of goes to the exhaustion

12   argument.  But they at least attempted to go through the

13   administrative channels, and only were they rejected -- after

14   they were rejected that they were prosecuted.

15             THE COURT:  Because I would have -- and I'm not

16   saying this is how I'm -- where I'm going, but my gut is is

17   that, again, there's an injury, right?  So that's where your

18   standing starts.  I mean, everyone has six years to challenge

19   the regulation.  If I'm in a group out there monitoring this,

20   right, I don't have to wait to be charged with an offense to

21   have standing.  I have six years because the AP recognizes that

22   I can come in as an interested part and challenge that.

23      Absent that is that you can do it at that point or you can

24   have -- you can be facing a criminal conviction that then

25   triggers that time period for you within which to challenge.

1          MR. SPIVAK:  I think you're right.  Now, the only

2    hesitance I have is it goes against sort of everything that the

3    APA is trying to do in establishing criminality for agency

4    decisions.

5          THE COURT:  But doesn't it still do that in theory

6    when it comes to the gist of the majority of what these

7    regulations are really geared at, which is, you know, more for

8    the larger groups that they may be affecting as a general

9    matter as opposed to an individual who is facing a criminal

10   offense as a result of the regulation?

11         MR. SPIVAK:  Yeah, I think what's hard about that

12   here is that the finality you referenced that would still

13   exist --

14         THE COURT:  Uh-huh.

15         MR. SPIVAK:  -- is the very finality I think at its

16   core the defendant is arguing.  And he'll say "I'm not

17   challenging the regulation," but then the citation is to

18   arbitrary and capricious and adoption of the regulation, so

19   that is not the agency action.  I guess I'm confused what the

20   agency action is.

21         THE COURT:  Uh-huh.

22         MR. SPIVAK:  It cannot be that any enforcement of the

23   regulation by the Park Service is an agency action, because

24   that would render the APA basically meaningless.

25         THE COURT:  Right.

1      MR. SPIVAK:  Every defendant would simply give APA

2  challenge -- APA challenge every regulation enforced, that

3  can't be the law.

4      THE COURT:  Uh-huh.

5      MR. SPIVAK:  And that's not really the purpose, I

6  don't think, of the APA.

7      THE COURT:  Uh-huh.

8      MR. SPIVAK:  It's to --

9      THE COURT:  Right.  But these are unique because

10  unlike the US code, do you know what I mean, that's adopted

11  through legislative action or whatever, do you know what I

12  mean?  It's a different beast, right?  So it's a way of

13  challenging.  I mean --

14      MR. SPIVAK:  Yeah.  But it's a procedure or

15  a regulation, I'm sorry --

16      THE COURT:  Uh-huh.

17      MR. SPIVAK:  -- that's been in place for four years.

18      THE COURT:  Uh-huh.

19      MR. SPIVAK:  And now 40 years later, I think in this

20  court the defendant is trying to go back and re-visit the

21  adoption of that regulation, and that's -- I think the citation

22  is arbitrary and capricious.  What is arbitrary and capricious,

23  maybe the defendant can clarify that.

24      THE COURT:  Uh-huh.

25      MR. SPIVAK:  Is it the ranger issuing the ticket, is

1    it the Park Service taking the position that BASE jumping falls

2    into that?  It's one thing the Ninth says in *Albers* is that

3    BASE jumping is not "the most organic fit for that crime under

4    that particular regulation."

5              THE COURT:  Uh-huh.

6              MR. SPIVAK:  Yet they conclude the agency's

7    interpretation of its regulation, given deference, and,

8    therefore, if the Park Service says it's BASE jumping and it

9    looks like it falls under the definition, well, that's BASE

10   jumping, and it qualifies -- (inaudible) it was a parachute

11   delivering a person or a property, a parachute, whether that's

12   prohibited.

13      And I think I lost my train of thought.  But is that the

14   agency action?  The idea that that BASE jumping does fall

15   within that, also more than six years ago -- so I think that's

16   our view.  The Court cited to the compendium --

17             THE COURT:  Uh-huh.

18             MR. SPIVAK:  -- regarding the application for a

19   permit.

20             THE COURT:  Uh-huh.

21             MR. SPIVAK:  And that tracked the regulation.

22   2.17(a)(3), the regulation at issue.  It says the same thing

23   about permits.

24             THE COURT:  Uh-huh.

25             MR. SPIVAK:  The following is prohibited.  A person

1   or object by parachute, parachute, or other airborne means,

2   except in emergencies involving public safety or serious

3   property loss or pursuant to the terms and conditions of the

4   permit.

