UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

UNITED STATES OF AMERICA,          ) Case No. 20PO00742-HBK
                                   )
            Plaintiff,             ) Yosemite, California
                                   ) Monday, February 6, 2023
vs.                                ) 1:00 p.m.
                                   )
DAVID A. NUNN,                     )
                                   )
            Defendant.             )
_____   )


                TRANSCRIPT OF MOTION TO DISMISS
       BEFORE THE HONORABLE JUDGE HELENA M. BARCH-KUCHTA
                UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:              BRODIE MACLEOD BUTLAND, ESQ.
                                JEFFREY A. SPIVAK, ESQ.
                                SEAN O. ANDERSON, ESQ.
                                United States Attorney's
                                  Office
                                2500 Tulare Street
                                Suite 4401
                                Fresno, California 93721
                                (559) 286-7331

For the Defendant:              BENJAMIN A. GERSON, ESQ.
                                Federal Public Defender,
                                  District of Nevada
                                411 East Bonneville Avenue
                                Suite 250
                                Las Vegas, Nevada 89101
                                (702) 388-6577




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Transcriber:                    Crystal Thomas
                                Echo Reporting, Inc.
                                9711 Cactus Street, Suite B
                                Lakeside, California 92040
                                (858) 453-7590

2                          --oOo--

3               (Call to order of the Court.)

4          THE CLERK:  Calling case 20-PO-742, United States

5     versus David Nunn.

6          THE COURT:  Thank you.  Can I please have

7     appearances for the record, starting with the Government.

8          MR. BUTLAND:  Yes, thank you, your Honor.  Brodie

9     Butland for the Government.

10         THE COURT:  Thank you, Mr. Butler?

11         MR. BUTLAND:  I'm sorry.  Butland.

12         THE COURT:  Butland, B-U?

13         MR. BUTLAND:  B-U-T-L-A-N-D.

14         THE COURT:  -- L-A-N-D.

15         MR. BUTLAND:  There's only one T.

16         THE COURT:  Okay.  I'm sure you had a lot of jokes

17    growing up, huh.  Okay.

18         MR. BUTLAND:  Still do.

19         THE COURT:  Well, welcome.  I understand you came

20    all the way from Washington.  So --

21         MR. BUTLAND:  Oh --

22         THE COURT:  Is that right?

23         MR. BUTLAND:  I wish I could take that much

24    credit, your Honor.

25         THE COURT:  Okay.

1          MR. BUTLAND:  Just Fresno.

2          THE COURT:  Just Fresno.

3          MR. BUTLAND:  But still, nonetheless, a different

4 country.

5          THE COURT:  Okay.  All right.  So, you got to come

6 see Yosemite.

7          MR. BUTLAND:  I -- I did in the wintertime.  I've

8 been here in the summer but never have been able to see the

9 snow.

10          THE COURT:  Okay.

11          MR. BUTLAND:  So, this is a good first experience.

12          THE COURT:  Well, it's beautiful any time of the

13 year.  So --

14          MR. BUTLAND:  That is the truth.

15          THE COURT:  Thank you.

16          And appearing on behalf of the Defendant?

17          MR. GERSON:  Good mor -- sorry.  Good afternoon,

18 your Honor.  Benjamin Gerson for Mr. Nunn.  Mr. Nunn is not

19 present today.  I believe he has a Rule 43 waiver.  He did

20 plan to join us by telephone, but I understand the line is

21 down.

22          THE COURT:  Oh.  Do you want to -- we could -- if

23 you have a cell phone, if you want to --

24          MR. GERSON:  I let him know I'll keep him apprised

25 of the proceedings.

1          THE COURT:  Okay.  All right.  Well, thank you and

2    welcome back, Mr. Gerson.  How is your new assignment in

3    Arizona?

4          MR. GERSON:  I'm in Las Vegas, but it's very good.

5    Thank you.

6          THE COURT:  You're in Vegas.  Okay.  Las Vegas,

7    even better.

8          MR. GERSON:  So, it's nice to be back.

9          THE COURT:  So, now you're back in the cold.  Did

10   you come in a few days early at least to get some skiing or

11   anything?

12         MR. GERSON:  I came into Fresno last night.

13         THE COURT:  Okay.

14         MR. GERSON:  So, just a quick trip this time.

15         THE COURT:  All right.  So, we're here -- the

16   Court had requested a hearing on the motion to dismiss that

17   had been filed.  This was previously -- there was a -- an

18   opposition, a reply.  We held an argument.  The Government

19   had requested to supplement at that point.  I had permitted

20   the Government to supplement, and then the Defendant had

21   obviously filed then a reply memorandum to that supplement.

22         So, I had some questions.  I'm still happy to

23   listen to argument from both sides on the issue, and I -- I

24   guess -- I guess first I'll let -- Mr. Gerson, is there

25   anything additional you would like to add since our last

1 hearing since the Government has filed a supplement and has

2 kind of changed somewhat the opposition from what the

3 original papers had stated.  So, I don't know if you want to

4 address that or -- I mean, I did read your reply as well,

5 but if you want to further address it, I'm happy to hear

6 argument on it.

7         MR. GERSON:  Judge, for now, just in the interest

8 of keeping things expedient, I'll -- I'll rest on the

9 briefing.

10         THE COURT:  Okay.

11         MR. GERSON:  If there are any other issues that

12 come up, I'll be happy to address them, but I think -- I

13 think we responded adequately to the Government's points in

14 the supplemental --

15         THE COURT:  Okay.

16         MR. GERSON:  -- brief.

17         THE COURT:  And anything that you want to add

18 before we go into questionings at all or --

19         MR. BUTLAND:  Yes, your Honor.  You know, one of

20 the things that I've been a little bit curious about in

21 going back to the briefing is I'm still not 100 percent sure

22 exactly what Mr. Nunn's arguments are because when you look

23 between the briefing, there are -- there are clear chefs,

24 and just to give one example for the record, the initial

25 reply from June of 2021 says on page six:

1          "The Government misconstrues Mr.

2          Nunn's challenge to 36 CFR 217(a) as a

3          broad attempt to overturn the regulation

4          as a whole.  Mr. Nunn challenges only

5          the application of the regulation to his

6          alleged activities, that is, base

7          jumping.  He asks only for his case to

8          be dismiss in that the substance of the

9          regulation cannot be applied to base

10          jumping."

11          So, this is a substantive argument.  In the reply

12 at ECF 43 in January of 2022, the most recent one, page two

13 to three:

14          "Mr. Nunn has never argued that

15          base jumping was not covered by the

16          prohibition on delivering a person by

17          parachute."

18          So, they -- they -- so, I guess one of the

19 difficulties I'm having as the Government is trying to hit a

20 moving target.  And, so, I'm hoping maybe with this hearing

21 we can clarify what precisely the argument is so that I can

22 respond a little bit more pointedly to it.

23          THE COURT:  Okay.  And I appreciate that, and

24 that's my concern, which is why I'm having the hearing

25 today.

1    There was a couple of things, Mr. Gerson, that you

2  raised.  The one -- one thing that was consistent was the

3  position that base jumping is flat out banned in Yosemite

4  National Park, and that's where I have a -- a real concern

5  because I read the Superintendent's Compendium not to have

6  an outright ban but to permit it only if a permit is first

7  applied and obtained.

8    Now, I don't know if you're going to the next leap

9  and saying, Well, they've never ever issued permits.  I

10  don't know if anyone's ever applied for permits.  You know

11  what I mean?  So, that's one of the issues I have.  But it's

12  clear in the compendium, unless I'm misreading the

13  compendium, that under the 2020 superintendent's compendium,

14  which would have been in effect at the time on page 21, 36

15  CFR 1. -- Section 1.6, Activities that require a permit:

16    "The following is a compilation of

17    those activities which require a permit

18    from the Superintendent."

19    And then it states Section 1.5(d) relating to

20  public use limits, and then it goes through the various

21  different sections, Section 2.1, wood cutting, carrying or

22  possessing a weapon or trap, specimen collecting, the

23  following camping activities which are limited other than

24  regular camping activities, auto disturbances.

25    2.17, aircraft and air delivery, (a)(3), delivery

or retrieval of a person or object by parachute, helicopter
or other airborne means.  That to me implies that it is a
permissible activity within Yosemite National Park that the
Superintendent has not outright banned but has permitted as
long as there is a permit.

        Go ahead.

        MR. GERSON:  Thank you, Judge.

        THE COURT:  Um-hmm.

        MR. GERSON:  I'm sorry.  Is it better if I stand
at the podium?

        THE COURT:  Yeah.  You can stand wherever you want
to stand, wherever you feel more comfortable, Mr. Gerson.

        MR. GERSON:  So, thank you, Judge.  And I can
address both of those points because I think they're
interrelated.

        First, to respond to the Government because I do
want to -- I do admit that -- that there were points in the
briefing, having now reread it, that I don't think I was as
clear as I possibly could have been.