5       So I think at a minimum the *Backlin* exhaustion analysis

6   would apply, and I think defendant conceded that there is an

7   exhaustion requirement, that by plain language, pursuant to a

8   terms and conditions of a permit, the defendant should have at

9   least been required to apply for a permit, be denied, there's

10  an analysis as to why conditions are applied by the

11  superintendent.  That wasn't done.  Instead we know what's

12  going on, it's not interested in following the law, he's just

13  interested in BASE jumping, which is what his second offense

14  is.

15      But, on account of that, he's borrowed from seeking relief

16  on that basis.  I think that's all I wanted to note.  Any

17  questions?  I'm not sure I can answer them, but --

18          THE COURT:  I guess my question is if indeed there is

19  in the compendium a provision that does explicitly recognize

20  that a permit is available for that, albeit I think the

21  defense -- the defendant's argument is going to be that through

22  smoke and mirrors there's no real thought given to that process

23  that that's going to be denied, out of kilter, given the

24  history here.  But if indeed there's a formality that you need

25  to go through nonetheless to check the box, is it your position

1   then that it's an exhaustion issue as opposed to a time bar?  I

2   mean, are you doing either/or, or are you believing that it --

3            MR. SPIVAK:  I still believe it's both because I

4   think the regulation is 40 years old, or at least even

5   interpretation of the regulation as applied to BASE jumping is

6   at least 20 years old.  I do think it's barred.

7            THE COURT:  When you say 20 years old, why do you

8   think it's 20 years old?

9            MR. SPIVAK:  Well, I was citing to the data that --

10   oh, that's in Arizona.  I guess I would need further fact

11   finding on that.

12            THE COURT:  Has any other court interpreted that

13   provision to include BASE jumping?

14            MR. SPIVAK:  Not that I'm aware.  Well, there's a

15   case out of St. Louis, I don't remember if that's a circuit

16   case or not, *Ox*.

17            THE COURT:  Yes, I've seen *Ox*.

18            MR. SPIVAK:  I think that's an old -- I mean, I guess

19   defendant says 40 years, it's been 40 years, total ban

20   40 years, I think he said.  And defendant was prosecuted for

21   this offense in '98 in the docket, or I believe it's in ECF.

22            THE COURT:  I believe there's two out of this

23   district.  Okay.

24            MR. SPIVAK:  There might be another one.

25            THE COURT:  I think there's one more out of this

1    district, actually.  It was Carry (phonetic).  That was 2019,

2    uh-huh.  It is whether or not who had the burden of proof --

3              MR. SPIVAK:  I actually handled that case.

4              THE COURT:  Uh-huh.

5              MR. SPIVAK:  Interestingly enough, it's not really

6    relevant.

7              THE COURT:  Right.

8              MR. SPIVAK:  Yeah.  But to get back to the question

9    of exhaustion.

10             THE COURT:  Uh-huh.

11             MR. SPIVAK:  Had Mr. Nunn gone to the superintendent

12   and applied for a permit and was denied, I think it's possible,

13   I'm not conceding this, there might be an agency action that we

14   could litigate here.  In other words, what was the basis of

15   that?  And I'm not conceding that there would be a basis for

16   it, but it seems to me that might be an agency action that

17   would fit within what the APA is trying to accomplish.  Not

18   revisiting a 40-year-old statute, that's in here, not

19   revisiting the 40-year statute, and he didn't do that, and

20   under *Backlin* we think that bars his claim here.

21             THE COURT:  Okay.  Mr. Gerson?

22             MR. GERSON:  Thank you.  Just respond to a couple of

23   points that Mr. Spivak made.  I need to organize my thoughts

24   here for a second.

25             THE COURT:  That's okay.

1          MR. GERSON:  So, Judge, I think your analogy is well

2    placed and that we ask the question as to whether Mr. Nunn,

3    what would happen to him if he was in the same position as

4    Mr. Backlin was having not had this prior conviction in 1998?

5          I think in that case, you know, we run into a couple of

6    issues.  First, I don't have the *Backlin* case in front of me,

7    but I'm willing to bet that that mining regulation was made

8    more than six years before that case.

9          And so my position is this:  You know, and *Wind River*, I

10   think, is not applicable here, the government relies on it, but

11   it's also a civil case.  And also to point out that section

12   2.401 is also very strictly in the statute of the text says

13   civil, okay, this is a lawsuit, not from a prosecution.