        I understand the Government's concern that this
does seem to be incongruous where we say, you know, the
underlying regulation is invalid as a matter of -- of rule
and comment -- notice and comment rule making because it
does not have this reasoned basis and purpose.

        What I think that the briefing's not entirely

1  clear on is that we really are looking to the remedy.  So,

2  in a civil lawsuit that we would bring under the APA in a

3  hypothetical situation, assuming we were within the statute

4  of limitations, we would say, you know, this entire thing is

5  out the window because of this lack of a reasoned statement

6  of basis and purpose, and that would affect all aircraft

7  regulations in the park.

8          THE COURT:  So, you're talking about the CFR

9  itself.  So, when we say the -- the provision, we're talking

10 about the -- we're talking about 217(a)(3).

11         So, you're going back to saying that the

12 regulation itself was not subject to proper rule making?

13         MR. GERSON:  That's correct.  And, so, that's our

14 first argument, the second one being that the part didn't

15 really apply under the Overton Park framework.  That's --

16 that's a separate issue that I'll set aside for now.

17         So, with that in mind, Mr. Nunn is not in a

18 position to challenge any of the other aircraft regulations

19 that may be in -- in effect in the park, and this I think is

20 related to the permitting question.  And, so, the -- the

21 issue is, you know, were Mr. Nunn bringing this in a civil

22 suit within the statute of limitations, he could have the

23 entire thing thrown out, not just about parachuting but

24 about, you know, gyrocopters or helicopters or hang gliders

25 or whatever else might land in the park, any other kind of

1 airborne.  So, the entire regulation would be thrown out.

2 That's just not applicable to his case, and we don't make

3 the case that the park should now allow get aircraft or

4 helicopters or anything else without a permit.  It only

5 applies to him in the context of base jumping.  So, it's an

6 as-applied challenge, and it really goes to the remedy, and

7 the remedy is just the dismissal.  So, we're not asking for

8 it to be overturned.  It may be invalid, but it's invalid in

9 this case to the extent that it cannot serve as the basis

10 for prosecution.  It's up to somebody else in a creative

11 litigation posture to come back and sue the park to get all

12 other aircraft allowed under this regulation, but that's not

13 Mr. Nunn's position.  Our posture is just that he's being

14 prosecuted, and we just want the case dismissed.  That's the

15 remedy, right?

16          THE COURT:  Okay.  So, if that's your challenge,

17 then what record -- because I'm supposed to look at the

18 administrative record, right, to determine whether or not it

19 was proper notice and comment and rule making.  What is the

20 record then that you're claiming that is lacking?

21          MR. GERSON:  So, going back to the Federal

22 Register, the initial -- and I believe they're cited in the

23 briefs.  I'm sorry, I didn't -- didn't write them out, but

24 they're lengthy cites.

25          THE COURT:  Um-hmm.

1       MR. GERSON:  There was an initial call for notice
2  and comment rule making for public comment.  The Park
3  incorporated that into the final rule making which I believe
4  was, if I remember correctly, June 30th of 1983 was when it
5  was finally promulgated.  That rule making dealt
6  specifically -- it left open the question of pretty much
7  every kind of aircraft with the exception of hovercraft --
8  I'm not sure why -- or what was going on in 1983 that people
9  had hovercrafts -- and hang gliding were specifically
10 mentioned.  And hang gliding comes into play with the permit
11 question that you just raised a minute ago.

12       So, that -- that entire administrative rule making
13 record, which, you know, the multiple Circuit Court
14 precedents from the Ninth Circuit, from the D.C. Circuit,
15 which is arguably the most learned in these administrative
16 law issues, saying that that is where the record needs to be
17 compiled, and it's very strict, and I believe the EPA case
18 and the pesticides -- again, I'll have to look at the cite,
19 but it's in our -- in our initial briefing where even with a
20 very strong scientific background, the EPA lost on that
21 because they had not shown why their research backed up the
22 rule that they promised -- or that they promulgated.

23       And, so, the -- the key here is that that is the
24 record.  That is the administrative record.

25       THE COURT:  Okay.  And, now, let me go back

1  because I'm trying to get my history straight.

2         MR. GERSON:  Yeah.

3         THE COURT:  The initial regulations at some point

4  did not include the word "parachute", right?  Parachute then

5  gets in, right, or then gets out or comes back in?  It gets

6  changed over time, right?

7         MR. GERSON:  So, my understanding is that the 1983

8  regulations --

9         THE COURT:  Is the most -- is the most current.

10        MR. GERSON:  -- is the most current.  My

11 understanding is that that copied from a previous version

12 which I believe was published in the 1960's, maybe the early

13 1960's, that did also include the prohibition on

14 parachuting.  And the Government in their brief raises the

15 issue that whether parachuting is -- whether base jumping

16 falls under parachuting, that's a matter of interpretation

17 up to the agency.

18        THE COURT:  Right.

19        MR. GERSON:  We don't disagree with that, and

20 that's been litigated in the Ninth Circuit, the Tenth

21 Circuit, I think the Fourth Circuit.  That's really not --

22        THE COURT:  That's the <u>Alvers</u> (phonetic) case, the

23 <u>Ox</u> (phonetic) case, that's correct.

24        MR. GERSON:  That's correct.  So, we really don't

25 argue that.  It's clearly parachuting.  We're not -- we're

1 intellectually honest on that point.

2      THE COURT:  Um-hmm.

3      MR. GERSON:  The fact that parachuting is in there

4 is not backed up by anything in the administrative record.

5 It never came in through notice and comment rule making.  It

6 was never considered.  And -- and really what it looks like

7 on its face is that the Park says, with the exception of

8 hang gliding, hovercraft -- again, it's a little bit

9 anomalous -- is they said we ban all aircraft except for

10 ones where you specifically ask for a permit, okay.  And,

11 so, I think that comes to your question about the

12 Compendium, why can't you just ask for a permit.

13      THE COURT:  Correct.

14      MR. GERSON:  The case that's at issue there is

15 called the San Francisco Herring case.  I can give you the

16 cite, but the -- the -- and that was against the Department

17 of the Interior having to do with Golden Gate National

18 Recreation Area, also the -- also the Park Service.

19      THE COURT:  Is this a bicycle case?

20      MR. GERSON:  It's called San Francisco Herring.

21      THE COURT:  Okay.

22      MR. GERSON:  And, so, the -- the rough facts of

23 the case was that there is a  protected fisheries area

24 around Golden Gate National Recreation Area where fishing

25 was prohibited and fishermen were being cited and charged

with misdemeanors.  So, again, very similar facts.  And the
Ninth Circuit ruled that they had to go through the
administrative process first, but where no administrative
process existed, you were entitled to judicial review in the
Federal Court, which I think is where we're at now.  And the
reasoning there was that the San Francisco -- excuse me --
San Francisco Herring Fishermen's Association, the
plaintiffs in that case, you know, successfully pled that
their efforts to negotiate with the National Park Service
had effectively been stonewalled for many many years.  And,
so, they had oral discussions with them.  They had meetings
with them, and basically the Park Service was so
intransigent they had what they called an enforcement order.
I suppose it was a park policy that was published, and the
Ninth Circuit held that that was sufficient to demonstrate
final agency action.  They no longer needed to go through
any more appeals in the administrative realm and could,
instead, bring it to Federal Court.

          And, so, we're looking at exactly the same thing,
and there's, I think, sufficient documentation in our
initial motion to dismiss that shows that the enforcement
procedures in Yosemite have been extremely strict for an
extremely long time, and those enforcement procedures --
again, this -- this falls under the Overton Park framework,
which is a little bit of a different discussion, but they

1 were made and there's documentary evidence where Bill Wendt

2 (phonetic), who was the Chief Ranger at the time, says, you

3 know, I made the permit system.  I can take it away.  I

4 don't like these people.  They're hippies.  They're long

5 haired, you know, free spirits or whatever it was, which is

6 kind of the definition of arbitrary and capricious.

7         And, so, my understanding, especially speaking to

8 people in the base jumping community is that, you know, you

9 can go through the Compendium, and you can apply for a

10 permit for your helicopter, for your bush plane, for your

11 drone, for whatever other aircraft you want to, but the

12 reality is is that you're never going to get one for base

13 jumping, right.  And, so, you know, and if you look at the

14 -- I believe we attached as an exhibit to our initial

15 pleading the permitting process for base -- or sorry, excuse

16 me.  Excuse me -- the permitting process for hang gliding --

17         THE COURT:  Hang gliding, um-hmm.

18         MR. GERSON:  Yes.  I'm sorry -- you know, and it

19 goes through any number of environmental impact studies.  It

20 has, you know, pilot qualifications.  It has certain number

21 of jumps per day, and all -- these are all things that are

22 well within the Park's authority to regulate, but that's

23 never been available for base jumpers, and that really has

24 to go back to what is final agency action, a decision by the

25 chief ranger at the time, to say, No more.  It's enough.