14         And so I know that we had to read into 401 to apply to this

15   case, and, in fact, I'll go along with the Ninth Circuit on

16   that, but I think there is a real issue there.

17         In the case of *Backlin*, I think that the issue which goes

18   to your question about standing is that even if the

19   administrative regulation -- and we're using the word

20   "administrative action" kind of interactively to mean different

21   things, so I'll try to differentiate a little bit.  But the

22   agency regulation which happened far before that, in this case,

23   you know, in 1983, you know, there may have been some

24   interested party who could then, you know, the United

25   Association of Base Jumpers, I'm a party, to show up and say,

1    "Within six years we have standing because we were injured by

2    the park's ban," they could litigate that in district court,

3    the civil suit, and all these things that apply.

4        Mr. Nunn's standing does not accrue until the criminal

5    prosecution.  So even though the regulation was promulgated

6    many, many years before, he's not in a position to bring suit

7    until he's actually in his place -- excuse me -- not bring

8    suit, excuse me, but challenge the regulation under criminal

9    prosecution until he is actually prosecuted.

10       And I think that's where the as-apply challenge comes in

11   here, is that, you know, we're not trying to re-visit statute

12   from 40 years ago, but we are.  But that's because we couldn't

13   do it until now when the standing issue actually accrued.

14       So, you know, we think that that's fine.  I mean, the

15   statute of limitations may have run, that's a question for

16   another case, in 1989, six years after it was promulgated for

17   any group interested civilly to come and bring suit in District

18   Court, but it did not run for Mr. Nunn too because he was

19   prosecuted and, therefore, his injury accrues.

20       Again, which is why it's an as-apply case because we're

21   asking not to overturn the whole statute, okay, and I think

22   even as civil suit you have very narrow standing because you're

23   not -- you know, the United Association of Base Jumpers or

24   whatever came, they wouldn't have standing to overturn

25   regulations on jet planes.

1      In any case, you're asking for what is basically applied

2    challenge to overturn this, you know, regulation as it applies

3    to your permitted activity, not all aircraft, right?  I think

4    it goes back to one of the defects of the regulation being far

5    too broad.

6      The fact that Mr. -- you know, the government is basically

7    asking the Court in terms of Mr. Nunn's prior convictions, so

8    stepping out of the scenario, he's in the same position as

9    *Backlin*.

10     You know, what they're saying is it basically goes to the

11   constitutional issue that Justice Powell raises in his

12   concurrence in *Adamos* that does everybody knowing a park ban in

13   Yosemite, does prior litigation, other districts or other

14   circuits, does that provide enough notice that everybody should

15   have gotten notice and litigated this within six years?

16     I mean, the threshold question is was that litigation and

17   were all of these things known within six years?  The other

18   question is whether does that really fit the due process, the

19   conception will be considered the notice.  And I don't think it

20   does.  I mean, unless it has to do with things like actual

21   service, you know, and, you know, maybe there's like an in-rem

22   jurisdiction-type argument, but that's for the government to

23   make in a different case.

24     But I don't think this really meets the definition of due

25   process notice in the way the government wants this

1    constellation of different circumstances to kind of

2    conglomerate and put everybody's jumper in the world on notice

3    that they can now challenge this regulation in a civil suit.

4        And it certainly doesn't apply in Mr. Nunn's case because

5    he was on notice when he was handed the citation, and that's

6    when the statute of limitations would start to comply if he's

7    well within it.

8        In terms of the permitting issue, you know, Mr. Spivak is

9    correct, the 2.17 reference is permit requirements in the CFR

10   section 1.6, which in turn references section 1.7.  And again,

11   the Natural Park Service, by the nature of the APA, deals with

12   public land, it is not required to use the notice of common

13   rule making.  And I'm fairly certain in my research I've come

14   across cases where they're not required to do that.

15       However, they choose to do in this case.  But in monitoring

16   notice the comment process, they're effectively estopped from

17   saying you can make other decisions by another mechanism

18   because they've chosen to do that.  And then they also include

19   their own specific procedural mechanisms whereby the issue of

20   permits, you know, allow or deny other activities, and section

21   1.7 says -- 36 CFR 1.7 lays out very specific criteria about

22   public notice and all of these issues which I raised in my

23   initial argument, that even if it's in the compendium, I

24   seriously doubt that they've complied with their own

25   requirements that they have bound themselves to the mast to in

1    order to make this, you know, comply with due process and what

2    they call requirements without notice of common rule making

3    that they've chosen to adopt.