We're never going to do this, and then that's backed up for
-- for nearly four decades of enforcement where we have, you
know, really high profile cases of people being involved in
fatal accidents because they were jumping after dark,
because, you know, the one guy was trying to swim across the
river, and this was all to evade law enforcement.

And at any point, you know, somebody could have opened
a dialogue, and I don't place the blame entirely on the --
on the Park Service, but it's my understanding speaking to
people in the base jumping community that they thought this
was a futile effort. You know, and the Park Service also
could have come back and said, Hey, this is getting a little
out of hand. Let's figure out a way to do this better
rather than straight up strict enforcement.

And, so, I think under the San Francisco Herring
test from the Ninth Circuit, that satisfies final agency
action. So, while the Compendium may have guidance that
you're allowed to apply for a permit for any of these other
things, you know, I mean, presumably you could have a
commercial plain old sky diving where you land in the park
or maybe you're in the back country and have your supplies
air dropped to you by parachute. These may be things that
are subject to a permit. My understanding is that the
reality of it, the facts of this case over many many
decades, is that the final agency action has always been no

1  to base jumping, notwithstanding other permits for -- for

2  aircraft.

3          THE COURT:  Okay.  So, then my next question is is

4  your argument that the -- this particular provision, Section

5  217, okay, that any time there's advances in any type of

6  technology, that the fact that those weren't discussed at

7  the time of the implementation, that, therefore, it lacks

8  that -- that necessary notice and -- and to be able to get

9  -- I mean, in other words, at the time this was adopted in

10  '83, I don't know how prolific base jumping was, but then

11  doesn't it really come down to being an interpretation of

12  the particular provision that it includes base jumping.  And

13  then, of course, I mean, that's what <u>Alvers</u> says, right?

14  <u>Alvers</u> says, yep, it does include base jumping now.  We do

15  say.  So, isn't it more of an interpretation of the Park

16  Services that it includes it?

17          MR. GERSON:  I think as a -- as a comment on

18  administrative regulations generally, I think there's no

19  discussion that agencies are welcome to interpret things as

20  they see fit, with -- with certain limits, as long as it

21  doesn't create -- I think the -- the test is whether it's a

22  new right or obligation.

23          THE COURT:  Um-hmm.

24          MR. GERSON:  But, certainly, a parachute is a

25  parachute, and base jumpers use a parachute.  We don't argue

1 that fact.  So, I think the Park Service is well within its

2 rights to interpret that as falling under the prohibition.

3 Our position is that the prohibition itself is invalid for

4 lack of reasoned rule making at the very beginning.  And,

5 again, this is where it gets a little bit tricky, and I

6 apologize to the Court and the Government if the briefing

7 wasn't clear on this.  Our position is not that we're trying

8 to throw out the whole regulation, which would happen in a

9 civil lawsuit against the Park Service, really, just that we

10 want the remedy of dismissal because he's being prosecuted

11 under an invalid statute.

12          THE COURT:  All right.  And I still don't

13 understand why he can't apply for the permit and then

14 challenge the denial of the permit.  What is -- let me ask

15 you this.  When I apply for a permit and I'm denied a

16 permit, I'm assuming there has to be a certain due process.

17 Otherwise, if -- in other words, if your statement is

18 National Park Service does not permit base jumping in

19 Yosemite even though they say it gets a permit, it never

20 ever granted a permit, then I think you have an argument

21 that it -- I mean, it is an act in futility and the fact

22 that they don't have a permitting system and never ever

23 grant a permit and never have to answer to that, I don't

24 know what the appeals process is or what the remedy is when

25 someone's denied a permit, what the next challenge is, but

1  wouldn't that be the -- the more appropriate place to raise

2  an arbitrary and capricious argument as to whether or not

3  the Agency informally have adopted an action contrary to

4  what the CFR says, unless a permit is obtained, which to me

5  implies that it's not about not prohibition but whether one

6  that needs to be permitted.

7         And -- and then the -- then if they say in

8  Yosemite, sort of like there's the one case with the bear

9  cans, right?  I don't know if you're familiar with that one,

10  the Sierra -- the bear cans issue when they stopped the soft

11  pack bear cans, same type of thing, right.  The Agency says

12  we're not going to have it, but we have to make -- need to

13  make these decisions based on certain rational reasons.  You

14  know, it can't just be done arbitrarily and capriciously.

15         Do you see what I'm saying?  I guess I'm -- I'm

16  trying to figure out why we're going after the adoption all

17  the way back in 1985 instead of the implementation or the

18  enforcement of it if your argument is that they don't ever

19  permit it.  But you don't -- but no one's asking for a

20  permit to be denied and then to challenge the denial of

21  those permits.

22         MR. GERSON:  Right.  So, I think that goes -- if

23  I'm understanding correctly -- and stop me if I -- if I'm

24  not.  I think that goes to the second argument that we

25  raised, which is under the <u>Overton Park</u> framework, which is

that even if we assume that Section 2.17 as promulgated
correctly with the requisite notice and comment rule making
reason, the way that it's implemented by law enforcement is,
again, in itself arbitrary and capricious because the
reasoning for it is we don't like these people.  There's
animus towards the sport, not that it has some impact on
things that the Park is meant to preserve, so, not that it
has an impact on wildlife or an impact on traffic or things
that are well within the Park's, you know, organic statute
to regulate.  And that -- that, again, it goes right back to
the permitting issue is that the -- the enforcement priority
at the time -- and I believe it's cited in -- in several of
the documents that we cite, as well as in the documentary
movie that was made about it where there's an interview
given this first Mr. Wendt, who was the previous ranger --

        THE COURT:  Um-hmm.

        MR. GERSON:  -- where he just says, I don't like
it, and I'm taking the permits away, and that's it, right,
which is the definition of arbitrary and capricious.

        So, that -- in that situation, you're a step
removed from whether or not the -- the permanent -- or the
regulation itself is valid.  We assume that it is in that
case.  But how it is applied as an enforcement priority as
an internal agency decision also needs to be supported by
valid reasoning.

1        THE COURT:  And, doesn't the -- okay.  So, your

2   document, like your evidence that you're alleging, right, we

3   don't really have any of that evidence here.  I can't take

4   judicial notice of something that a ranger supposedly said

5   to a newspaper article.  You know what I mean?

6        The -- so, but if you were denied a permit and

7   those bases were stated on that permit, right, the denial,

8   you then have a basis to then challenge, you know, to the

9   extent they alleged, you know, inherent dangerousness, you

10  know what I mean, or whatever their basis is.  You know what

11  I mean?  I understand what you're saying, and I think they

12  have to come up with reasons as to why they would deny it if

13  the -- the Compendium appears to say it shall be granted as

14  long as you get a permit.  I mean, we now have free solo

15  going on in the Park.  However, we know that in the, you

16  know, wilderness areas you need to get permitting now --

17        MR. GERSON:  Right.

18        THE COURT:  -- to rock climb.  You know what I

19  mean?

20        MR. GERSON:  Sure.

21        THE COURT:  So, there's certain restrictions that

22  are being implemented.  If they deny, then those permits, I

23  assume there's a mechanism for somebody to challenge the

24  denial.  You know what I mean?  I -- I'm -- I know where

25  you're going, but I just don't know we're getting there the

1  right way.

2          MR. GERSON:  Right.  And I -- and I think -- I

3  think this actually came up at our -- at our previous

4  hearing because I do remember you had asked about the

5  appeals process then.

6          THE COURT:  Um-hmm.

7          MR. GERSON:  And I unfortunately don't have more

8  information on that now.  That may be a better question --

9          THE COURT:  Oh, I'm going to ask the Government.

10          MR. GERSON:  -- for the Government.

11          THE COURT:  -- because I think the Government

12  should -- better know what the appeals process is for denial

13  of a permit.

14          MR. GERSON:  Right, but I think --

15          THE COURT:  To the extent they're alleging there

16  needs to be exhaustion, how does one exhaust?

17          MR. GERSON:  Right.  And I think -- I think your

18  question is well founded.  And, so, in the hypothetical you

19  give, sure, if there was a -- if there was a process saying,

20  you know, wilderness permits are a good example.  There's a

21  very clear process for applying for them, and you can go out

22  in the wilderness.

23          If there was a process for applying for a base

24  jumping permit or a rock climbing permit and it was denied,

25  you know, the denial had a reason that was like, you know,

1  protecting Peregrine Falcons or something that's -- that's

2  well within the realm of the Park's regulatory pattern --

3           THE COURT:  Right, reasonable.

4           MR. GERSON:  Right.

5           THE COURT:  There's a reason --

6           MR. GERSON:  -- versus I don't like you, you know,

7  then you would appeal it, and it would be the exhaustion of

8  then you would have your review in Federal Court.

9           THE COURT:  Right.

10          MR. GERSON:  You would be entitled to that, and

11  that's very clear.