4        And so I've asked to the Court to look very carefully at

5    section 1.6 and 1.7 and the compendium and to determine whether

6    there was any kind of meaningful permit application process by

7    which somebody could apply, be denied, appeal it, and then have

8    their day in District Court within the statute of limitations.

9    I don't think that there is such a thing.

10       And so based on the herring Fishermen case in San Francisco

11   Bay, I think it goes straight to the final administrative

12   action which is prosecution different than the promulgation of

13   regulations, we've used those terms interchangeably.  I just

14   want to make clear that they're different, but that prosecution

15   is the final agency action in this case, and that's what

16   approved standing to Mr. Nunn to challenge these regulations,

17   you know, then I don't think there's anything that especially

18   under *Backlin* since that seems to be the controlling case we're

19   working from, I think he meets both of the problems in *Backlin*

20   based on that.

21       Just a couple of quick comments.  You know, I've just asked

22   the Court to be very aware that Mr. Spivak is correct and that

23   there is not a huge amount of case law in terms of the overlap

24   between Administrative Procedures Act and criminal due process.

25       Some of the Supreme Court cases are very wary of it.  It

1  seems to be an issue that's not been litigated fully yet;

2  however, the strictures of due process are well known and they

3  apply here.

4       In terms of the park, you know, the *Albers* case I take

5  issue with specifically because it runs against the Supreme

6  Court's instructions, which is that when an administrative

7  agency does not make clear what their recent analysis was, it

8  is not for the Court to fill it in.

9       And so, you know, we don't deny it's a parachute, we don't

10  deny that there's delivery inside the park.  I mean, those

11  things are basically clear to anybody.  But making assumptions

12  such as dangerousness or things like that or reasons why it

13  should be banned, that's really not within the purview of the

14  Court.

15       The park is free to ban any number of dangerous activities,

16  I mean, so they permit any dangerous activities.  I mean,

17  there's not a single thing in the world that's free of risk,

18  you know, but the park has to be given the reasons why.

19       So if they determine that BASE jumping is far more

20  dangerous than hang gliding or rock climbing or any of the

21  other things that are allowed, ice skating, that's fine, they

22  get deference on that -- excuse me.

23       But they have to say why.  And that's what we're asking the

24  Court to do is just hold the government to that -- to that

25  requirement.

1          You know, finally just going back to the permit question,

2     I'm sorry, it's a little bit out of order.  I think that even

3     if the government, you know, is correct in that the Park

4     Service has the ability to regulate its own permitting process

5     and reserves the right to keep all aircraft prohibited allowing

6     only those ones by special permit, you know, the method by

7     which they did that in this case was arbitrary and capricious,

8     and that was head ranger Bill White saying I don't like it

9     because it's done by a group of people who I dislike.  That's

10    just animus toward the sport and towards the participants.

11         That's very different than the part preceding under 1.6 or

12    1.7 with some kind of internal reason analysis, and this is all

13    the Overton Park analysis where we kind of need the same type

14    of reasoning to be shown an internal agency decision as we

15    would if it was through militant conduct (inaudible) or contact

16    procedure.

17         The process in this case is lacking, again not for the

18    Court to fill it in, but at least for the government to

19    demonstrate that it did that.

20              THE COURT:  So is it the -- is it the promulgation of

21    the regulation under, you know, at the time that was arbitrary

22    and capricious, or are you saying that it's the Yosemite

23    Rangers that are being arbitrary and capricious?

24              MR. GERSON:  So our brief and our argument is that

25    it's both.  The underlying regulation suffers a defect of

1    overruns basically not giving us recent analysis.

2              THE COURT:  In its adoption?

3              MR. GERSON:  In its adoption.  It's an original

4    promulgation.

5              THE COURT:  And I think we can now concede, I mean,

6    anyone who looks at the Federal Register sees there is

7    absolutely zero comment made about BASE jumping or comments

8    that were even received about BASE jumping.  I mean, I agree

9    with that, so I guess should there have been some comment in

10   adoption at that point.  Is that part of what you're arguing or

11   am I missing that?

12             MR. GERSON:  I mean, I think it doesn't have to be

13   based on specific.