12          THE COURT:  I guess that's what I'm trying to

13  figure out, what the agency action here is, because the CFR

14  doesn't just apply here in Yosemite National Park.  Do you

15  see what I'm saying?  I guess what I'm trying to figure out

16  is what is the agency action that is arbitrary and

17  capricious.

18          MR. GERSON:  Right.  I think --

19          THE COURT:  You're saying the adoption of the

20  rule.  So, it's step three.  It's -- I guess there's the

21  three part that, you know, as to where you challenge the

22  APA --

23          MR. GERSON:  Right.  I think --

24          THE COURT:  -- issues.

25          MR. GERSON:  I mean, I think the Park framework is

1  -- does give some guidance on that because comparing the

2  National Park Service to the Bureau of Land Management,

3  which does allow base jumping or I know Shenandoah National

4  Park allows base jumping.  So, again, that's an enforcement

5  decision made internally within those -- I hate to say

6  subagencies.  It's inarticulate -- but subagencies of the

7  Department of the Interior.

8         You know, so -- so, maybe they have a good reason

9  to allow it or disallow it, but in this case, the

10 enforcement priority was never based on any real reason.  It

11 was based on animus towards the sport.

12         And in terms of -- of exhaustion, I think there's

13 good case law and good authority from the Ninth Circuit that

14 you -- you know, there is no mechanism for that, and you can

15 effectively skip over the exhaustion requirement and go

16 straight to review because we've had this final agency

17 action which was the decision not to allow it, decision to

18 revoke a rudimentary early permit system that only existed

19 for a few months and all of that on the basis of just

20 generally dislike for the sport.

21         THE COURT:  But I don't think they've withdraw the

22 permitting.  That's where I think had they withdrawn the

23 permitting, then I would say that's the agency action

24 they're challenging, the withdrawing of the permitting,

25 right?

1          MR. GERSON:  Well, I think that the record on that

2    would always be, you know, unless the -- unless the Park

3    articulated a separate permitting procedure for every kind

4    of aircraft, so, a helicopter permit, a gyrocopter permit, a

5    jet plane permit, a base jumping permit, but really what

6    they would do is reserve -- you know, everything is

7    prohibited until you get a permit of any kind.

8          THE COURT:  Well, but see, they do do that with --

9    that's why in -- when you talk about the different aircraft,

10   under 36 CFR 716, which is the Yosemite powerless flight

11   requires a permit for the Superintendent.  Powerless flight

12   not being base jumping obviously because the Ninth has said

13   it doesn't include base jumping.

14         But they are -- they're recognizing in the

15   Compendium itself also that that -- that does fall within

16   716, and they do state that  36 CFR 217 aircraft and air

17   delivery (a)(1), not (a)(3), but (a)(1), areas designated

18   for operating and using aircraft are provided for in Section

19   7.16(c).

20         So, again, they are recognizing other aircraft.

21   That's why I'm saying I -- to me, it's still recognizing

22   that there's a permitting process available for 217(a)(3),

23   in addition, a different one for (a)(1) and those that fall

24   within 36 CFR 716.

25         MR. GERSON:  And I think the distinction is -- is

1   -- or maybe not the distinction but the -- the illustrative

2   point that has to do with hang gliding, is that clearly

3   permits have been issued for that.  It doesn't fall within

4   any of the --

5           THE COURT:  So, how --

6           MR. GERSON:  -- on this list as powerless flight.

7   I'm not sure.

8           THE COURT:  How many people applied for a permit

9   for base jumping and were denied?  Do you know?

10          MR. GERSON:  I do not know.  But I think that the

11  -- the general assumption is that you would always be

12  denied, and based on the documentary record, which, again, I

13  don't know if the Court will take judicial notice of, but it

14  does -- it is instructive -- is that the -- the position was

15  always that it would be denied.

16          THE COURT:  Okay.  I get it.  I mean, I've read

17  some of the Law Review articles on the issue, and -- and I

18  get the poll.  You know, it's preservation of the parks and

19  then recreation and how the two intertwine and whether it's

20  more impactful to the environment than some other sports

21  that are permitted within the park.  I mean, I get your

22  arguments.

23          MR. GERSON:  Well, but I don't think any of those

24  were -- and, again, I haven't read the -- any Law Review

25  articles.  I'm actually not even aware that this was a topic

1 that --

2          THE COURT:  Yeah, it is.

3          MR. GERSON:  -- reached the level of academia.

4          THE COURT:  It's a very high level topic of

5 conversation among the youth apparently.

6          MR. GERSON:  So, but I -- you know, I think that

7 the hang gliding or rock climbing permits deal with many of

8 the same issues, and the park has -- has done the right

9 thing and undertaken a huge amount of environmental impact

10 studies, and that's very different than what has happened.

11 At least the record we can divine is that it was just denied

12 on the basis of dislike for the sport or dislike for the

13 participants or, you know, not socially acceptable at the

14 time or something like this, which is -- which is really the

15 definition of arbitrary and capricious over the Overton Park

16 framework.

17          THE COURT:  Okay.  All right.  Thank you.

18          MR. GERSON:  Thank you.

19          THE COURT:  All right.  Mr. Butland.

20          MR. BUTLAND:  Thank you, your Honor.

21          THE COURT:  First, I'm dying to know how does one

22 appeal the denial of a permit.  Is there a mechanism to do

23 so?

24          MR. BUTLAND:  Your Honor, I don't know if there is

25 a -- if there's an internal mechanism, but I -- one of the

things -- and maybe this would help answer the question from a more general standpoint.  So, Mr. Nunn is making an argument under the APA.  He's challenging regulation.  I think a question you raised is a very good one.  To have a final agency -- or to -- to do an APA challenge, you have to have a final agency action.  You can't just say, well they -- you know, we thought that maybe we would have been denied and, so, therefore, that's the final agency action.

Now, I heard in the argument -- I think there are two different ones they're pointing to.  One is the adoption of the regulation itself.  The other is when this ranger said he didn't let -- I'll paraphrase a little bit somewhat humorously -- but "I don't like hippies."  And that -- you know, that occurred, if I remember their briefing correctly, sometime in the early 1990's.

If those are the two agency actions, the biggest problem they have here is the statute of limitations.  And -- you know, and that's where I think their argument completely falls apart.  Now, how might they get around that?  Well, I think you provided one possible way.  You have some sort of interactive dialogue with the National Park Service now.  When they say no, then you've actually got something that you can challenge within the six years.  But that's what I think they're -- but that's where I think the problem is is that, you know, they're trying to create

1 what they call an as applied procedural challenge.  That

2 doesn't exist under agency law.  You can't do an as applied

3 challenge.  You either have a procedural challenge or you

4 have a substantive challenge, one subset of substantive

5 being as applied.

6         So, and that's where the six-year problem is.  And

7 I think especially in this case, it's even a starker problem

8 because Mr. Nunn was convicted of the exact same offense in

9 1999.  So, that was another opportunity for him to raise

10 this exact issue, and he didn't do it.  We're now 20 years

11 away from that, more than 20 years.  At some -- the reason

12 why our statute of limitations exists as -- as Wind River

13 said is that at some point the Government has an interest in

14 finality.  We can't keep revisiting the same things.

15         So, I -- I think then to just sort of sum up your

16 question as to what's the appeal process, well, I think it

17 -- it may depend a little bit on what exactly they're coming

18 to in terms of the approach.  But I think that the air --

19 the hang gliding is a great example of how this could work.

20 You know, hang gliding we saw in -- in their brief -- it's

21 Exhibit A that has all the -- that has all the hang gliding

22 documents.  There are almost 30 pages here, and what's very

23 clear is that the hang glider -- there's a hang glider's

24 association basically that had an interactive discussion

25 with the park, and they came up with a proposal to allow

hang gliding.  So, what does that look like?  Well, it's
only two hours during the day at the very beginning.  Why
did they do that?  Well, one of the main reasons is to avoid
interference with aircraft because helicopters come in
periodically, and if you have a hang glider and a
helicopter, we kind of know how it ends.

So, you know, you can do that.  There's only a
certain number of permits that can be granted.  There's only
one jump off point, Glacier Point.  That's the only place
that you can actually hang glide from.  There is a
designated landing point in a meadow, and it's -- if I
remember correctly, it's about 150 by 50 feet.  So -- and
then there's a very specific route they have to go, which is
basically three-quarters of a circle, and on top of all
that, it has to be under the auspices of this hang glider's
association.

Now, if that was what the base jumping community
did, if they came with a really solid proposal and said --
basically like the hang gliders did and said, Here, we want
to jump off from this point.  We want to do it at this hour.
We want the landing spot to be here.  Here's how we're going
to protect.  You know, like, for example, in El Capitan, the
biggest concern I would think -- and I think the National
Park would agree -- is there are mountain climbers on it.
Well, what happens if somebody misjudges and they fall into

1  the -- you know, they fall into the rock face, which I
2  believe is what happened to Mr. Nunn?