14             THE COURT:  Specific.

15             MR. GERSON:  I think the defect is that all aircraft

16   are lumped together, and that's what the garment union workers

17   union argument is that you can't just lump everything together

18   and make a broad generalization about everything to be

19   regulated, it has to be some recent analysis as to how you end

20   up with this conclusion.  And again, you know, a jet aircraft

21   have a very different impact on the park than parachutists

22   or --

23             THE COURT:  Hang gliders.

24             MR. GERSON:  So, you know, I don't expect that BASE

25   jumpers -- I mean, you know, the administrative record and

1    promulgation is very thin.  There weren't a lot of people who

2    wrote in comments, I think it's in the Federal Register.  You

3    know, it's a narrow process always with those in common rule

4    making, so I don't think they were held to the burden that BASE

5    jumpers had to be specifically involved public --

6              THE COURT:  Okay.

7              MR. GERSON:  -- compared to somebody with hovercraft

8    was.

9              THE COURT:  Short of the industry.

10             MR. GERSON:  But, you know, the point is you can't

11   lump hovercraft and parachutes and everybody into one.  But the

12   D.C. Circuit, which is the premier circuit court on these

13   administrative law issues, which has made it very clear you

14   can't do that.

15             THE COURT:  Right.

16             MR. GERSON:  You know, so that's the first basis,

17   that it would be promulgated correctly.  And again, I don't

18   think we're restricted by the statute of limitations.  We are

19   attacking it as it was four years ago, but that's because the

20   (inaudible) has just accrued -- the injury in the form of this

21   criminal prosecution is just approved in the case.

22       And the seems to fit within the Ninth Circuit's statutory

23   framework.  In terms of the second part of your question

24   whether it was the enforcement priorities of the park, yes,

25   those are also arbitrary and capricious because *Overton Park*,

1  which is a very well-known Supreme Court case, (inaudible)

2  Overton Park basically says that even when an agency official

3  is, you know, empowered to make day-to-day decisions, they

4  still have to justify those in some reasonable way, they still

5  have to justify those in some reasonable way, some kind of

6  reasoned analysis.

7      And again, they get an enormous amount of deference.  I

8  mean, they could have had any number of reasons for saying, "I

9  don't like people who are free spirits," he's not one of them.

10  That's the definition of arbitrary and capricious.  And, you

11  know, it's very clear from our research that is what happened.

12      You know, the Park Service has adopted, it seems to be on

13  the face, a reasonable regulation for allowing or disallowing

14  activities.  I'm sure that all other activities they've gone

15  through it so that you -- I think included the brief -- the

16  hang gliding regulations, that whole environmental impact

17  study.  I know that there have been recently -- invoked some

18  permitted requirements for the multiday rock climbing

19  (inaudible).  I'm sure they also had some kind of recent

20  analysis behind them.  These don't fit the mold.  It is just

21  somebody who, you know, arbitrarily revoked the permit system.

22  And, based on the park, that's been the practice ever since.

23            THE COURT:  Go ahead.

24            MR. GERSON:  So --

25            THE COURT:  And contrary to some other of the other

1  parks.

2          MR. GERSON:  And contrary to some of the other parks.

3  And it's not to say that Yosemite is bound by other parks.

4          THE COURT:  Absolutely not, right.

5          MR. GERSON:  But, you know, it is possible that they

6  could get it not in part and there's just no analysis.  I mean,

7  it is entirely possible to say that Yosemite comes up with a

8  reasoned analysis memorandum that says, "We know we could do

9  it, but we're going to decline to because of X, Y, and Z," that

10 would be fine.  They would probably (inaudible) on that and

11 just asking the Court to hold him to that burden.

12         THE COURT:  All right.  Understood.

13         MR. GERSON:  And I think that's all of my comments.

14         THE COURT:  Okay.  Mr. Spivak, anything further?

15         MR. SPIVAK:  The only -- I think the Court asked

16 defendant if there were two agency actions, the adoption and

17 regulation in 1983, or is it issuing a citation?

18         THE COURT:  Uh-huh.

19         MR. SPIVAK:  And then in our view I think I heard a

20 third agency action which was the then superintendent, is that

21 chief ranger?  Yeah, the chief ranger's comment or

22 implementation, I guess, of a de facto ban, and so -- I think

23 the first two are time barred, defendant had knowledge of them,

24 could have challenged them, didn't.

25     And I think the third one issuing a permit -- I'm sorry --

1  the ranger is issuing a citation clearly falls under the

2  exhaustion requirement.  It should have applied for a permit

3  and didn't.

4      Comments about --

5          THE COURT:  Where is the exhaustion process codified

6  or where is it set forth for the APA?  Is it set forth anywhere

7  in particular for exhaustion, like what are the steps for

8  exhaustion?

9          MR. SPIVAK:  Yeah.

10          THE COURT:  Like where does one go about exhausting?

11          MR. SPIVAK:  So the leading -- I think at least the

12  case I have is a Supreme Court case.