3          You know, but if there was that iterative proposal
4  and then the National Park Service simply said, No, you
5  know, we have this proposal but we're not going to give it
6  to you anyway, I think that would be subject to a potential
7  APA challenge.  Now, may still lose on the merits depending
8  on what the National Park Service says, but that's sort of
9  the process that I think we should be looking for and which
10 didn't occur here.  And -- and this challenge should have
11 been either brought through that or, at minimum, back in
12 1999 when he was convicted of the -- when he was charged
13 with this before.  That would have been a time to raise this
14 issue as well.  The six-year statute of limitations bars the
15 claim.

16          I want to add one other point too, which is that I
17 think, in a way, Mr. Nunn kind of has the idea backwards in
18 terms of where the findings need to be.  If you look at the
19 regulation, it says -- and I'm sure you're sick of looking
20 at it, but I will --

21          THE COURT:  Hold on.  Let me get it.

22          MR. BUTLAND:  But -- but it says, you know,
23 217(a)(3), aircraft and air delivery:

24              "The following are prohibited:

25              Delivering or retrieving a person by

1          object or parachute, helicopter or other

2          airborne means except in emergencies or

3          except pursuant to a permit."

4          The point is the presumption is that it's illegal

5   unless you can show either an emergency or that you got a

6   permit.  If you didn't do that, that's game over.  And when

7   you look at hang gliding as the example, you -- you

8   probably, with the 29 pages that they attached of hang

9   gliding, with 60 different findings as to whether hang

10  gliding would impact certain things, this particular plan,

11  that's what the Government has to go through if they're

12  going to decide whether to grant a permit.  It's not simply,

13  Hey, I want to base jump.

14          Well, the National Park Service can't really

15  evaluate what the impact is on that until they know the

16  specifics, and that's why the permitting process here and

17  the -- and the interactive process that -- that I brought up

18  earlier, that's why it's so important, because, you know,

19  the -- the -- I guess maybe the way to put it is comity is a

20  two-way street.  The person applying for the permit has to

21  have respect for the National Park Service to give them the

22  specifics they need to make the decision.  The National Park

23  Service, meanwhile, has to make findings within the

24  regulations and statutes.

25          And, so, I -- I think the -- just to reiterate, I

think the big problem here is that they're actually kind of reversing the way that it should go. The default position should be you don't get to deliver anything. You don't get to fly helicopters into the Park. You don't get to jump through parachutes. You don't get to -- whatever technology they happen to invent as recreation, the presumption is you can't do that unless you can provide information to the Park to let them conclude it's not going to have those impacts.

THE COURT: And they can issue a permit.

MR. BUTLAND: And then they can issue a permit or if they don't, when there is a showing that, look, this will not impact the wildlife, this is completely safe, it won't, you know, interfere with airspace, you know, for helicopters that come in or hang gliders that are in the area, something like that, you know, if you can show all of that and the Department of the Interior still says no, well, then there might be something to discuss in terms of lack of reasoned decision making as a procedural challenge. But, as it stands right now, the six-year limitations period has run. It ran a very long time ago, and they can't really invent it --

THE COURT: But does -- let me ask you that --

MR. BUTLAND: Yeah, sure.

THE COURT: -- because I have a question on the six-year statute of limitations. It's a civil statute, the

 1   six-year statute of limitations.  This is a criminal case.
 2   So, is there -- is there not an -- a mechanism to -- where
 3   that six-year statute is then triggered when it becomes --
 4   when it is impacted in terms of resulting in a criminal
 5   offense?  In other words, the six-year statute of
 6   limitations is to challenge civilly, right, the -- the --
 7   the adoption, you know what I mean, for an agency, a group
 8   to come in, you know, whether if I'm -- if I'm drafting
 9   something with timber, maybe I have a timber group that
10   comes in and says, No, we don't like this.  We want to be
11   able to challenge this, and we go into District Court and we
12   file a suit as an entity to challenge that provision.
13           This is something a little bit different here,
14   don't you think?  I mean, the --
15           MR. BUTLAND:  Well, you know, your Honor, I was
16   told early in my career that judges don't care what your
17   opinion is.  They care about what other judges' opinions
18   are.  And, so, I would refer you to what the Ninth Circuit
19   has already held on this topic.  If we look at U.S. v.
20   Backland or U.S. v. Lowrey, both bases were criminal cases.
21           THE COURT:  Right, but there was an exhaustion --
22   there was an -- there was an exhaustion.  That's why I say
23   isn't it the permitting?  Without the permitting, there's --
24   there's a mechanism that there has to be some kind of agency
25   action that then gives you the right to challenge it

1  criminally.  You still have to have some sort of a precursor

2  to that.

3         MR. BUTLAND:  Yes, your Honor.  I think if I could

4  slightly rephrase it a little bit, there has to be a final

5  agency action that is challenged.  In the case of Backland,

6  if I recall correctly, it was a previous finding as to

7  whether somebody was using the land for proper use.  For

8  Lowery, it was a question of whether she had an exemption

9  for -- some sort of exemption for American Indian tribes.

10        There was a very identifiable final agency action

11 that they -- that the Defendant identified, and the Ninth

12 Circuit said in both instances, Well, that was more than six

13 years ago.  You lose.

14        So, I would apply it to the same thing here.  The

15 final agency action that they're identifying is either the

16 adoption in the federal -- or printing in the Federal

17 Register, which Ninth Circuit has been very clear that

18 that's what starts the six-year statute of limitations or

19 this -- you know, or you have, you know, a rogue park ranger

20 who hates hippies in the 1990's.

21        Well, in either case, if those are the agency

22 actions, then the six-year statute of limitations has run.

23 If they can identify a final agency action that occurred

24 within the previous six years, we might be having a

25 different discussion.  But they -- but they haven't -- but

1   they haven't done it.  And, certainly, if the -- if they

2   referenced something in the previous six years, it wouldn't

3   be adoption of the regulation.  It would have to be

4   something else.  It would have to be -- you know, it would

5   have to be denial of a permit as one example.

6            THE COURT:  Or if the superintendent in their

7   Compendium decided no leash jumping in Yosemite National

8   Park.

9            MR. BUTLAND:  Yeah.  I mean, I think if --

10           THE COURT:  A flat out ban, contrary to what the

11  CFR says, unless in emergencies and/or permit.

12           MR. BUTLAND:  I think if they specifically --

13  yeah, if they -- if they alter the regulation in a way which

14  I think the -- the Compendium in this case is -- as your

15  Honor has probably noted, is basically identical to the

16  regulation.

17           THE COURT:  Um-hmm.

18           MR. BUTLAND:  So, if they were to change the

19  regulation in some way, either by, you know, creating a

20  permitting process that base jumpers didn't like because

21  they didn't think it was broad enough or they just -- you

22  know, the flat out said, you know, we -- we just -- no

23  matter what the iterative process is, no matter what they

24  present us with, there is absolutely nothing, period, that

25  they can show us that will make us change our minds, then

maybe we have a different discussion.  But it's -- but I
think the important thing is that there has to be some kind
of iterative process for there to be a final agency action
within the six years, and hang gliding I think, ironically,
is the best example for us in showing how that's supposed to
work.

        THE COURT:  Um-hmm.

        MR. BUTLAND:  I actually don't think it helps the
Defendant's side at all in that regard.

        THE COURT:  Okay.  I guess I -- my concern is I'm
trying to figure out what is the administrative record I'm
supposed to be reviewing.  Do you see what I'm saying?  I --
Mr. Gerson, that's what I'm asking you I guess.  What is the
agency?  My understanding is the focal point for my review
is the administrative record already in existence, not a new
record made initially in the reviewing court.

        So, the administrative record you're saying is the
original adoption of the CFR  So, you are in essence
challenging the original provision, right, Section 217, when
adopted?

        MR. GERSON:  That's correct, your Honor.  So, our
position would be that -- under our first line of attack
would be that the adoption and the promulgation of Section
2.17 was incorrect as a matter of notice and comment rule
making because it did not have this statement of basis and

purpose, reasoned analysis about aircraft generally.

You know, and I think -- I think the Government raises an interesting question, which is whether or not the Government needs to articulate every single reason or whether they can reserve that power for future internal decision making, which is -- which is in a certain sense what they did is that they said everything is banned until you get a permit.  We don't -- we don't disagree with that reading, right, but it doesn't give a reason as to why they would even make that decision, you know.

So, if they were to say something like, you know, planes over a certain tonnage are prohibited and everybody else needs a permit, it would kind of make more sense because it would have to do with the regulation and the preservation of the Park.

Moving on from that is our second line of attack which falls under Overton Park, which is that, you know, this power that the agency has reserved for itself to then issue permits and to make internal decisions is -- is also flawed, and that has to do with this kind of animus towards the sport in the early 1980's.