13          THE COURT:  Uh-huh.  But they're not -- I'm an

14  individual and I want to challenge something, okay?  I, you

15  know, I want to exhaust my -- where do I find out how I

16  exhaust?  That's what I'm trying to --

17          MR. SPIVAK:  The regulation.

18          THE COURT:  Okay.

19          MR. SPIVAK:  You look to the statute and the

20  regulation.

21          THE COURT:  And it will specify exactly what that

22  exhaustion process is?

23          MR. SPIVAK:  (Inaudible.)

24          THE COURT:  So if there is a permitting process, you

25  must first seek a permit, you must appeal that process through

1    the Park Service, that particular part that may or may not have

2    an appeals process for denial of a permit.  So I'm not sure

3    that the park here does.

4        So if I apply to the park for a permit and the park says

5    "denied," if I have to then seek through the park to find out

6    if they have a mechanism for me to appeal that denial of my

7    permit, so it may vary, in other words, is what you're saying?

8        There's not a specific -- it's not an EOC claim, it's

9    the -- in order you must do A, B, C before you can go to court.

10            MR. SPIVAK:  Correct.  And the law is that unless

11   there is a procedure to -- what the Supreme Court, the case

12   that I have is the case known as *Darby v. Cisneros*, 509 US 137,

13   1993.  It says, "The plaintiff is only required to exhaust" --

14   pardon me -- "exhaust administrative remedies or appeal to a

15   higher agency adjudicator where such remedies are required by

16   statute or regulation."  So there must be some procedure.

17       Our view is that the process that you can apply for is that

18   procedure, but I'm not aware of an appellate procedure.

19       So if Mr. Nunn had applied for a permit and it was denied,

20   I think at that point he would be exhausted because --

21            THE COURT:  Unless there is a provision within the

22   Park Service that requires --

23            MR. SPIVAK:  Yes, which I didn't find.  I looked for

24   it and I didn't find.

25            THE COURT:  Uh-huh.

1          MR. SPIVAK:  So I think that letter might be the end

2     of the exhaustion, and then he can come to District Court.

3          THE COURT:  Okay.  And that, besides the *Darby* case,

4     you're saying the regulations themselves state that there is an

5     exhaustion avenue available for someone who's agreed other than

6     challenging during that agency process?

7          MR. SPIVAK:  It seems odd that there isn't a code

8     section, but I'm not finding one in my materials.

9          THE COURT:  I was having difficulty myself, I thought

10     maybe I'm missing it.

11          MR. SPIVAK:  Oh, and I think the comment was made

12     about due process and notice.  And I think the argument was

13     defendant didn't have notice, was not on notice, and the

14     standing issue didn't accrue until he received a citation,

15     which is a second citation.  "We failed to see how there could

16     be a due process argument if a regulation has been essentially

17     unchanged since the time of his first citation."

18       And that's it.

19          MR. GERSON:  May I respond?  I think that if this

20     were a civil case the government's position on that might be --

21     sorry.

22          THE COURT:  That's okay.

23          MR. GERSON:  I think if this were a civil case the

24     government's position on that might be tenable; however, the

25     fact that it's a criminal case, I don't think you waive any

1  defenses based on prior conviction.  I think that's the

2  fundamental difference here is that, you know, just because, I

3  mean, I could rob a bank, plead guilty, and I could rob another

4  bank and raise a number of other defenses including the fact

5  that the underlying anti-bank robber statute, so there's no

6  preclusion on that.  I think the government mentioned earlier

7  that every defendant could bring administrative law challenge.

8  There's nothing preventing that, that's totally fine.  You

9  know, most of them would be frivolous, but there's absolutely

10  nothing that bars that.  So sorry, if you wanted to respond.

11          THE COURT:  So Mr. Spivak, you did ask about further

12  briefing.  I don't think it would hurt.  This is a very complex

13  area.  I spent a lot of time trying to review everything and

14  wrap my brain around exactly what this argument is because it's

15  unique, so I would ask that you do further briefing on it for

16  the Court.

17      And I'm trying to keep it in focus in terms of what the

18  challenge is, because I don't think it's a typical challenge

19  where we're subsequently challenging a statute as vague, which

20  you're well aware is, you know, the Supreme Court at any point

21  can determine something that's been on the books for 50 years

22  until it's challenged its vagueness doesn't make a

23  determination of its vagueness.  It doesn't preclude an

24  individual from somehow not challenging something until -- so I

25  am inclined to find that the standing issue with regard to

1    standing really has to occur when someone is charged -- to some

2    regards.