The question I would ask -- and I don't mean to be flippant, but it's a bit of a rhetorical question, is -- is why did hang gliding get a foot in the door but base jumping didn't.  And, you know, the Government --

1          THE COURT:  Did base jumping ask?

2          MR. GERSON:  That's -- that's one view of it.

3  But, I mean, it could be that base jumping was -- also had

4  this very negative view from Park administration at the time

5  and was effectively doomed, because, remember, the Park --

6  the Park did issue permits for base jumping at least for

7  several months when it was kind of a new sport, and then it

8  decided, This is too much.  We're not going to do it

9  anymore.

10         You know, so, you know, you -- even both of those,

11 starting and stopping the permits, you could construe as --

12 as violating <u>Overton Park</u>.  And, so, there is a real

13 question about how they issue the permits, what, you know,

14 criteria they use to assess them.  I think the hang gliding

15 does go through things that are well within the -- the

16 Park's ability to regulate, and it's a very well thought out

17 regulation I think.

18         THE COURT:  Um-hmm.

19         MR. GERSON:  You know, the question is you know

20 why hang glider -- excuse me -- base jumpers never invited

21 -- or never felt that they had to do that, and I think they

22 were deterred at the very beginning because of this hostile

23 enforcement, and the hostile enforcement position has gone

24 on for many many years, despite fatalities, despite really

25 kind of Herculean efforts to avoid rangers despite negative

1 press.  You know, the Park's position has always been no
2 base jumping.  It never even indicated that it would be
3 willing to reconsider it or to open a permitting process.
4 You know, and that's -- that's just the way the history has
5 played out, whether it's judicial notice, record, whatever
6 else.  It's -- it's -- it's the facts is that the Park has
7 always had a hostile enforcement position.

8      THE COURT:  And I guess that's an assertion,
9 right?  I mean, I don't know that -- you're referring to it
10 as a fact, but without there being applications for the
11 permit and an opportunity to sit down with the Park and try
12 to discuss that going forward, I don't know that you can
13 take what somebody said how many years ago and with a broad
14 brush say that that still happens to be the -- the situation
15 in the Park today.

16      MR. GERSON:  I mean, I agree.  There -- there may
17 be some onus on the -- on the base jumping community to
18 develop that record.

19      THE COURT:  To develop that report.

20      MR. GERSON:  But -- but I think that my
21 discussions with -- with particularly authors in base
22 jumping, who are not parties to this case but people who
23 have consulted on this is that it was effectively pointless
24 to try and approach the Park about this.  They always knew
25 they were going to be rebuffed just because of this hostile

1  enforcement environment.

2          THE COURT:  I think that's where you get your

3  record, right?  That's -- that's where you get your ability

4  to then challenge that agency action, because I -- I go back

5  to I'm not sure what the -- what is the -- as a reviewing

6  court, what is the right -- you want me -- you want me to

7  piece out from the CFR just that provision and -- and not

8  find the entirety of -- of it improperly done for notice and

9  rule making but just as applied to Mr. Nunn.  Do you see

10 what I'm saying?

11         MR. GERSON:  Well, I think that -- I think that as

12 a procedural challenge, you do have to in some sense find

13 the entirety of 2.17 is invalid.

14         THE COURT:  Right.

15         MR. GERSON:  But the remedy is not that we open up

16 the park to every kind of aircraft.  The remedy is just that

17 this case is dismissed.  That's the distinction that I'm

18 drawing, right, is that it's not -- it's not -- beyond this

19 case, I don't think it has broad applications.  That may be

20 a -- a Federal Court's type question of academic interest,

21 but in this case, we're just asking for a very narrow

22 remedy.

23         One thing I would also just like to respond to is

24 the -- the statute of limitations question.

25         THE COURT:  Um-hmm.

MR. GERSON:  And I have serious concerns with that.  You know, first, just as a -- as a textual matter, it's very clear in the statute it says civil.  You know, it doesn't require a whole lot of reading into it, and I think that that's -- your position is correct is that if somebody comes -- let's say I'm a drug company and then I watch the FDA very closely and they publish something.  I have six years to then challenge that through whatever process, whether it be Federal Court or administrative review.  And then after that, the interest of finality supercedes that.  I have no disagreement with that.

But as a criminal matter, I find it very troubling, and I think -- I cited to a case <u>Adamos Wrecking</u>, where there was a dissent in the Supreme Court that kind of skirted the issue but really raised the same constitutional question, and, you know, the first question is -- is one that's largely common sense, which is if I commit a crime and I can raise any number of defenses and lose and then I commit a crime again, am I precluded from raising other defenses.  You know, so if I rob a bank, you know, and I lose at trial and I go to jail, I get out of jail and I rob another bank, is anything I said in the first trial affected?  No.  I'm still entitled to the full compliment of -- of defenses, including collateral attack.  And in a -- in a statute that was set forth by Congress, that collateral

1 attack would be subject to rational basis review, and

2 there's -- there's one working its way through the Ninth

3 Circuit right now on exactly that question having to do with

4 immigration statutes, rational basis.  Rational basis review

5 not being very favorable, that's a different, again,

6 academic discussion.

7            The -- the --

8            THE COURT:  Which review would you like, strict

9 scrutiny?

10            MR. GERSON:  So, the -- the second -- you know,

11 the kind of complimentary part of that is that as a

12 delegation question, which is maybe less common sense, it

13 really raises the question of whether Congress in enacting

14 the Organic Act that empowers the Park Service and the

15 Department of the Interior, also gave them the power to

16 restrict what are effectively due process rights.

17            And, so, does the Park Service, can they say, yes,

18 this administrative regulation has criminal penalties?  You

19 could spend six months in jail and be subject to a fine, but

20 also you're not allowed to raise certain things, you know,

21 after.  And that was really the -- the constitutional

22 question I think they get at in Adamos Wrecking, which is

23 largely unanswered but -- but raised enough eyebrows that it

24 made it into the dissent as worth watching.

25            And, so, I would be very cautious.  Like, I find

1 it -- I find it very difficult to read into the six-year

2 statute of limitations in this context.  If -- if it was a

3 civil lawsuit, it clearly applies.  In this case, I think

4 Mr. Nunn is entitled to raise the full range of whatever

5 defenses he wishes to -- you know, the wisdom and the

6 success of them notwithstanding, but he's entitled to raise

7 those, and I think that is a -- a real question of due

8 process and delegation.

9 　　　　THE COURT:  And I -- I see that.  I also see, you

10 know, challenging the provision on vagueness grounds, you

11 know what I mean, that you -- a facial challenge, but that's

12 already been decided by <u>Alvers</u>, right, because he could

13 argue, I didn't know that that included based jumping.  I

14 mean, that -- that's what I think his argument would be, to

15 -- you know, which is what other people's arguments were,

16 right.

17 　　　　MR. GERSON:  Right.

18 　　　　THE COURT:  I didn't think it included that.  So,

19 all right.  I get that.

20 　　　　MR. BUTLAND:  Your Honor, may I respond to one

21 point?

22 　　　　THE COURT:  Um-hmm.

23 　　　　MR. BUTLAND:  It would regard whether the statute

24 of limitations should apply, and I realize that the horse

25 may be dead and I'm still kicking it, but I, nonetheless,

1  want to make sure I -- I do a complete record.

2          So, you know, the -- the -- this is to me a very

3  radical argument.  Essentially, the argument is that the

4  Court should be able to disregard a statute of limitations

5  in criminal cases for this very specific mechanism where the

6  Government waived sovereign immunity, opened itself up to

7  suit under the Administrative Procedure Act, and -- but you

8  can just ignore the six-year limitations period.

9          And this might be a good academic discussion as to

10 whether it -- you know, whether this creates problems in

11 administrative law or -- or something like that, but, again,

12 I go back to the Ninth Circuit has already talked about

13 this, and I would -- if I could just read a couple of quotes

14 from the cases just so -- you know, just so that you don't

15 think that I'm mischaracterizing anything, if we go to U.S.

16 v. Backland on page -- page 1001 --

17          THE COURT:  Hold on.

18          MR. BUTLAND:  Sure.

19          THE COURT:  Okay.  Go ahead.

20          MR. BUTLAND:  Okay.  And, so, on page 1001, it

21 says -- and I -- I don't know where -- hopefully you'll be

22 able to find it in your copy quickly, but:

23              "The APA affords a person in

24              Backland's position at least two options

25              for obtaining judicial review of the

1          disputed agency action.  He may file

2          suit in Federal District Court under the

3          APA or he may challenge the agency's

4          decision in a subsequent criminal

5          proceeding.  In either case, he must act

6          within the six-year time limit."

7          And then on page 999 of the same decision, it --

8 you know, the Ninth Circuit prohibited one defendant from

9 contesting a prior agency action based on the six-year

10 limitations period, and it phrased it as follows:

11          "He may not now circumvent the

12          APA's exhaustion requirement by

13          collaterally attacking the agency

14          decision as a defense in this criminal

15          proceeding."