3         But the problem I have here is we're going behind the

4    facial challenge to the statute -- I mean, to the particular

5    regulation itself.  And instead what we're looking at is the

6    rule making that went into effect in order to promulgate that

7    regulation.

8         So it's a little bit different here because we're not ever

9    going back and saying, "Well, let's look at how Congress

10   adopted this, and let's show that there was bias here when we

11   adopted," do you know what I mean?  It is a different type of a

12   beast.

13        So I would appreciate more briefing on that.  And I -- you

14   know, and off the top of my head, I probably shouldn't talk off

15   the top of my head, but I do have -- I don't buy that unless

16   that plea agreement specifically waived anything, I would be

17   hard pressed to find that someone who decides to plea

18   subsequently is precluded from raising any viable defenses or

19   challenges to something in the future.

20        It could be a number of reasons why he pled.  I don't know

21   if he was counseled, I don't know -- do you know what I mean?

22   I have no idea what the circumstances were surrounding that,

23   but I think that in any case that plea agreement would be the

24   only thing that would arguably preclude him from subsequently

25   raising any viable defenses to a future prosecution -- you

```
 1    know, prosecution for future charges.  I would be hard pressed
 2    to use a theory of res judicata in a criminal case.
 3              MR. SPIVAK:  Can I just respond?
 4              THE COURT:  Uh-huh.
 5              MR. SPIVAK:  It's not a position --
 6              THE CLERK:  Can you push the microwave -- microphone.
 7              MR. SPIVAK:  It's not our position that he's waived
 8    the right to challenge the regulation or res judicata.
 9              THE COURT:  Uh-huh.
10              MR. SPIVAK:  It goes back to that six-year statute.
11              THE COURT:  So you're arguing that his first
12    opportunity, if indeed the six years applies had to be when he
13    was first injured.
14              MR. SPIVAK:  From the time --
15              THE COURT:  Injured.
16              MR. SPIVAK:  -- the action accrues.  That's the entry
17    that time.
18              THE COURT:  Understood.
19              MR. SPIVAK:  And so with the briefing clearly would
20    also give some color and administrative history on the adoption
21    of the 1983 regulation.
22              THE COURT:  Uh-huh.
23              MR. SPIVAK:  It sounds like also on the adoption of,
24    I guess, the park service's view that BASE jumping was an
25    activity that fell under 2.17, and then how about on the third
```

1    agency action of the ranger handing the defendant a citation?

2              THE COURT:  Yeah.  I guess I would want to know at

3    what point you think where you believe -- I mean, I think your

4    position is that six years started when the regulation was

5    promulgated, so it would have expired in what, 1989?  I don't

6    even know how old Mr. Nunn is.  He may not even have been born,

7    you know, at the time of the regulation -- the adoption of the

8    regulation.

9       So, you know, I guess -- what the trigger events are, you

10   believe, when that agency action is?

11             MR. SPIVAK:  Okay, sounds good.  And there is some

12   argument that --

13             THE COURT:  In terms of what's arbitrary and

14   capricious.  Is it limited to the adoption of the regulation or

15   the park's implementation or their -- I guess it would be their

16   application of that regulation, right?  What is the arbitrary

17   and capriciousness?  Where are we looking?  Are we looking back

18   at the time the regulation is adopted?  Are we looking at the

19   implementation by the particular park?

20             MR. SPIVAK:  The question that I've struggled with

21   too is that Mr. Gerson cited that -- I should have the statute

22   of limitations provision.

23             THE COURT:  The six years?

24             MR. SPIVAK:  28 U.S.C. 2401.

25             THE COURT:  Uh-huh.

1            MR. SPIVAK:  It requires that a civil action

2   commence -- against the United States be barred unless the

3   complaint is filed within six years after the rate of action

4   first accrues.

5            THE COURT:  Uh-huh.

6            MR. SPIVAK:  He's completely right, and you can rule

7   against the United States, and you can just look at our

8   caption --

9            THE COURT:  Uh-huh.

10           MR. SPIVAK:  -- you know, we're on the other side.

11           THE COURT:  Right.

12           MR. SPIVAK:  The Ninth Circuit has, at least in

13  *Backlin* suggests, that that extends to criminal cases.

14           THE COURT:  Right.

15           MR. SPIVAK:  So if there's any confusion around that,

16  the government would ask maybe then the Court stay this

17  procedure, order the defendant to file a civil case so that we

18  have the protections.