16          Backland rejected the due process argument that's

17 being made right now.  Exact same thing in U.S. v. Lowery

18 from 2008, and if I could just read one more quote into the

19 record, and then I will be --

20          THE COURT:  Yeah, wait a minute.  There was -- I

21 remember, though, in Backland, there was -- the other one

22 was timely because there was other action taken by the

23 individual, correct?

24          MR. BUTLAND:  Correct, your Honor, yeah.  Backland

25 involved two different defendants and --

1    THE COURT:  That's why I'm saying I think there

2 needs to be something.  We need a permit.  We need something

3 is what I guess I -- that exhaustion requirement I think is

4 -- the statute of limitation and exhaustion kind of go had

5 in hand in -- in my opinion.  There has to be an exhaustion

6 of something that then triggers or starts that running.

7 That's why I was asking what -- where does the -- where does

8 the statute of limitations run.  In the one case, the

9 individual had done nothing.  In the other one, the

10 individual had done something and had -- had basically had

11 some action that they could have then tied it to if --

12    MR. BUTLAND:  I agree, your Honor.  To maybe --

13 maybe make it a more generalizable rule, if -- you know, if

14 you assert final agency actions A, B, and C, and you want to

15 challenge all three of them, you can only challenge the ones

16 that occurred within six years.  And in the case of

17 Backland, one of the Defendants could actually point to

18 something that was challenged within six years, but the

19 other one could not.

20    THE COURT:  Okay.

21    MR. BUTLAND:  Just one more quote I'll read from

22 U.S. v. Lowery, page 1203:

23        "Allowing Lowery to collaterally

24        attack the administrative proceedings

25        would effectively circumvent the six-

1          year statute of limitations we have held

2          governs review of such actions."

3          So, I understand that the statute itself says

4   civil in it, but that -- the Ninth Circuit has not felt that

5   was dispositive and applied it into -- to criminal context,

6   and I think if we're going to -- to borrow from Hitchens's

7   Razor, extraordinary claims require extraordinary evidence.

8          If they're going to claim that the statute of

9   limitations doesn't apply in criminal cases as a matter of

10  due process, there should be a case that supports that view

11  from the Ninth Circuit or from the U.S. Supreme Court, and I

12  haven't seen one in any of the briefing.

13         So, I would submit that without that case law, we

14  should defer to what the Ninth Circuit has said, and the

15  remedy, I suppose, is to take this up on appeal and ask the

16  Ninth Circuit to reconsider its prior decision or to try to

17  distinguish this in some way.  I'm not candidly sure how

18  they would, but, you know, who knows?

19         But I think that would be the -- but, in the

20  meantime, I think we need to just -- we need to follow what

21  the Ninth Circuit has opined on.

22         THE COURT:  Right.  Understood.

23         MR. BUTLAND:  Thank you, your Honor.

24         MR. GERSON:  I'm sorry, Judge.  I don't mean to

25  drag things out.  I just want to respond very briefly

1 because I think there's a different reading of -- of

2 <u>Backland</u>.

3        So -- so, in <u>Backland</u> -- and I think it's the same

4 for <u>Lowery</u>, at least one of the Defendants in <u>Backland</u> had

5 applied for this permit to live at his mining site through

6 the Forest Service and had properly gone through the appeals

7 process, and he was then allowed to challenge it in his

8 subsequent criminal prosecution.

9        So, his subsequent criminal prosecution, triggered

10 that ability just the same way that -- that filing a civil

11 suit would have triggered.  The Ninth Circuit is very clear

12 from the quote we just heard.

13        The other defendant did not go through these

14 administrative exhaustion remedies and was, therefore, not

15 allowed to.  And the same thing with <u>Lowery</u>, where my

16 understanding is that she applied for this permit to reside

17 on the land under an American Indian treaty of some kind but

18 did not follow through the process, and it sat dormant for

19 many many years before she was eventually prosecuted.  And,

20 so, it had -- it had not exhausted or run through the

21 statute of limitations.

22        In this case, you know, we're in the same position

23 where -- where the action is triggered by the most recent

24 arrest, Mr. Nunn's arrest in this case.  Just like the ninth

25 Circuit says in <u>Backland</u>, you can then attack it in a

subsequent criminal proceeding.  The difference is there's never been any evidence and the Government hasn't supplied any evidence of a way to appeal a permit to apply for a permit, and the final agency action was very clear that there was never going to be a permit.  The historical record indicates that base jumping was never going to be allowed.

         And, so, I think you can skip over those intermediate steps of -- of looking at where these -- these appeal process, internal -- excuse me -- administrative appeals process steps would have landed and just go straight to the current prosecution which triggers the collateral attack.

         THE COURT:  But then doesn't that make the -- any permitting process in the parks null and void for all intents and purposes?

         MR. GERSON:  Well, I think other permitting processes that don't have the -- the unfortunate background that base jumping does.  You know, so --

         THE COURT:  I know you keep talking about the unfortunate background, but I don't see the evidence of that.  I don't see a record that says, you know, here are 28 applications in one month for -- you know, for base jumping that were all denied without comment.  Here's an opportunity -- you know, here's dialogue that had been initiated trying to get the permit.  There's your agency.  That to me is your

1 agency action.  There's your -- you know what I mean?  If

2 it's a flat out denial, you know, with no explanation and

3 we're not going to have the dialogue, then -- then I could

4 give an argument that it's futile.  But just the belief that

5 it's going to be denied I don't think is sufficient.  Do

6 you?

7          MR. GERSON:  Well, I mean, I think if it's -- if

8 it's widespread and historical enough and there's -- you

9 know, I think it is actually in <u>Overton Park</u> where they

10 speak to developing an evidentiary record because it's often

11 hard to develop from internal agency decision making, and

12 that case specifically calls for an evidentiary hearing on

13 the issue.

14          THE COURT:  Right.

15          MR. GERSON:  I'll just put it out there.  But --

16          THE COURT:  Because that -- that's really what

17 you're -- you would need is evidence to be able to -- to

18 prove that there's -- and I just -- I don't -- when your own

19 client didn't apply for a permit, I think it -- he's hard

20 pressed to say, I've been treated just like these other 25

21 people.

22          MR. GERSON:  Well, I think it's more than 25

23 people, and I think that it really comes from extreme

24 circumstances where you've got -- again, we -- we cite to

25 the documentary where it's this person giving, you know, an

1  interview.  We don't have a reason to disbelieve him or that

2  he would fabricate this, that he, you know, arbitrarily

3  stopped the permitting process for reasons that are not

4  valid or that, you know, over many many years and many many

5  fatalities that are well reported, where people were making

6  base jumps after dark or at twilight or in suspect areas in

7  order to avoid being arrested and having their -- their

8  equipment --

9          THE COURT:  But is that on the National Park

10 Service or is that the assumption of risk by the particular

11 base jumper?

12         MR. GERSON:  Well, I think -- I think base jumpers

13 always assume the risk, but I think that the -- the question

14 is would you assume additional risk knowing -- without

15 knowing -- sorry, maybe I'm using two negatives.  If you

16 knew that there was not a drastic consequence at the end of

17 this, would you assume the risk, right.  And, so, if every

18 base jumper in the base jumping community, which I

19 understand is very close-knit, understands that the rangers

20 will be out to enforce this, to arrest them to confiscate

21 their gear, that they'll end up here in this courtroom on

22 every single jump every single time with no reconsideration

23 and that's circulated widely, I think that is enough to show

24 that it's a final agency action, that that is the -- the

25 wall that you've hit in terms of applying for permits or

1  applying for permission.

2          THE COURT:  All right.  Mr. Backland, do you want

3  to address that or --

4          MR. BUTLAND:  Your Honor, I -- I think that -- I

5  think that I probably addressed a bit of it before and also

6  in our briefing, which -- you know, which I would refer to

7  again with the two opposition briefs that we filed.

8          The one thing that I would add here is that we

9  just heard what seems to be a new final agency action which

10  is triggered by arrest.  And I am not aware of that

11  constituting a final agency action because, as I think your

12  Honor has already pointed out, that is an interpretive rule

13  issue.  That's a question of, okay, we have a regulation.

14  Does this conduct fall within it?  That's not -- that's not

15  a final agency decision that's subject to any sort of notice

16  and comment or reasoned decision making.  And, you know, and

17  we've cited quite a few cases in that regard, that with the

18  -- like, for example, with the Fifth Circuit case of a --

19  you know, a prison forbids possession of dangerous tools and

20  an inmate has a cell phone and he gets disciplined for it

21  because they say that's a dangerous tool.  Well, the BOP had

22  never really held that before, but that didn't matter.  Just

23  because the BOP decided we're going to punish somebody for

24  holding a cell phone under a regulation we hadn't applied to

25  that issue before, that didn't create a new agency action.

1  That was just an interpretative --

2          THE COURT:  Interpretation.

3          MR. BUTLAND:  Yeah, just an interpretive rule, and

4  -- and that does not require any of the notice and -- or the

5  reasoned decision requirements of the APA and -- you know,

6  and we identified all that in our brief, and I would just

7  refer to that.