19       Because if it is really an APA claim, I think the

20  government should be entitled to the same kind of statutory

21  protections we have in a civil case.

22       And that, actually, I don't know if it is interesting, I

23  was going to argue that, and there was a case like a year or

24  two ago in Washington DC.

25           THE COURT:  Uh-huh.

1              MR. SPIVAK:  Paul Manafort challenged the appointment

2     of the special counsel, Robert Mueller.

3              THE COURT:  Uh-huh.

4              MR. SPIVAK:  And the Department of Justice actually

5     moved to dismiss the civil case, I think you ought to remedy

6     that law.

7              THE COURT:  Law in criminal.

8              MR. SPIVAK:  In criminal case.  So I guess we're back

9     here, but then it can't be that we don't have the same

10    protections of the, you know, the formality, the exhaustion,

11    the statute of limitations, things like that.  I think that's

12    what *Backlin* says, but -- and then, of course, it raises -- you

13    know, is this a case that should stay here in Yosemite or it is

14    a civil case that should go to district?  I don't know.  I

15    think it can stay here, but --

16             THE COURT:  Right.

17             MR. SPIVAK:  But --

18             THE COURT:  Okay.  Mr. Gerson, anything further?

19             MR. GERSON:  Judge, just on the -- on the section 241

20    issue.  I'm willing to accept back on the face value that it

21    doesn't apply.  I have some reservations about it which I think

22    is a totally different case.

23        However, I don't think that Mr. Nunn is insufficient where

24    he has to be forced to file a civil claim.  He didn't ask to be

25    here.  So if the government wants to haul him into court and

1   prosecute him and essentially take away his liberty, we have a

2   whole procedure for that which protects the defendants' right.

3   You know, and then the government is going to force him to

4   litigate in order to protect, essentially, the government right

5   that he's a little bit out of line, you know.

6       And the government, of course, to avoid briefing this or

7   avoid issue, we just dismiss the case.  However, it does fall

8   into category of, you know, if it is irrefutable in avoiding

9   review, you know, so I would ask them to proceed, but I don't

10  think Mr. Nunn is speaking from a position where he has to be,

11  you know, forced and litigated affirmatively.

12      This is an affirmative defense because we brought him

13  their --

14          THE COURT:  You know, notably they didn't charge him

15  authority to obtain a permit, did they?

16          MR. SPIVAK:  They didn't.  I don't know that we can

17  read that much into that.  Maybe we'll find out.

18          THE COURT:  All right.  Anything further?

19          MR. GERSON:  No, your Honor.  Submitted.

20          THE COURT:  Okay.

21          MR. GERSON:  And for additional briefing, do you plan

22  to publish a --

23          THE COURT:  Yeah, I'll do it.  How long, Mr. Spivak,

24  would you request for a briefing?

25          MR. SPIVAK:  Probably something like 60 days because

1    I do think --

2              THE COURT:  It's going some research.

3              MR. SPIVAK:  (Inaudible) division, and maybe even the

4    Park Service counsel.

5              THE COURT:  Okay, what's 60 days?

6              THE CLERK:  December 13th.

7              THE COURT:  Okay.  How about December 13th?

8        And then, Mr. Gerson, how long would you like to respond

9    then, minimum of 30, I would assume, depending on what it is?

10             MR. GERSON:  That will be fine.

11             THE COURT:  Okay.  30 days' response.

12             THE CLERK:  So we'll go to January 17th.

13             THE COURT:  Okay.

14             MR. SPIVAK:  I'm sorry.  What was the date in

15   December, I'm sorry?

16             THE COURT:  December 13th would be the date that the

17   government's supplemental brief would be due, and then you

18   would be able to respond to the supplemental brief by

19   January the 17th.

20             MR. GERSON:  Understood.

21             THE COURT:  Great.  Anything further?

22             MR. GERSON:  No, your Honor.

23             THE COURT:  We're in recess.

24             MR. SPIVAK:  Thank you very much.

25             THE COURT:  We can go off the record, please.

1          THE CLERK:  It will take just a second to get

2     everything turned off.

3          THE COURT:  Okay.

4        (Proceedings adjourned:  12:30 p.m.)

5                     ---o0o---

6        I, court-approved transcriber, certify that the foregoing

7     is a correct transcript from the official electronic recording

8     of the proceedings in the above-entitled matter.

9

10                          /s/ Thresha Spencer
                            THRESHA SPENCER
11                          CSR No. 11788, RPR

12

13

14

15

16

17

18

19

20

21

22

23

24

25