8          THE COURT:  Okay.

9          MR. BUTLAND:  Thank you, your Honor.

10         THE COURT:  Thank you.

11         MR. GERSON:  I'm sorry.  Just to clarify that.

12         THE COURT:  Go ahead.

13         MR. GERSON:  So, my position on the arrest is not

14  that it's an interpretive issue or an agency action or

15  anything else.  I'm just quoting from Backland where

16  Backland, the Ninth Circuit very clearly says what triggers

17  the collateral attack, your ability to attack it is either

18  you file a lawsuit or on a subsequent arrest after you've

19  gone through whatever intervening administrative appeals.

20         So, it's -- it's not that we say that the arrest

21  itself is interpretive or anything else.  It's just that

22  that is the touchstone for your ability to then challenge

23  it, just like filing suit would be.

24         THE COURT:  Understood.

25         MR. GERSON:  So --

1    THE COURT:  And I guess following up with that,
2 then, Mr. Gerson, is my question is what were the
3 administrative appeals here that were available?
4    MR. GERSON:  So, it's our position is that --
5    THE COURT:  I go back to isn't it the permitting?
6    MR. GERSON:  Right.  So -- so, our position is
7 that a permit was never available nor was an appeal process.
8    THE COURT:  Okay.  So, you're essentially saying
9 it's futile.
10    MR. GERSON:  That's correct.
11    THE COURT:  That to the extent there is a
12 permitting process and an appeal of such process, that it's
13 futile?
14    MR. GERSON:  The permit itself is certainly
15 futile, and nobody in two hearings now has given us any
16 indication of what the appeal process would actually look
17 like.
18    THE COURT:  All right.  And I --
19    MR. GERSON:  So, I'm not sure it exists.
20    THE COURT:  Yeah.  I -- I would love to know what
21 is the -- you know, if I apply for a permit and I am denied
22 a permit through the National Park Service, for whatever I
23 want to apply for or, in particular, base jumping, okay,
24 because it's in there, right:
25        "The following shall require a

permit.  The following is a compilation

of those activities for which a permit

from -- which require a permit from the

superintendent:  Delivery or retrieval

of a person or object by parachute,

helicopter or other airborne means."

I want to base jump in Yosemite.  I go in.  I get a permit from the Superintendent.  I go online or wherever the permit is, and I request to base jump.  I -- whatever the permit asks me -- I don't know.  I haven't gone online to look at the permitting process, but I assume, dependent upon what I'm asking to do -- I mean, I know, for instance we have law day every day -- every year here in the Park. You know, there's certain permitting things that we need to go through in order to have a small band in the park or have students come up into the park.  You know what I mean? There's different things that -- hoops you have to jump through to do certain things in the park.

There -- I submit that permit.  At some point that permit's either granted or denied.  Is that it?  Is there an appeals process?  Is there not?  Does that open the dialogue for the community to then come in and say, Well, how do we go about to get this into the Park system?

MR. BUTLAND:  I don't believe there's an internal appeals process if you apply for a permit and are rejected,

1  your Honor.  And, so, for whatever the -- you know, what

2  ever the denial would look like, either, well, we don't

3  think that you've met requirements or I suppose they could

4  just --

5          THE COURT:  Or we deny it on the basis of the

6  following, A, B, C, D.

7          MR. BUTLAND:  Yeah.

8          THE COURT:  And that's the agency --

9          MR. BUTLAND:  Or -- or just even say, Well, we

10 don't accept permits for that, you know, possibly.  But the

11 -- you know, but ultimately I go back to the regulation

12 itself that we're talking about here is (a)(3), which says

13 you can't deliver by parachute or helicopter or other means

14 unless it's an emergency or unless you have a permit.

15         THE COURT:  Permit.

16         MR. BUTLAND:  Right.  And, so, the question that

17 we have to ask is is that regulation that says prohibition

18 except in these two cases, is that arbitrary and capricious.

19 And the -- and we can't answer that question until we know

20 precisely what the argument is.  You know, we can't really

21 shadowbox here.  We have to have a specific argument made,

22 and what I have heard is that there are, you know, two

23 different situations, one when the regulation was enacted,

24 one --

25         THE COURT:  Which is the lack of notice you're

1 saying.

2        MR. BUTLAND:  Yeah.  And -- and then there's some
3 kind of ambiguous when exactly it occurred, but at some
4 point it became assumed by the base jumping community that
5 there would never be a permit granted here.

6        Okay.  When was that?  We need a date.  And I --
7 from -- for what I can tell of the briefing, it appears to
8 be sometime in the '90's, but that would have been the time
9 to challenge it, and same thing with -- with -- with
10 Backland.  I mean, it says in either case, whether you
11 choose to bring an outright civil action or whether you
12 choose to collaterally attack in a criminal, in either case
13 it's got to be within six years of when the final agency
14 action occurred.

15        I would submit that if there was, in fact, a
16 ranger who says -- and I know you don't have the evidence
17 before you that -- that can prove that, but if you have
18 evidence that -- where a ranger says in 1993, I don't care
19 what's going to happen.  I will never allow a permit,
20 period, well, then 1993 is the final agency action, and
21 they've got until 1999 to raise the issue, and they haven't
22 done that.

23        And, you know, another thing that makes this not
24 as significant, I'm going to go back to what was said in
25 Wind River, in the Wind River case.  Why is it okay to apply

1  a statute of limitations of six years even if the person

2  hadn't been born yet at the time that the regulation was

3  enacted in the first place?  And what Winder River said was

4  two things.  Number one, an interested community will have

5  people who would want to -- who would have an incentive to

6  bring the exact same procedural claim.  Number two, the

7  government's interest in finality trumps the interest of

8  latecomers.

9         Well, we've heard about how tightly knit this base

10 jumping community is.  They talk to each other.  They know

11 -- they know very much which -- you know, which parks might

12 be arguably hostile to base jumping.  Even if Mr. Nunn

13 wasn't able to raise this until now, a lot of his -- a lot

14 of his colleagues could have.  And none of them ever did.

15 Mr. Nunn could have raised it in 1999, and he didn't.

16        So, I will just say that I don't think that the

17 Court even needs to go into a lot of the questions of what

18 specifically does the appeal look like or what does the

19 administrative record say.  I think at the end of the day,

20 that's just going to be an advisory opinion.

21        The -- the more direct way is you need to identify

22 a final agency action, and you have six years, and you

23 haven't done it.  You haven't brought it within six years.

24 You had another opportunity in '99, and you didn't.  I think

25 that brings this case very squarely within Backland and

Lowery, where you had a prior agency action, where they enforced it against the exact same individual, and he didn't make his argument. He -- he waived his argument at that time. He shouldn't be able to bring out the exact same argument 20 years later when he's arrested for the same -- or when he's cited, rather, for the exact same conduct.

So, but I -- I appreciate -- I appreciate the opportunity to speak, your Honor. So, thank you.

THE COURT: Okay. Thank you.

And, with regards, I get your due process issue, but I think there's other avenues to challenge that, and I think that's on a vagueness challenge, right? Because we see that all the time in criminal statutes all the time. You know what I mean, subsequently? Old statutes being challenged under vagueness grounds. You know what I mean, that have been around forever too. So, I -- I don't -- I get what he's saying with regards to the six years and -- and whether that civil statute applies or not. I -- I don't know that I even need to go there. But I -- I don't think it forecloses a challenge otherwise to a criminal statute, that that -- that that is the only challenge that somebody would otherwise have, especially when you're challenging just the arbitrary and capriciousness of this particular implementation, you know, and not the statute itself of being constitutionally insufficient.

1          Do you see what I'm saying?

2          MR. BUTLAND:  Yes.

3          THE COURT:  Okay.  So, all right.  Anything

4  further from either side?

5          MR. GERSON:  Nothing from me, your Honor.  Thank

6  you.

7          MR. BUTLAND:  Nothing.  Nothing further.

8          THE COURT:  I appreciate the insight.  I

9  appreciate the further discussion.  I just wanted to make

10 sure I understood both sides' arguments well, and I feel

11 like I do much better now.  And, hopefully, I will be

12 getting out an opinion shortly because I know there are a

13 number of cases that are backlogged waiting for this

14 particular case.

15         So, I -- I can attest that we have a number of

16 these citations out there.  Again, I don't know whether

17 anybody's applied for a permit, but I do know your client

18 was charged not only with the base jumping but with failure

19 to have the permit, which in and of itself implies that

20 there is a permitting process.

21         So, all right.  Thank you.

22         MR. BUTLAND:  Thank you very much, your Honor.

23         MR. GERSON:  Thank you, your Honor.

24     (Proceedings concluded.)

25

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/Crystal Thomas               4/19/2023
     Transcriber, AAERT CERT *654    Date
6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
     /s/L.L. Francisco
9    L.L. Francisco, President
     Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25