*United States v. David Nunn*

**Case No. 6:20-po-00742 HBK**

**Exhibit A**

# DECLARATION

I, Brendan Weinstein, declare as follows:

1. I am currently the president of Base Access, a 501(c)(3) organization, started in 2023 with my co-founder, Dylan Avatar.

2. Base Access advocates for the advancement of BASE jumping. We encourage responsible freefalling and parachuting by the BASE jumping community. Our mission is to (1) preserve BASE jumping access on public lands within the United States, (2) foster respect for the natural environments in which we recreate, (3) represent and help educate thousands of BASE jumpers from around the world in collaboration with government agencies responsible for regulating public lands that offer access to BASE jump exit points, and (4) decriminalize BASE jumping.

3. I started BASE jumping in 2014. In 2015, I created a website known as www.basebeta.com. It is a guidebook for BASE jumping.

4. I have spent countless hours documenting BASE jumps. I consider Yosemite National Park to be the safest place in the world for BASE jumping. There are many large sheer walls that afford forgiveness to mistakes in start technique as well as the ability to deploy one's parachute at a reasonable altitude. Yosemite ledges are level and often have perfect 90-degree angles. This reduces the risk of slipping off the exit uncontrolled. The granite rock is of low risk of crumbling as the result of a jumper's "push." In addition, many jump spots in Yosemite are led to by trails that do not require exposed scrambling or technical climbing. There are frequent high pressure weather systems that afford long windows for safe jumps that are well-forecasted by multiple weather models. Soft dirt, sand, and grass in its landing areas reduces the probability of lower extremity and back injury if a parachutist encounters turbulence just before landing. The valley is not so narrow as to cause significant Venturi effect winds.

5. I have made numerous attempts to work with the National Park Service and Yosemite National Park to gain legal access for BASE jumping.

6. On February 22, 2023, the BASE Access board drafted a proposal for BASE jumping regulations for Yosemite that I believe address concerns with congestion, safety, and environmental impact in the park. This draft was intended to open a dialogue with Yosemite administrators. Ex. 1.

7. On May 10, 2023, after the BASE Access board approved our proposal, I sent a letter to the National Park Service, along with the proposal, requesting for a meeting to discuss ways to work together to ensure safe BASE jumping access in the national parks. Ex. 2. I also sent this letter and proposal to Bob Ratcliffe, bob_ratcliffe@nps.gov, who was still listed as Division Chief of Conservation and Outdoor Recreation as late as December 7, 2023. Neither the NPS nor Bob Ratcliffe responded to this letter.

EXHIBIT A-1

8. On December 7, 2023, after speaking with Krista Sherwood, an employee of the National Park Service, I emailed her and provided her with a copy of our May 10, 2023, submission to the National Park Service. Ex. 3.

9. On December 12, 2023, I sent an email to Jesse McGahey and Cicely Muldoon with the National Park Service requesting a meeting with Yosemite National Park officials to discuss BASE jumping. Ex. 4. Neither Mr. McGahey nor Ms. Muldoon responded to this email.

10. On December 12, 2023, I applied for a special use permit to wingsuit BASE jump at Yosemite in January 2024. This permit is the standard application form supplied by Yosemite to carry out activities in the park. I included a supplement to the permit application introducing our organization and goals, and supplying detailed information for a proposed BASE jump. Exs. 5, 6. This information was necessary to ensure transparent communication with the park, as BASE jumping permits are rare.

11. On January 2, 2024 I sent a follow-up email (available at https://baseaccess.s3.us-west-1.amazonaws.com/outreach/Jan2-Yosemite-Followup.pdf) to Jesse McGahey and Cicely Muldoon requesting a meeting with Yosemite National Park officials to discuss BASE jumping. Neither Mr. McGahey nor Ms. Muldoon responded to this email.

12. On January 9, 2024, Yosemite responded to my special use permit application. I received a letter from Joseph Meyer on behalf of Superintendent Cicely Muldoon informing me the National Park Service needs to conduct a "park planning process" in accordance with law and policy to determine if BASE jumping is an appropriate activity at Yosemite National Park before it would consider any permit application. The same letter informed me that Yosemite National Park does not have the capacity to conduct such a study. Ex 7.

13. On April 12, 2024, Base Access attorney Kendrick Dane submitted an appeal of Yosemite National Park's January 9, 2024 denial of my special use permit application. Base Access's administrative appeal documented several decades of the BASE and parachute community's fruitless efforts to engage with national parks only to be swept aside. Ex. 8

14. On July 24, 2024, I received an email from Alan Kunz, the Permit Program Manager at the Special Park Uses Office for Yosemite, informing me that the $100 check from my December 12, 2023, special use permit application was being returned to me. Ex 9.

15. I responded back to Mr. Kunz on August 1, 2024, assuming a mistake had been made and returned the check back to his office. I included in my response that we are still waiting on a response to our April 12, 2024, administrative appeal and I mentioned in the email that Superintendent Muldoon has not responded to BASE Access's requests to meet with her regarding park planning. I reiterated our continued willingness to meet and engage with her. Ex. 10.

**EXHIBIT A-2**

16. On August 8, the National Park Service responded to our appeal denying it. In its letter, the National Park Service stated that there is no formal administrative appeal process. It also stated that permits are only available if a park has undertaken a "planning process" to determine that it is available. Ex. 11.

17. In addition to Yosemite National Park, our organization has reached out to other national parks in the country and filed permit applications to BASE jump. All have been denied:

| National Park | Permit Denied |
|---|---|
| Yosemite | January 9, 2024 |
| Zion | February 7, 2024 |
| Grand Teton | February 15, 2024 |
| Grand Canyon | February 23, 2024 |
| Guadalupe | February 23, 2024 |
| Northern Cascades | February 23, 2024 |
| Big Bend | March 8, 2024 |
| King's Canyon | April 2, 2024 |
| Glen Canyon | April 25, 2024 |
| Glacier | August 1, 2024 |

The details of each application and denial are available at http://baseaccess.org/outreach.

18. Our organization sent outreach to the superintendent of each park listed above requesting a meeting with the Superintendent. We failed to secure a single meeting with any superintendent. The only meeting we managed to secure was with the Chief Ranger of Northern Cascades National Park in February 2024.

19. For over a year, our organization has made efforts to plan and engage with the National Park Service and have not been afforded the opportunity to do so. In addition, our efforts make clear that there is no legitimate or functioning permit system available for BASE jumping in any national park.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

September 12, 2024

Brendan Weinstein

EXHIBIT A-3

*United States v. David Nunn*

**Case No. 6:20-po-00742 HBK**

**Exhibit A-1**

# Yosemite Proposal

**Date Created**: 2023-02-22

**Author**: BASE Access (team@baseaccess.org)

## Goals

- Give BASE jumpers a legal path for jumping in the park on a regular basis
- Minimize impact to the environment
- Minimize chance of disruption to park operations

**Proposal**

Yosemite amends its guidelines to allow BASE jumping throughout the year without a permit from sunrise to 10am. BASE Access will ensure that the jumping community respects this time rule. Additionally, we suggest the following rules in service of ensuring minimal impact to wildlife, minimizing the chance that jumpers distract park employees during peak park hours, and reducing accident risk:

**Proposed rules**

- All jumpers wishing to visit Yosemite should possess a United States Parachuting Association (USPA) PRO rating.
  - The requirements for obtaining that license include establishing proficiency in landing in small target areas, a necessary skill for BASE jumpers.
  - Each of the 4 incidents in Yosemite that required a search-and-rescue response in the past 20 years were responses to folks who did not have a PRO rating, and likely did not have the skill required to obtain that rating.
- No jumping except from sunrise to 10am.
  - This ensures that if there is an incident it is not during peak park hours. The park is generally quiet before 9am and quite vibrant from 10am onwards.
- No jumping from El Cap during May-June and September-October to help alleviate congestion
- No jumping from Glacier Point.
  - Glacier Point has problems with tourists climbing the railing to stand on precarious ledges. It's possible tourists seeing jumpers might exacerbate that problem and create a safety hazard
  - It's the easiest access jump in the park. More likely to have accidents from this exit since there would be a higher volume of jumps+jumpers.
- No jumping from any exit near where peregrine falcons are nesting (roughly May-July)

**EXHIBIT A-1.1**

- ○ BASE Access will ensure the BASE community has the latest updates on when jumping is forbidden vs allowed. And will provide explicit guidance on which exits are within a half mile.
- All jumpers should deploy their parachutes high enough to ensure at least a 20 second canopy ride.
- All jumpers are responsible for visually checking for clear airspace in their flight path before jumping. If necessary, jumpers are willing to call a number to confirm clear airspace before each jump.
- BASE Access will relay and ensure the BASE jumping community respects ad hoc jumping restrictions for rescue operations, wildfire, emergencies, special events, etc.

**EXHIBIT A-1.2**

*United States v. David Nunn*

**Case No. 6:20-po-00742 HBK**

**Exhibit A -2**

# NPS Draft Letter

**Date Created**: 2023-04-04

**Context:** Submitted on May 10, 2023 via
https://www.nps.gov/common/utilities/sendmail/sendemail.cfm?o=4A96D0B58DC08FB284A85DA8F601&r=/a
boutus/contactus.htm. Also sent to Bob Ratcliffe (bob_ratcliffe@nps.gov) who is still listed as Division Chief of
Conservation and Outdoor Recreation on this NPS website as of December 7, 2023


I am writing on behalf of BASE Access, a non-profit organization dedicated to preserving exit point access on
public lands.

We'd like to work with the NPS to create a framework that would allow for BASE jumping in the parks in a way
that is aligned with the NPS' mission.

We kindly request any information on steps we'd need to take to have the NPS work with us to create a
framework for allowing BASE jumping in the national parks.

We kindly request an audience with the Yosemite superintendent to discuss our proposal for how BASE
jumping in Yosemite could work. Our Yosemite proposal is available at
https://docs.google.com/document/d/1e-Aoby3tLLmcflqBm2Ov5rxXyt68YWPPtFVV77jRvj0/edit

We kindly request an audience with Bob Ratcliff, Chief of Conservation and Outdoor Recreation, to discuss a
Memorandum of Understanding document we have drafted that outlines how we believe our two organizations
could effectively work together to ensure safe, sustainable, minimal impact BASE jumping in America's
national parks.


Best Regards,

Brendan Weinstein

BASE Access Board President

EXHIBIT A-2

*United States v. David Nunn*

**Case No. 6:20-po-00742 HBK**

**Exhibit A -3**

 Gmail

Brendan Weinstein <brendan@baseaccess.org>

## BASE Access partnership with the NPS

**Brendan Weinstein** <brendan@baseaccess.org>                                    Thu, Dec 7, 2023 at 9:33 PM
To: krista_sherwood@nps.gov
Bcc: ████████████████████████████████████████████████████████████

Hey Krista,

I really appreciate you taking the time to chat with me this afternoon. I believe in light of Bob's retirement, you are the right person to be contacting, but if not, please let me know who I should contact instead and feel free to pass along the entirety of this email.

In May we sent a message, which was unanimously approved by our board, to the National Parks expressing our desire to partner with the NPS to create a framework that would allow for BASE jumping in the parks in a way that is aligned with the NPS' mission.

I've attached that original letter as well as a proposal that was also included in that letter describing how we believe regulated jumping could best work in Yosemite National Park. We believe that proposal can serve as a template that can be reasonably adjusted for other parks.

I've also shared with you a rough draft Memorandum of Understanding (MOU) that we believe can serve as a good guide for how our two groups would work together. In short, we believe the way that the Access Fund and the NPS work together is a good model for how our two groups would ideally collaborate.

I am incredibly proud of the board we have established for BASE Access, which includes three parents, three executives, one attorney, and two BASE instructors. Julia is an attorney who has experience working with the national parks in Brazil to preserve site access for BASE jumpers. Shannon is the former director of marketing for the United States Parachute Association (USPA). Dylan co-founded Merit which is a tech company used by skydiving, medical industries, and the military for managing credentials. We could not have a better group of people working on a path forward for BASE jumping on public lands.

At the beginning of the call you mentioned that you believe BASE jumping is a banned activity within the National Parks. I believe many in the BASE jumping community shared this perception until recently. It was surprising, but welcomed, to see the Government express a desire to work with the BASE jumping community in US vs Nunn (Case No. 20PO00742-HBK). I've attached the relevant statements made on behalf of the Government below:

**EXHIBIT A-3.1**

```
18  to in terms of the approach.  But I think that the air --
19  the hang gliding is a great example of how this could work.
20  You know, hang gliding we saw in -- in their brief -- it's
21  Exhibit A that has all the -- that has all the hang gliding
22  documents.  There are almost 30 pages here, and what's very
23  clear is that the hang glider -- there's a hang glider's
24  association basically that had an interactive discussion
25  with the park, and they came up with a proposal to allow
```

*Echo Reporting, Inc.*

```
                                                               29

 1  hang gliding.  So, what does that look like?  Well, it's


17          Now, if that was what the base jumping community
18  did, if they came with a really solid proposal and said --
19  basically like the hang gliders did and said, Here, we want
20  to jump off from this point.  We want to do it at this hour.
21  We want the landing spot to be here.  Here's how we're going
```

**EXHIBIT A-3.2**

```
10        MR. BUTLAND:  And then they can issue a permit or

11  if they don't, when there is a showing that, look, this will

12  not impact the wildlife, this is completely safe, it won't,

13  you know, interfere with airspace, you know, for helicopters

14  that come in or hang gliders that are in the area, something

15  like that, you know, if you can show all of that and the

16  Department of the Interior still says no, well, then there

17  might be something to discuss in terms of lack of reasoned
```

If you look at the local organizations section of our website, you'll find great examples of BASE jumpers working with government and other parties (paragliders, hanggliders, farmers) to collaboratively share space for recreation. I'd be happy to show you around Lauterbrunnnen, Switzerland and demo how jumpers call the local helicopter company before every jump to ensure they are flying into clear airspace. It's a smaller valley with heavier air traffic, and things run smoothly! It's quite impressive.

I look forward to hearing back from you. Please let us know any suggestions or feedback on the documents+proposals shared and/or this email. Thanks to the work of the NPS the National Parks have been preserved as an American treasure. It is the dream of many in our community to safely recreate as BASE jumpers within the Parks.

Best,
Brendan Weinstein
BASE Access Board President


——---

# NPS Letter

**Date Created**: 2023-04-04

**Context:** Submitted on May 10, 2023 via https://www.nps.gov/common/utilities/sendmail/sendemail.cfm?o=4A96D0B58DC08FB284A85DA8F601&r=/aboutus/contactus.htm. Also sent to Bob Ratcliffe (bob_ratcliffe@nps.gov) who is still listed as Division Chief of Conservation and Outdoor Recreation on this NPS website as of December 7, 2023 though we now understand he is retired.

I am writing on behalf of BASE Access, a non-profit organization dedicated to preserving exit point access on public lands.

We'd like to work with the NPS to create a framework that would allow for BASE jumping in the parks in a way that is aligned with the NPS' mission.

**EXHIBIT A-3.3**

We kindly request any information on steps we'd need to take to have the NPS work with us to create a framework for allowing BASE jumping in the national parks.

We kindly request an audience with the Yosemite superintendent to discuss our proposal for how BASE jumping in Yosemite could work. Our Yosemite proposal is available at https://docs.google.com/document/d/1e-Aoby3tLLmcflqBm2Ov5rxXyt68YWPPtFVV77jRvj0/edit

We kindly request an audience with Bob Ratcliff, Chief of Conservation and Outdoor Recreation, to discuss a Memorandum of Understanding document we have drafted that outlines how we believe our two organizations could effectively work together to ensure safe, sustainable, minimal impact BASE jumping in America's national parks.

Best Regards,

Brendan Weinstein

BASE Access Board President

——------

# Yosemite Proposal

**Date Created**: 2023-02-22

**Author**: BASE Access (team@baseaccess.org)

## Goals

- Give BASE jumpers a legal path for jumping in the park on a regular basis
- Minimize impact to the environment
- Minimize chance of disruption to park operations

**Proposal**

Yosemite amends its guidelines to allow BASE jumping throughout the year without a permit from sunrise to 10am. BASE Access will ensure that the jumping community respects this time rule. Additionally, we suggest the following rules in service of ensuring minimal impact to wildlife, minimizing the chance that jumpers distract park employees during peak park hours, and reducing accident risk:

**Proposed rules**

- No jumping except from sunrise to 10am.
  - This ensures that if there is an incident it is not during peak park hours. The park is generally quiet before 9am and quite vibrant from 10am onwards.
- No jumping from El Cap during May-June and September-October to help alleviate congestion
- No jumping from Glacier Point.
  - Glacier Point has problems with tourists climbing the railing to stand on precarious ledges. It's possible tourists seeing jumpers might exacerbate that problem and create a safety hazard

**EXHIBIT A-3.4**

Case 6:20-bo-00742-HBK    Document 61-1    Filed 09/16/24    Page 15 of 99

- It's the easiest access jump in the park. More likely to have accidents from this exit since there would be a higher volume of jumps+jumpers.
- No jumping from any exit near where peregrine falcons are nesting (roughly May-July)
  - BASE Access will ensure the BASE community has the latest updates on when jumping is forbidden vs allowed. And will provide explicit guidance on which exits are within a half mile.
- All jumpers should deploy their parachutes high enough to ensure at least a 20 second canopy ride.
- All jumpers are responsible for visually checking for clear airspace in their flight path before jumping. If necessary, jumpers are willing to call a number to confirm clear airspace before each jump.
- BASE Access will relay and ensure the BASE jumping community respects ad hoc jumping restrictions for rescue operations, wildfire, emergencies, special events, etc.

———-----

**EXHIBIT A-3.5**

***United States v. David Nunn***

**Case No. 6:20-po-00742 HBK**

**Exhibit A -4**

 Gmail

Brendan Weinstein <brendan@baseaccess.org>

---

## BASE Access -- Yosemite

---

**Brendan Weinstein** <brendan@baseaccess.org>                      Tue, Dec 12, 2023 at 7:50 PM
To: Jesse_McGahey@nps.gov
Cc: Cicely_Muldoon@nps.gov
Bcc: updates@baseaccess.org



Hey Jesse,

My name is Brendan Weinstein and I am reaching out on behalf of BASE Access, a non-profit representing BASE jumpers.

I called the general information office today and was advised that either you or the superintendent would be the best two people to reach out to for our inquiries.

BASE jumpers would like to start a dialogue with Yosemite National Park on re-introducing BASE jumping to the park in a way that is in line with the park's mission to preserve Yosemite for future generations. We have the understanding that parks partake in a regular planning process where new activities can be officially integrated into the park, and we would like to be involved in Yosemite's process for this. And we'd like to know what is the proper way for our group to participate.

Back in May we drafted a proposal for an initial set of rules that we believe could govern jumping in the parks. You can view that proposal [here](). It was drafted with heavy consideration for minimizing impact to park staff and its resources, and with the mentality that rules could be tightened or loosened based on the outcome of a trial period.

We sent an inquiry back in May through the contact form on the Yosemite website asking about who to get in touch with for discussing our proposal, and requested a meeting with the Superintendent, but did not hear back.

Yosemite is the best place in the country for BASE jumping. It's the birthplace of BASE. It has a broad set of greens and blues (ie high margin flights), whereas most of what is outside the national parks are blacks or double blacks (ie low margin, high risk flights). As an aging father who loves flying wingsuits, I see that the safest future for our activity is in the national parks. And when I think of the next generation of jumpers, the only responsible way to help bring them into the sport in the United States is through a regulated path in the national parks, with Yosemite being the park that offers the greatest amount of margin and safety.

In parallel we've sent a draft [Memorandum of Understanding]() document to Krista Sherwood, National Program Manager for Outdoor Recreation, in the hopes that our organization, BASE Access, can serve as the functional equivalent of what the Access Fund is for climbers in managing the relationship between BASE jumpers and the NPS.

**EXHIBIT A-4.1**

We've also submitted a special use permit application for a small group to complete a wingsuit BASE jump from Porcelain Wall in January. That application is scheduled to arrive tomorrow, but if you want to take a peek you can view it here. We are hopeful to get constructive engagement on that permit application and believe it can be the first step in building a fruitful relationship between jumpers and Yosemite National Park. If you think this letter would be better addressed to a different staff member, feel free to pass on. And please let me know who would be the correct person with whom to be in correspondence. If you or Cecily are the correct folks and are amenable, it'd be great to hop on a video call for 30 minutes to chat about our proposal.

Best,
Brendan Weinstein
BASE Access Board President

**EXHIBIT A-4.2**

*United States v. David Nunn*

**Case No. 6:20-po-00742 HBK**

**Exhibit A -5**



**APPLICATION FOR SPECIAL USE PERMIT**

**Yosemite National Park**
P.O. Box 700
El Portal, CA 95318



(209) 379-1434

Please supply the information requested below.  **Attach additional sheets, if necessary, to provide required information.**  A nonrefundable processing fee of $100.00 must accompany this application unless the requested use is an exercise of a First Amendment right or a film permit.  You must allow sufficient time for the park to process your request; check with the park for guidelines.  You will be notified of the status of the application and the necessary steps to secure your final permit.  Your permit may require the payment of cost recovery charges and proof of liability insurance naming the United States of America an additional insured.

**\* Enter either a Social Security Number OR a tax ID number; we do not require both.**

| Applicant Information | Company/Organization Information |
|---|---|
| Applicant Name: | Company/Organization Name: BASE Access |
| Social Security Number*: | Tax Identification Number*: 92-3448461 |
| Street Address: | Street Address: 6150 Sunrise Meadows |
| City: | City: Reno |
| State: | State: Nevada |
| Zip Code: | Zip Code: 89519 |
| Country: | Country: United States |
| Telephone Number: | Telephone Number: 650 - 427 - 9829 |
| Cell Phone Number: | Contact Name: Brendan Weinstein |
| Fax Number: | Fax Number: |
| Email Address: | Email Address: team@baseaccess.org |

**EXHIBIT A-5.1**

RECORDS RETENTION: Unapproved (3 years).  Maintain Approved applications with related permit and associated records based on appropriate item(s) in NPS Records Schedule 1, Resources Management and Lands, (N1-79-08-1)

## Activity Details

| **Description of Proposed Activity** (attach diagram and/or additional pages, if necessary) |
|---|
| Wingsuit base jump from exit point at the top of the Porcelain Wall. See attached sheets for details. |

## Location Details

| **Requested Location** |
|---|
| Porcelain Wall, Yosemite, United States. |

## Equipment Details

| **Support equipment** (list all equipment; attach additional pages if necessary) |
|---|
| Standard hiking equipment, wingsuits, single parachute systems, and Garmin inreach beacon. Please see attached sheets for additional details. |

## Timing

**EXHIBIT A-5.2**

RECORDS RETENTION: Unapproved (3 years).  Maintain Approved applications with related permit and associated records based on appropriate item(s) in NPS Records Schedule 1, Resources Management and Lands, (N1-79-08-1)

| Set-Up Begins | Activity Begins | Activity Ends | Removal Completed |
|---|---|---|---|
| Date:<br>Time:<br>AM  PM | Date: January 19, 2023<br>Time: 6:45 AM | Date: January 26, 2023<br>Time: 4 PM | Date:<br>Time:<br>AM  PM |
| Date:<br>Time:<br>AM  PM | Date:<br>Time:<br>AM  PM | Date:<br>Time:<br>AM  PM | Date:<br>Time:<br>AM  PM |
| Date:<br>Time:<br>AM  PM | Date:<br>Time:<br>AM  PM | Date:<br>Time:<br>AM  PM | Date:<br>Time:<br>AM  PM |

### Vehicles & Participants
If using any vehicles, attach a parking plan to this form.

| Type | Maximum Number |
|---|---|
| Participants (best estimate) | 4 |
| Cars | 4 |
| Vans/Light Trucks | |
| Utility Vans/Trucks | |
| Buses/Oversized Vehicles | |

### Support Personnel
List support personnel including addresses and telephones; attach additional pages if necessary

| Name | Address | Cell Phone Number |
|---|---|---|
| Shannon Searles | 62 Oceansize Drive Daly City, CA 94015 | 303-887-7346 |
| Graham Hall | 17119 Iron Mountain Dr Poway CA 92604 | 407-907-7615 |
| Dylan Avatar-Arnold | 8028 E Maringo Dr Spokane WA 99212 | 925-262-3815 |

### Individual in Charge
Individual in charge of activity onsite who is authorized to make decisions related to the permitted activity

| Name | Cell Phone Number |
|---|---|
| Brendan Weinstein | 650-427-9829 |

### Activity Questions
Is this an exercise of First Amendment Rights?                                              Yes  No

Have you visited the requested area?                                                        Yes  No

Do you plan to advertise or issue a press release before the event?                         Yes  No

Have you obtained a permit from the National Park Service in the past?                       Yes  No
(If yes, provide a list of permit dates and locations on a separate page.)

Will you distribute printed material?                                                       Yes  No

Is there any reason to believe there will be attempts to disrupt, protest or prevent your event?   Yes  No
(If yes, please explain on a separate page.)

Do you intend to solicit donations or offer items for sale?                                 Yes  No



**EXHIBIT A-5.3**

RECORDS RETENTION: Unapproved (3 years).  Maintain Approved applications with related permit and associated records based on appropriate item(s) in NPS Records Schedule 1, Resources Management and Lands, (N1-79-08-1)

(These activities may require an additional permit.)
Is this permit to carry out a Good Samaritan Search and Recovery Mission?          Yes   No

***You are encouraged to attach additional pages with information useful in evaluating your permit request including:*** staging, sound systems, parking plan, security plans, sanitary facilities, crowd control, emergency medical plan, use of any building, site clean-up, etc.

*The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or statements have been given.*

| Name | Brendan Weinstein |
|---|---|
| **Title** | **BASE Access President** |
| **Signature** | |
| **Date** | **December 9, 2023** |

**EXHIBIT A-5.4**

RECORDS RETENTION: Unapproved (3 years).  Maintain Approved applications with related permit and associated records based on appropriate item(s) in NPS Records Schedule 1, Resources Management and Lands, (N1-79-08-1)

## NOTICES

### IMPORTANT NOTICE TO APPLICANT

This is an application **only** and does not serve as permission to conduct any special activity in the park.  The information provided will be used to determine whether a permit will be issued.  Send the completed application along with the application fee in the form of a [cashier's check, money order or personal check made payable to the **National Park Service** to the Office of Special Park Uses at the park address found on the first page of this application.

If your request is approved, a permit containing applicable terms and conditions will be sent you. The permit must be signed by the responsible person and returned to the park for final approval by the Park Superintendent before the permitted activity may begin.

### Customers Making Payment by Personal Check

When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction.  When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution.

### Privacy Act Statement

**General:**  This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 21, 1984, for individuals completing this application.

**Authority:** The authority to collect information on the attached form is derived from 54 U.S.C. 100101, Promotion and regulation; 54 U.S.C. 100751(a), Regulations; 54 U.S.C. 103104, Recovery of costs associated with special use permits; and 54 U.S.C 100905 Commercial Filming.

**Purposes and Uses:**  The information being collected to allow the park manager to make a value judgment on whether or not to allow the requested use.  Information from the application may be transferred to appropriate Federal, State, and local agencies, when relevant to civil, criminal or regulatory investigations or prosecutions.

**Effects of Nondisclosure:**   It is in your best interest to answer all of the questions.  The U.S. Criminal Code, Title 18 U.S.C. 1001, provides that knowingly falsifying or concealing a material fact is a felony that may result in fines of up to $10,000 or 5 years in prison, or both.  Deliberately and materially making false or fraudulent statements on this form will be grounds for not granting you a Special Use Permit

**Information Regarding Disclosure of Your Social Security Number Under Public Law 93-579 Section 7(b):**  Your Social Security Number (SSN) is needed to identify records unique to you. Applicants are required to provide their social security or taxpayer identification number for activities subject to collection of fees and charges by the National Park Service. Failure to disclose your SSN may prevent or delay the processing of your application. The authority for soliciting your SSN is 54 U.S.C.103104. The information gathered through the use of the SSN will be used only as necessary for processing this application and collecting and reporting any delinquent financial obligations. Use of the social security number will be carried out in accordance with established regulations and published notices of system of records.

### Paperwork Reduction Act Statement

We are collecting this information subject to the Paperwork Reduction Act (44 U.S.C. 3501) to provide the park managers the information needed to decide whether or not to allow the requested use.  All applicable parts of the form must be completed in order for your request to be considered. You are not required to respond to this or any other Federal agency-sponsored information collection unless it displays a currently valid OMB control number.

### Estimated Burden Statement

Public reporting burden for this form is estimated to average 30 minutes per response including the time it takes to read, gather and maintain data, review instructions and complete the form.  Direct comments regarding this burden estimate, or any aspects of this form, to the Information Collection Clearance Officer, National Park Service, 12201 Sunrise Valley Drive Reston, Virginia 20192.  Please do not send your form to this address.

**EXHIBIT A-5.5**

RECORDS RETENTION: Unapproved (3 years).  Maintain Approved applications with related permit and associated records based on appropriate item(s) in NPS Records Schedule 1, Resources Management and Lands, (N1-79-08-1)

| **INTERNAL AGENCY USE ONLY** |
|---|
| **Project Number/BILL:** |
| **Date Processed:** |
| **Permit Number:** |
| **Prepared By:** |
| **Organization Name:** |

**EXHIBIT A-5.6**

RECORDS RETENTION: Unapproved (3 years).  Maintain Approved applications with related permit and associated records based on appropriate item(s) in NPS Records Schedule 1, Resources Management and Lands, (N1-79-08-1)

*United States v. David Nunn*

**Case No. 6:20-po-00742 HBK**

**Exhibit A -6**

# Special Use Permit Application for Wingsuit BASE jumping in Yosemite National Park

Prepared by [BASE Access](#)
Submitted on Monday, Dec 11, 2023

One thing National Park Service staff and BASE jumpers have in common is a love for nature and the outdoors. The BASE jumping community's preferred mode of enjoying the outdoors is through non-motorized gliding flight. The primary goal of responsible BASE jumpers hoping to fly in our National Parks is to be allowed some degree of access to our nation's largest cliffs and most sublime natural resources, which are most often located within National Parks. Because these features represent the safest – and in some cases the only practical – means of practicing our sport in our home country, we believe it is only reasonable that we be allowed *some* degree of access. We're hoping that through this application we can forge a new relationship between the National Parks and BASE jumpers and open a fruitful dialogue about how to best allow space for unpowered human flight within the parks.

The intent of this permit application is to utilize the park planning and permitting process referenced in the legislation and park policies below, to allow for the completion of a safe and legal wingsuit BASE jump within Yosemite National Park. We are confident that this activity is consistent with the park's purpose of serving recreation and can be performed in a manner that will not "unduly interfere with normal park operations, resource protection, or visitor use." This special use permit will allow a group of highly experienced BASE jumpers to hike to the top of the Porcelain Wall using the Snake Dike climber's approach, and descend to the Mirror Lake area using wingsuits and single-parachute systems. The permit window will be January 19-26, 2024 and will apply to the following jumpers: Robert Morgan, Julia Morgan, Brendan Weinstein, and Graham Hall. Our plan involves mitigating risk and impact on visitors and resources by jumping in stable weather conditions and jumping in a low traffic area of the park.

In 2006 the National Park Service *Management Policies* were significantly amended in section 8.2.2.7 to clarify that "Parachuting (or BASE jumping), whether from an aircraft, structure, or natural feature is generally prohibited by 36 CFR 2.17(a)(3). <u>However, if determined through a park planning process to be an appropriate activity, it may be allowed pursuant to the terms and conditions of a permit.</u> [Emphasis added.]" This is a significant shift from earlier 2001 *Management Policies* language, which explicitly stated that "BASE jumping […] is not an appropriate public use activity within national park areas." The removal of this language and the revision of the *Management Policies* suggests an acknowledgment by the National Park Service that BASE jumping can in fact be an appropriate public use of national park lands, if a permit is applied for and issued. Even 36 CFR 2.17, the original Federal Regulation which prohibits

1

**EXHBIT A-6.1**

"Delivering […] a person or object by parachute" within a national park, acknowledges that this activity is acceptable "pursuant to the terms and conditions of a permit." It is our intention to continue to engage in good faith dialogue and collaboration with the National Park Service until we arrive at a consensus about what constitutes an appropriate use of public lands by members of the BASE jumping community.

## Activity Details

Date Window Requested: Friday, Jan 19 to Sunday, Jan 26, 2024

BASE jumping is dependent on low, consistent winds, generally 20kts or less. The activity is expected to take 10 hours from start to finish in a single day. The multi-day window will provide the group the best opportunity to select a day based on optimal local weather conditions to ensure the safest experience possible for all parties involved.

One week prior to activity, the group lead will monitor the weather forecast to watch for stable weather conditions. One day prior to activity, group lead will notify ranger headquarters that the group intends to execute the activity.

On the day of the activity, the group will:
1. Meet at "trailhead parking" below Glacier Point at 6:45 a.m.
2. Begin the hike to Porcelain Wall by 7:00 a.m..
3. Hike for an estimated five hours to accommodate winter conditions.
4. Reach Porcelain Wall at this location 37.74174, -119.54341 by noon and jump by 2 p.m...
   - If wind speeds exceed 20 kts, the group will hike down
   - If beneficial, we can call the local heliport to confirm a 5-minute window of clear airspace before jumping. There is a clear visual of all relevant airspace from the Porcelain Wall exit, so it shouldn't be necessary. In other countries it is a common practice though if the intended line of flight wraps around a corner.
5. Land on the trail adjacent to Mirror Lake near 37.749565, -119.548172

2

**EXHBIT A-6.2**

## Participants & Experience

- Robert Morgan
  - Role: Participant
  - Jump Experience:
    - Skydives: 4000
    - BASE Jumps: 2000
    - Time in Parachuting: 15 years
- Dylan Avatar-Arnold
  - Role: Ground Crew
  - Jump Experience:
    - Skydives: 1493
    - BASE Jumps: 458
    - Time in Parachuting: 9 years
- Julia Morgan
  - Role: Participant
  - Jump Experience:
    - Skydives: 1049
    - BASE Jumps: 1253
    - Time in Parachuting: 14 years
- Brendan Weinstein
  - Role: Participant and group lead
  - Jump Experience:
    - Skydives: 1101
    - BASE Jumps: 1014
    - Time in Parachuting: 13 years
- Graham Hall
  - Role: Participant
  - Jump Experience:
    - Skydives: 1128
    - BASE Jumps: 635
    - Time in Parachuting: 7.5 years
- Shanon Searles:
  - Role: Ground Crew
  - Jump Experience:
    - Skydives: 1248
    - BASE Jumps: 512
    - Time in Parachuting: 12 years

## Location Reasoning

 Our group will safely recreate on the public lands in Yosemite while aligning with the goals of the National Park. The Porcelain Wall Cliff 37.74174, -119.54341, meets these criteria because it:

3

**EXHBIT A-6.3**

1. Has a well traveled path that is approved by the park directly to the cliff, primarily used by climbers.



   a.

2. Is a large cliff that provides significant margin for safety for experienced participants.Has a safe landing area that can be reached by appropriately skilled participants.


## Risk Mitigation

- Each participant will be using a helmet, wingsuit, and single parachute system.
- The group will have at least one Garmin InReach satellite communication device.
- The group will also have at least one laser rangefinder to validate the mountain profile.
- Rigorous pre-jump safety checks of equipment
- Ground crew will have emergency medical equipment available

## Impact

Minimal Environmental Disruption: BASE jumping is a non-invasive, non-motorized activity that does not require any permanent structures or alterations to the natural landscape. The activity has a very low footprint compared to other recreational activities. The jump we have chosen has a simple line of flight that allows pilots to deploy parachutes high, fly in clear airspace, and land in an area free of hazards. The risk of injury is minimal for the flight we have chosen.

The flight also takes place in the back of the park during off-season, so should go unnoticed by park visitors. It is worth noting that even in the busiest valley for BASE jumping in the world,

Lauterbrunnen, it is almost impossible to see a wingsuit and difficult to catch a canopy in the air since average canopy rides are 30-60 seconds.

Highly Experienced Participants: The participants listed in the application are highly experienced in BASE jumping and parachuting. Their extensive experience and proficiency significantly reduce the risk of accidents or mishaps that could impact the park environment or resources.

Controlled Number of Participants: The application details a specific and limited number of participants. This controlled group size ensures that the impact on the park is minimized.

Selective Timing and Weather Conditions: The proposed activity is time-bound and contingent on stable weather conditions. By choosing optimal weather, the group minimizes the risk of unexpected incidents and ensures a swift and efficient operation that minimizes the time spent in sensitive areas.

No Interference with Wildlife: Given the nature of the activity, it's unlikely to significantly disrupt local wildlife. The jumpers will be in the air for a brief period, and in all other respects will be operating similar to any other hiker or park visitor. The landing area is a trail that runs alongside a beach. We don't see how the landing could possibly damage the trail or beach anymore than normal hiking.

Our understanding is that peregrine falcons nest near Taft Point in May-June. We've intentionally picked an exit far away from known falcon nests and at a time where there should be no risk of interfering with their nesting.

Safety and Emergency Protocols: The group's adherence to safety protocols and the presence of experienced ground crew ensures quick response to any unforeseen event, minimizing potential impact on park resources and other visitors.

## BASE Access

BASE Access is a 501(c)(3) registered non-profit organization in the state of Nevada. Our mission is to preserve BASE jumping site access on public lands within the United States. We encourage responsible freefalling and parachuting by the BASE jumping community, and foster respect for the natural environments in which we recreate.  We represent and help educate thousands of BASE jumpers from around the world and collaborate with government agencies responsible for regulating public lands that offer access to BASE jump exit points.

5

**EXHBIT A-6.5**

*United States v. David Nunn*

**Case No. 6:20-po-00742 HBK**

**Exhibit A -7**



# United States Department of the Interior

NATIONAL PARK SERVICE
Yosemite National Park
P. O. Box 577
Yosemite, California 95389

IN REPLY REFER TO:
A9031b (SUPT)

Brendan Weinstein
6150 Sunrise Meadows
Reno, NV 89519
brendan@baseaccess.org

Dear Mr. Weinstein:

Thank you for your application for a special use permit for BASE jumping in Yosemite National Park. Although federal policy and regulations allow the park Superintendent discretion to consider issuing such a permit after evaluating such an activity, the National Park Service (NPS) would first have to engage in a thorough planning process to determine if BASE jumping is an appropriate activity at Yosemite National Park and evaluate impacts with respect to the NPS Organic Act, National Environmental Policy Act, National Historic Preservation Act, Endangered Species Act, and the Wilderness Act, among other federal laws. NPS has not evaluated BASE jumping at Yosemite in a planning process.

As you have pointed out, Section 2.17 of Title 36 of the Code of Federal Regulations (CFR) and NPS Management Policies 2006 8.2.2.7 prohibit parachuting/BASE jumping unless such an activity is "determined through a park planning process to be an appropriate activity." You may also be aware of Section 7.16(c) of Title 36 CFR, a Yosemite-specific regulation addressing powerless flight, which states: "The use of devices designed to carry persons through the air in powerless flight is allowed at times and locations designated by the superintendent, pursuant to the terms and conditions of a permit."

Section 8.2.2.7 of NPS Management Policies (2006) states:

> *Parachuting (or BASE jumping), whether from an aircraft, structure, or natural feature, is generally prohibited by 36 CFR 2.17(a)(3). However, if determined through a park planning process to be an appropriate activity, it may be allowed pursuant to the terms and conditions of a permit.*

The NPS has not conducted a park planning process in accordance with law and policy and does not currently have capacity to do so. Therefore, we are unable to issue a permit for BASE jumping in Yosemite.

Thank you for your appreciation and interest in Yosemite and the national parks.

Respectfully,

JOSEPH
MEYER

Digitally signed by
JOSEPH MEYER
Date: 2024.01.09
09:52:51 -08'00'

*for* Cicely Muldoon
Superintendent

**EXHIBIT A-7**

***United States v. David Nunn***

**Case No. 6:20-po-00742 HBK**

**Exhibit A -8**

April 12, 2024

<u>*Via Email Only*</u>
Yosemite National Park
Attn: Superintendent Cicely Muldoon
P.O. Box 577
Yosemite National Park, CA 95389
cicely_muldoon@nps.gov
YOSE_Superintendent@nps.gov
YOSE_Special_Use_Permits@nps.gov

**Re:    A9031b (SUPT) – Administrative Appeal of Superintendent's Denial of BASE Access, Inc. Application for Special Use Permit**

Dear Superintendent Muldoon:

BASE Access, Inc. is in receipt of your January 9, 2024 letter to Brendan Weinstein denying this organization's December 12, 2023 Application for Special Use Permit ("ASUP") to conduct a wingsuit BASE jump within Yosemite National Park ("Yosemite"). This letter shall serve as BASE Access, Inc.'s administrative appeal of your decision. This appeal is taken on the following bases: 1) Yosemite's official policy of neither approving nor denying applications to conduct a BASE jump constitutes the unlawful withholding or unreasonable delay of agency action contrary to 5 U.S.C. 706(1); 2) Yosemite's inaction operates as a *de facto* denial of BASE Access, Inc.'s ASUP absent any administrative record, reason, explanation, or rational basis contrary to 5 U.S.C. 706(2); and 3) Yosemite's intentionally disparate regulation of BASE jumping vis-à-vis substantially identical recreational activities is malicious and without a rational basis in violation of the equal protection guarantees of U.S. Const. Amend. XIV, § 1.

## I.      BACKGROUND.

Fifty-eight years ago, BASE jumping was born in Yosemite Valley when Michael Pelkey and Brian Schubert parachuted from the summit of El Capitan on July 24, 1966 under round parachutes. Twelve years later, Carl Boenish made the world's first ram-air parachute jumps from El Capitan. His film documenting the 1978 jumps, as well as his other advocacy for the then-nascent sport captivated the public imagination and inspired generations of future BASE jumpers. From those fringe roots, the sport of BASE jumping has grown into a mainstream recreational

**EXHIBIT A-8.1**

activity enjoyed worldwide by an estimated 20,000 people and featured ubiquitously in pop culture media.

For as long as BASE has existed, so too have tensions between the BASE community and the National Parks Service ("NPS"). Faced with this novel use of El Capitan—still the most revered BASE object in North America, and an influx of parachutists seeking to replicate Mr. Boenish's jumps, Yosemite swiftly banned the activity. In 1980, Director Joe Svec of the United States Parachute Association ("USPA") negotiated a permitted jumping program with Yosemite's then-Administrator Robert Binnewies. The program required prospective El Capitan jumpers to, amongst other things, submit a written application to jump, demonstrate a minimum skydiving experience level (USPA D License), limit jumps to certain times of day, refrain from parachute formation flying, use only ram-air parachutes, and other requirements.

Yosemite began permitting jumping under this regulatory program on August 1, 1980 and anticipated closing the program on October 31, 1980. Only five weeks into the program, Yosemite terminated the program and reinstituted its ban on BASE, citing problems associated with jumpers including arrests and fines issued to jumpers who jumped without a permit, violated permit conditions, damaged rock structures, and used motor vehicles on closed backcountry roads to avoid the hike to summit. Since then, no legal BASE jump has taken place in Yosemite. The culture of animus towards BASE jumping metastasized throughout NPS and today ensures that many thousands of responsible, conservation-minded, law-abiding BASE jumpers are being punished (and indeed made criminals) for the half-century old sins of a few, committed when the sport was still a fringe activity for the outlaw-inclined.

In connection with the rescission of the 1980 permitting system, NPS employees laid bare the justifications for the policy. Bill Wendt, former Chief Park Ranger, stated in the 2014 film *Sunshine Superman* that the ban was necessary because "[t]here were just too many free spirits, and we had to shut [BASE jumpers] down." In 2019, Yosemite spokesman Scott Gediman noted to journalists that BASE jumping stirs up a spectacle[1]. Mr. Gediman also noted that throughout the history of BASE, its participants regularly ask for Yosemite's engagement in a process that would provide for sanctioned jumping in the park. Despite this, Yosemite refuses any such engagement, noting without evidence that "[w]e feel that the activity is just not appropriate in Yosemite" because it "creates a circus-like atmosphere that impacts the other users here."[2] This curious policy position is at odds with Yosemite's acknowledgement that BASE jumping still periodically occurs within Yosemite, with no apparent circus-like atmosphere or other tangible impact on other users. Absent any planning inquiry as to the sport's compatibility with NPS'

---

[1] Gregory Thomas, *Meet the people trying to legalize BASE jumping in California*, SAN FRANCISCO CHRON., Nov. 26, 2019, at 2, https://www.sfchronicle.com/culture/article/the-secret-base-jumpers-of-california-14839305.php
[2] *Id.*; *see also* n. 30 (Mr. Gediman's public statements opine as to the appropriateness of BASE within NPS Units pre-planning process contrary to its administrative policy).

**EXHIBIT A-8.2**

mandates and other park uses, it is inappropriate for Yosemite to express any opinion of appropriateness.

Outwardly, Yosemite and other National Park Service Units have communicated for decades that they are not anti-BASE and in fact encourage representatives of the parachuting community to involve themselves in the planning processes that take place at each park.[3] For example, in response to a series of letters sent to NPS by then-U.S. Representative Thomas Tancredo (R-CO 6th) in 2002-2004 proposing a permitting system for BASE jumping in NPS Units, P. Lynn Scarlett, NPS' then-Assistant Secretary for Policy, Management, and Budget, wrote: "Director Mainella is committed to providing the public with appropriate opportunities for enjoyment of park resources and values, and to thoughtfully reviewing our policies and procedures when they are called into question. I am confident that she would expect park superintendents and other NPS decision-makers to give serious consideration to parachuting and similar activities as part of their normal responsibilities for managing recreational uses."[4] Ms. Scarlett closed her correspondence with the entreaty that "[NPS] hope[s] that members of the parachuting community will avail themselves of the many opportunities that the parks offer for involving them in the planning and decision-making process[.]"[5]

Despite its public lament that NPS would seriously consider BASE if only parachuting stakeholders would engage with the park Units' planning processes, decades of deliberate efforts to suppress such planning processes, ignore consistent and voluminous outreach from the parachuting community, and enforce BASE infractions on a harsher and different basis than other similar regulatory infractions bely NPS' public statements to the contrary, *to wit:*

1. NPS' 2004 correspondence with Rep. Tancredo.

2. In Summer 2010, BASE Access, Inc. member Gregory Lane Coates submitted an ASUP to Yosemite proposing to jump from Half Dome on October 4, 2010.[6] Yosemite rejected his permit application.

3. On October 4, 2011, Ammon McNeely pled guilty to one count of violation of 36 CFR 2.17(a)(3); delivery of a person by parachute and sentenced to imprisonment for a term of 20 days.[7] When Mr. McNeely had served 29 days in custody, his Federal Public Defender moved for his release, citing his imprisonment for beyond

---

[3] *See*, Letter from P. Lynn Scarlett to Rep. Thomas Tancredo (Jul. 1, 2004), at 3.
[4] *Id.*
[5] *Ibid.*
[6] *See,* Gregory Lane Coates, *Application for Special Use Permit* (2010).
[7] *See generally, USA v. McNeely*, 6:11-mj-00141-MJS

the sentence term.[8] National Park Services' Acting Legal Officer opposed the motion to release. Thankfully, the United States District Court for the Eastern District of California ordered Mr. McNeely released on March 12, 2012—after serving a 33-day total term of imprisonment.

4.  On July 5, 2013, Zion National Park Superintendent Jock Whitworth denied BASE jumper Mitchell Potter's request for engagement with the park with a view towards future permitted BASE jumping, citing the need for a park planning process to study its appropriateness.[9]

5.  On October 29, 2018, BASE jumper Eric Kunkel wrote to Yosemite Superintendent Michael Reynolds requesting engagement with NPS with regard to BASE jumping's future within the Unit.[10] Mr. Reynolds never responded.

6.  On June 6 and 11, 2019, BASE Jumper Kristian Geissler wrote to Yosemite Superintendent Michael Reynolds proposing a pilot project whereby Yosemite would permit BASE jumping in the park. On July 9, 2019, Mr. Reynolds responded to Mr. Geissler that the park would only consider BASE jumping pursuant to a park planning process.[11] Worse, Mr. Reynolds, consistent with several decades of NPS policy, stated that no planning efforts are currently underway or anticipated in the foreseeable future writing that "[w]e are not taking any actions at this time to change current policy or practice at Yosemite on this matter."[12]

7.  On November 22, 2019, in response to a letter from BASE jumper Graham Hall to NPS Deputy Director David Varela, NPS Office of Policy Chief Alma Ripps wrote that "[d]uring the preparation of planning documents—such as general management plans, resource management plans and visitor use plans—parks managers invite everyone who may be interested to offer their ideas and perspectives regarding appropriate recreational uses of a park."[13] Ms. Ripps further represented that "Deputy Director Vela is committed to providing the public with appropriate opportunities for enjoyment of park resources and values, and expects park superintendents and other NPS decision-makers to give serious consideration to parachuting and similar activities as part of their normal responsibilities for managing recreational use."[14]

---

[8] *Id.,* at Doc 9. (Mar. 8, 2012).
[9] *See* Letter from Jock Whitworth to Mitchell Potter (Jul. 5, 2013), at 1.
[10] *See* Email from Eric Kunkel to Michael Reynolds (Oct. 29, 2018).
[11] *See generally* Letter from Michael Reynolds to Kristian Geissler in re: A3615 (Jul. 9, 2019).
[12] *See id.,* at 2.
[13] *See* Letter from Alma Ripps to Graham Hall (November 22, 2019), at 1.
[14] *Id.,* at 2.

**EXHIBIT A-8.4**

8. In 2022, BASE jumpers Graham Hall and Leonardo Durant wrote to Cindy Orlando, NPS Acting Regional Director with jurisdiction over Yosemite, requesting a dialogue about permitting BASE jumping in Yosemite.[15] Their letter went unanswered.

9. On July 12, 2022, Brendan Weinstein was cited for one count of violation of 36 CFR 2.17(a)(3); delivery of a person by parachute.[16] During the pendency of that case, Sean O. Anderson, Legal Officer for the U.S. Dept. of Interior, advised Mr. Weinstein through counsel that NPS policy is to pursue criminal BASE violations to conviction and never to entertain plea bargains, revealing NPS' policy of disparate treatment of BASE prosecutions relative to other similarly situated regulatory prosecutions.[17]

10. BASE Access, Inc. has similarly been swept aside by Yosemite. On May 10, 2023, BASE Access submitted electronic correspondence to NPS Division Chief of Conservation and Outdoor Recreation Bob Ratcliffe requesting an audience with Ms. Muldoon and other appropriate NPS stakeholders with a view towards discussing a permitting framework for BASE jumping in Yosemite. This correspondence went unanswered.

11. On December 10, 2023, BASE Access emailed Yosemite Superintendent Muldoon and Jesse McGahey requesting a dialogue on the topic of BASE jumping within the park.[18] This email too went unanswered.

12. On January 2, 2024, BASE Access sent a follow-up email to Yosemite Superintendent Muldoon and Jesse McGahey requesting a dialogue on the topic of BASE jumping within the park.[19] This email too went unanswered.

The above examples represent a mere fraction of the parachuting community's decades of outreach efforts, and they reflect BASE Access' experience attempting to engage with NPS personnel. In fact, the only outreach this organization has succeeded in soliciting from Yosemite was its January 9, 2024 denial of A9031b (SUPT), which similarly cited the need for BASE to undergo a park planning process Yosemite has admitted it will not undertake, citing a lack of

---

[15] *See generally,* Letter from Graham Hall and Leonardo Durant to Cindy Orlando.
[16] *See generally, USA v. Weinstein,* 6:22-po-00512-HBK.
[17] *See, e.g. USA v. Madl, USA v. Hennage, USA v. Brokemond.*
[18] *See generally,* Email from Brendan Weinstein to Cicely Muldoon (Dec. 12, 2023).
[19] See *generally,* Email from Brendan Weinstein to Cicely Muldoon (Jan. 2, 2024).

**EXHIBIT A-8.5**

capacity to do so (a baffling assertion given Yosemite's stunning success completing 831 non-BASE-related planning projects according to NPS Planning, Environment & Public Comment).

The record reveals that Yosemite and the NPS actively resist any planning process, study, or substantive engagement with BASE stakeholders despite nearly a half century of requests and public comments. According to Larry Walter, Concession Management Specialist for Zion National Park (another park Unit which has recently denied BASE Access's ASUP pursuant to official NPS policy), "Zion National Park, to date, has not formally evaluated whether base jumping is an appropriate activity within the park through a required park planning process."[20] Mr. Walter also noted that the Zion Wilderness Stewardship Plan (WSP), formalized in 2007, did not include BASE jumping in its scoping process, and that "BASE jumping was not identified as an activity the public would like to see allowed in ZION."[21] Bafflingly, Mr. Walter made these assertions in the same paragraph he acknowledged that Zion received over 50 comments asking the park to allow BASE jumping during the comment period on the draft plan/environmental assessment.[22]

Yosemite's insistence on a planning process for BASE that will never happen is not required by 36 C.F.R. 2.17. This additional hurdle first arose with the publication of NPS' system wide *2006 Management Policies.*[23] That document notes that other recreational activities are prohibited in NPS Units by federal regulation. Much like the aerial delivery regulation, NPS observes that "[p]ersonal watercraft use is generally prohibited by 36 CFR 3.24. However, it may be allowed within a park by special regulation if it has first been determined through park planning to be an appropriate use that will not result in unacceptable impacts." *2006 Management Policies,* § 8.2.3.3. Despite purporting to regulate personal watercraft almost ***identically*** to BASE jumping, NPS has somehow found the capacity and resources to undertake planning processes at fifteen park Units which allow permitted personal watercraft use notwithstanding the general prohibition found at 36 C.F.R 3.24.[24] NPS has even touted the devotion of substantial resources to that undertaking.[25] This cooperative approach stands in stark contrast to NPS history of dilatory and hostile action towards the BASE community.

Yosemite's decades-long refusal to even consider including BASE jumping in any current or future park planning process is further contrasted by its permissive approach to substantially similar air sports and other high risk recreational activities which were not subjected to a planning

---

[20] Email from Larry Walters to Brendan Weinstein (Feb. 7, 2024).
[21] *Id.*
[22] *See id.*
[23] Yosemite has also failed to timely update its park-specific management policies consistent with 54 U.S.C. 100502 (see Gescheidt v. Haaland, No. 21-cv-04734-HSG, 2021 U.S. Dist. LEXIS 144162, at *10 (N.D. Cal. Aug. 2, 2021)).
[24] *See* https://www.doi.gov/ocl/personal-watercraft.
[25] *See id.*

process. For example, throughout the 1980s and up to 1992, Yosemite permitted hang gliding in the park under the management and, tellingly, the *participation* of Yosemite National Park Rangers. From 1992 through the present day, Yosemite has granted a SUP to the Yosemite Hang Gliding Association ("YHGA") each year and even granted YHGA categorical exclusion from any future NEPA review.[26] The act of leaping from a cliff under an unpowered glider wing is substantially identical to wingsuit and parachute flight. Nevertheless, Yosemite's resistance to BASE jumping runs so deep that it will not even permit paragliding under the YHGA SUP merely because the soaring device *appears* to uninitiated policymakers to *resemble* a parachute—never mind that the same governing body that regulates hang gliding (United States Hang Gliding and Paragliding Association) also regulates the identical, lower-impact soaring pursuit of paragliding. Climbing and slacklining are similarly permitted in Yosemite without prior planning process study.

Yosemite's final rulemaking activity in connection with its 1983 promulgation of 36 C.F.R. 2.17 illustrates its arbitrary and capricious distinction between hang gliding and BASE jumping further. Due to the participation in the sport of hang gliding by Yosemite Park Rangers, it decided to carve that activity out of the final prohibition on aerial delivery despite overwhelming public comment in opposition to the activity.[27] As further reassurance to the recreating public, NPS went on to state in its publication of the final aerial delivery rule that, with respect to activities regulated by 36 C.F.R. 2.17, "[t]he National Park Service will be consistent in its approach to authorizing special uses in park areas."[28] Yosemite has wholly failed to adhere to this commitment. It has issued a SUP to the hang-gliding community in each of the ensuing 41 years, and denied every single ASUP submitted by the BASE community without explanation or study or intent to ever seriously consider one. The purpose of this disparate treatment is to favor activities enjoyed by Yosemite personnel (even in the face of overwhelming public disapproval), while criminalizing and ruthlessly punishing participants of substantially identical activities deemed of less personal interest or merit to Yosemite insiders—public be damned.[29]

Simply put, Yosemite's denial of BASE Access' ASUP is inconsistent with federal law as more fully set forth in Section 2, *infra*, and with NPS policy. Director's Order No. 53 – Special Park Uses, notes in connection with an ASUP, "[w]hether a request to engage in a special park use is approved or denied, the Superintendent's decision must be based on consideration of relevant factors related to the request. The decision document should articulate a rational connection

---

[26] *See* https://parkplanning.nps.gov/projectHome.cfm?projectID=43657#:~:text=Hang%20gliding%20in%20the%20park,under%20permit%20from%20the%20park.

[27] *See* 48 F.R. 30252, at 15 ("The Service received 78 comments citing the inappropriateness of hang gliding in park areas. Two commenters supported this activity. The National Park Service acknowledges that in a particular park area hang gliding may be a desirable and appropriate recreational activity.").
[28] *Id.*
[29] *See, Dec. of Carol Moses* (Feb. 27, 2023), ¶¶ 9, 11; *see also, Dec. of Grady Bryant* (Mar. 7, 2023), ¶¶ 5, 8.

between the facts and the final decision. The decision should conform to NPS legal mandates, Servicewide policies, consider effects on Servicewide programs, be consistent with decisions made both at the individual park and at parks Servicewide, and be thoroughly documented in an administrative record."[30] Despite this statement of policy, Yosemite (and indeed NPS Servicewide) elects purposefully not to document any facts or rational connection to its decision not to act on BASE jumping ASUPS in clear contravention of its own mandates.[31] Worse, Yosemite and Servicewide managers appear to have doubled down on NPS official policy of discrimination against BASE jumpers as a class in apparent response to BASE Access' advocacy. NPS' Associate Director of Visitor and Resource Protection William Shott issued a memorandum to all Associate and Assistant Directors and Regional Directors systemwide on February 8, 2024 ("Shott Memo") ordering each NPS Unit to neither approve nor deny BASE jumping ASUPs[32] contrary to the above-cited requirements of NPS administrative policy respecting ASUP decisions and the clear mandates of the Administrative Procedures Act.

Following the February 8 order from William Shott, BASE Access received verbatim responses from Grand Teton, Grand Canyon, Northern Cascades, Guadalupe, and Big Bend national parks refusing to approve or deny its permit applications. In each instance, the denying (or abstaining) NPS Unit used the form of rejection letter appended to the February 2024 *Shott Memo*. Representatives from BASE Access attempted to reach out to the Superintendent's office of each of these respective parks to schedule a call to discuss BASE jumping, and with the exception of Northern Cascades National Park, each Superintendent ignored the outreach. Grand Canyon National Park, in its denial letter, went so far as to say that it would not likely consider BASE as an activity "due to conflicts with criteria listed under 36 C.F.R. 1.6 (a)," without specifying which of the 10 criteria listed therein it perceived to be at issue.

NPS Deputy Director Stephen Martin testified in 2005 regarding its revision of the Management Policies as follows: "We have been asked 'Why are you revising the policies now?' The answer is simple—it is about excellence. The world is changing, and we continue to strive for excellence. Excellence means improving our guidance of not only preventing impairment but on preventing 'unacceptable impacts'. ***Excellence means increasing the understanding of 'appropriate use' and making sure that this part of the mission is not overlooked***. Excellence means keeping the key management decisions in the hands of the managers by better defining

---

[30] Director's Order No. 53 – Special Park Uses, at 2, § 2; *see also* RM-53 SPECIAL PARK USES, Ch. 8, at C8-1 (*"The decision to approve or deny a special park use should be based on objective data and recorded in the administrative record."*).
[31] *See* Letter from Cicely Muldoon to BASE Access, Inc. (Jan. 9, 2024) (citing no reasons for its decision).
[32] *See* William Shott, *Memorandum Re: Managing BASE Jumping* (Feb. 8, 2024).

**EXHIBIT A-8.8**

'professional judgment.' Excellence means not managing our parks in isolation but working with others and engaging the public in the conservation of the resources."[33]

The NPS' systemwide decision to categorically deny BASE ASUPs without any rationale is inconsistent with individual and Servicewide decisions permitting recreational uses that are substantially similar to BASE jumping. Further, in the current instance and each past instance cited herein, NPS has failed to document the facts or articulate any rational connection between the facts and the decision reached in an administrative record.[34]

Accordingly, for these and the following reasons, BASE Access respectfully requests that Superintendent Muldoon overturn her January 9, 2024 decision to deny its BASE jumping ASUP without rationale or consideration of objective data consistent with NPS' aspiration to excellence in understanding appropriate use, and initiate a planning process giving substantive consideration to the activity of BASE at Yosemite.

## II.    ARGUMENT.

### a.    NPS' official policy of declining to act on ASUPs for BASE jumping on the basis that it must first evaluate BASE in a planning process it never intends to undertake constitutes the unlawful withholding or unreasonable delay of agency action contrary to 5 U.S.C. 706(1).

Yosemite and the NPS, through the *Shott Memo*, have chosen to officially fail to act on BASE jumping ASUPs Servicewide in violation of the Administrative Procedure Act. *See* 5 U.S.C. 706(1) ("APA"). The APA confers jurisdiction upon courts to review the claim of "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." Section 702 (entitled "Right of review"). Unless a statute provides a private right of action, courts may only review "final agency action for which there is no other adequate remedy." Section 704 (entitled "Actions reviewable"); *see Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61-62, 124 S. Ct. 2373, 159 L. Ed. 2d 137 (2004).

---

[33] STATEMENT OF STEPHEN P. MARTIN DEPUTY DIRECTOR, NATIONAL PARK SERVICE BEFORE THE SUBCOMMITTEE ON NATIONAL PARKS HOUSE COMMITTEE ON RESOURCES CONCERNING THE NATIONAL PARK SERVICE ORGANIC ACT AND ITS IMPLEMENTATION THROUGH DAILY PARK MANAGEMENT (Dec. 14, 2005) (emphasis added).

[34] Zion National Park's February 7, 2024 rejection of BASE Access' ASUP additionally claims that "Parachutes are considered a form of mechanized transport" as the term is used in the Wilderness Act of 1964 and its implementing regulations. However, BASE jumping does not employ a "contrivance which travels over ground, snow, or water on wheels, tracks, skids, or by floatation and is propelled by a nonliving power source contained or carried on or within the device or is a bicycle or hang glider," obviating any argument that a parachute system featuring only a fabric harness and container, fabric wing, and fabric suspension lines either travels over ground or otherwise meets the definition of mechanical transport as that term is defined in applicable regulations.

**EXHIBIT A-8.9**

In this context, the reviewing court is charged with deciding all relevant questions of law and interpreting constitutional and statutory provisions. Section 706 mandates the court to "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency actions, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Sections 706(1), 706(2)(A). *See also Drakes Bay Oyster Co. v. Salazar*, 921 F. Supp. 2d 972, 984 (N.D. Cal. 2013). "In conducting an APA review, the court must determine whether the agency's decision is 'founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment.'" *River Runners v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citing *Ariz. Cattle Growers' Ass'n v. U.S. Fish Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001)).

Yosemite's denial of BASE Access, Inc.'s ASUP is undoubtedly agency action within the actionable ambit of Section 706. "A challenge to NPS's decision to deny or suspend a permit is brought under the Administrative Procedure Act." *Gurnani v. United States DOI*, No. 1:23-cv-01293-ADA-SKO, 2023 U.S. Dist. LEXIS 170342, at *7-8 (E.D. Cal. Sep. 25, 2023) (citing *Drakes Bay Oyster Co. v. Salazar*, 921 F. Supp. 2d 972, 984-85 (N.D. Cal. 2013)). A decision not to issue a special use permit constitutes "agency action" under the APA. *See Salazar*, 921 F. Supp. 2d 972, 984.

Yosemite's denial or abstention from acting on BASE ASUPs violates the APA because it contravenes its own policy, the edicts of 36 C.F.R. 1.6, and because it is based on no fact finding at all, much less a rational connection between factual conclusions made and its decision to deny or not act upon BASE jumping ASUPs. *See* Director's Order No. 53 – Special Park Uses, at 2, § 2; *see also* RM-53 SPECIAL PARK USES, Ch. 8, at C8-1. Accordingly, its failure to act is in violation of 5 U.S.C. 706(1).

### b. NPS' unexplained denial of BASE Access, Inc.'s ASUP is arbitrary and capricious contrary to 5 U.S.C. 706(2).

Yosemite's policy requiring the *de facto* denial of BASE ASUPs without reason or rational basis likewise violates 5 U.S.C. 706(2). "The reviewing court shall . . . hold unlawful and set aside agency actions found to be (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* Yosemite's denial or abstention from acting upon the instant ASUP contravenes 36 C.F.R. 1.6, Director's Order 53, and the APA's mandate that agency decisions rest upon a clearly articulated reason and facts—none of which are present in its January 9th denial. An agency action is arbitrary and capricious if the agency relied on factors which the legislature had not intended it to consider, if it entirely failed to consider an important aspect of the problem, if it offered an explanation for the decision that runs counter to the evidence, or if the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*See In re Space Ctr. Transp.*, 444 N.W.2d 575, 581 (Minn. Ct. App. 1989) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29,43 (1983)).

The sole assertion offered by the government in support of its decision not to act on the ASUP is Yosemite's insistence that BASE jumping must be reviewed in a park planning process before it can act on a BASE permit application. Yosemite's decision not to act on ASUPs for BASE at all is itself a violation of the APA by virtue of its contravention of NPS' own policy and guidance. However, Yosemite's insistence on a park planning process as a prerequisite to action on BASE ASUPs is likewise implausible and unsupported by fact, law, or NPS policy. Yosemite has undertaken decades of documented efforts to exclude BASE jumping from any planning process and laid bare its clear intent to never undertake one, rendering such insistences a disingenuous red herring. Yosemite may, through a Director's Order, rule by administrative fiat that BASE jumping is an appropriate activity for the park (even in wilderness areas) as it has done with other higher-impact, similarly situated recreational activities such as rock climbing. *See* Director's Order 41, § 7.2.

Yosemite has also managed to approve, without a planning process, a permit for the indistinguishably identical activity of hang-gliding for over four decades while it has rejected 8 permit applications from this organization in the last year alone. Simply put, Yosemite merely does not like BASE jumping because of negative interactions with the sport's founding fathers a half century ago. It therefore offers the planning process as a pretextual reason to deny BASE ASUPs without explanation, without creating a record, and while refusing to engage in the planning process it claims is necessary. Because its decision is based on no administrative record, no plausible reason, no rational basis, and no documented facts supporting the decision, Yosemite's January 9, 2024 denial or abstention from acting on BASE Access, Inc.'s ASUP is arbitrary and capricious contrary to 5 U.S.C. 706(2).

36 CFR § 1.6 provides guidelines for reviewing a permit application "The activity authorized by a permit shall be consistent with applicable legislation, Federal regulations and administrative policies, and based upon a determination that public health and safety, environmental or scenic values, natural or cultural resources, scientific research, implementation of management responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor use activities will not be adversely impacted".

Yosemite fails to justify its rejection by any of the reasons specified in these guidelines. In *Noem v Haaland* the court confirms that guidelines such as 36 CFR 1.6 "provide the court with a meaningful standard by which to judge the agency's exercise of discretion and can review its decisions under the APA."[35]

---

[35] *Noem v. Haaland*, 542 F. Supp. 3d 898, 913 n.7 (D.S.D. 2021).

**EXHIBIT A-8.11**

    **c.**  **Motivated solely by animus towards BASE jumpers, NPS intentionally regulates them differently from similarly situated unpowered flight participants engaged in substantially identical activities without a rational basis in violation of the equal protection guarantees of U.S. Const. Amend. XIV, § 1.**

As has been exhaustively chronicled in the nearly half century since NPS adopted 36 C.F.R. 2.17, Yosemite has intentionally, arbitrarily, and irrationally applied the rule differently to two similarly situated classes of air sports participants engaged in substantially identical activities: hang gliders and BASE jumpers. Yosemite's motivation to reward hang gliding with permits while criminally prosecuting and subjugating BASE jumpers arises solely from its publicly documented, admitted hostility towards the BASE community—which Yosemite personnel find useless, unlike other recreationists Yosemite dislikes but tolerates for their helpfulness in search and rescue applications.[36] There is no plausible policy reason for Yosemite's discriminatory treatment of these two classes of similarly situated recreationists. Instead, Yosemite's disparate treatment is malicious and intended to discriminate.

The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citing *Sioux City Bridge Co.* v. *Dakota County,* 260 U.S. 441, 67 L. Ed. 340, 43 S. Ct. 190 (1923)). "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id.*

"[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Laws that "exhibit[] such a desire to harm a politically unpopular group" receive "a more searching form of rational basis review." *Lawrence v. Texas,* 539 U.S. 558, 580 (2003) (O'Connor, J., concurring).

A "discriminatory purpose" implies that the decisionmaker ... selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added). Numerous Yosemite employees have acknowledged the discriminatory purpose of NPS' anti-BASE regulation vis-a-vis other similarly situated recreationists in sworn declarations submitted in cases pending before the United States District Court for the Eastern District of California. For example,

---

[36] *See, Dec. of Carol Moses* (Feb. 27, 2023), ¶¶ 9, 11.

**EXHIBIT A-8.12**

Ranger Grady Bryant writes affirming the NPS' aggressive behavior towards BASE jumpers. "Yosemite National Park adopted an aggressive policy of arresting and citing BASE jumpers. Many rangers considered it a "challenge" to outsmart BASE jumpers. The base jumpers also tried to evade law enforcement rangers. A culture of division developed."[37]

Former ranger Carol Ann Moses writes "The rangers disliked both the climbers and BASE jumpers…Bill Wendt explained his reasons for shutting down the BASE jumping permit system at one of the ranger's daily 7:30 AM briefings. First, he did not like BASE jumpers, and unlike the climbers they did not serve a useful purpose. The Chief Ranger was clear about his dislike of BASE jumpers. "[38] The film Valley Uprising documented the animus Yosemite rangers developed against climbers, "I think there was a lot of jealousy, a lot of these rangers were pretty pissed off that they had to work and we didn't have to do anything except go have fun"[39], as well as documenting how the modern BASE jumping community was birthed from the very same climbing community, "now a lot of the climbers are BASE jumpers…all of the monkeys have become the flying monkeys".[40] Alex Honnold attests in the Yosemite history film "pretty much everybody I know BASE jumps now, and it's a great way to get down"[41].

Former ranger Carol Ann Moses further describes how rangers began to treat chasing jumpers like a game, "Special patrols were formed to catch BASE jumpers. Apprehending BASE jumpers became a "cat and mouse" game for the rangers."[42] Dean Potter, a second-generation BASE jumper, describes the cat-and-mouse game circa 2005-2015, "The rangers stake us out and hunt us BASE jumpers."[43] Marshall Miller in an instagram video in 2023 attests to the persistence of the same sporty nature of pursuit practiced by the NPS in modern times, "I passed someone…and it was a ranger but at that moment I knew it was kind of game on because within a minute and a half there were two rangers with full lights on and spotlights just flying up the canyons and for the next two and half to three hours it was this crazy game of *cat and mouse*, of Marshall the family man who is trying to be responsible hiding behind trees and running over logs"[44] After evading rangers during a three-hour chase, the rangers tracked down Marshall's hotel address, attempted to arrest him, left, obtained a search warrant, and returned at roughly 4am with a search warrant.[45]

---

[37] *See, Dec. of Grady Bryant* (Mar. 7, 2023), ¶¶ 6.
[38] *See, Dec. of Carol Moses* (Feb. 27, 2023), ¶¶ 9.
[39] See Valley Uprising 0:46:25.
[40] See Valley Uprising 1:21:59.
[41] See Valley Uprising 1:22:05.
[42] See, Dec. of Carol Moses (Feb. 27, 2023), ¶¶ 12.
[43] See Valley Uprising 1:22:28.
[44] See https://www.instagram.com/p/CqwzlY_MxKZ/ 4:05.
[45] See https://www.instagram.com/p/CqwzlY_MxKZ/ 6:23.

**EXHIBIT A-8.13**

Beyond the cat-and-mouse games, rangers have instigated such headstrong pursuits that have led to one jumper being tased in the neck and another drowning to death in the Merced[46]. Ammon McNeely, a second-generation jumper, describes being tased, "shooting the tasers at me…50,000 volts right in the back of the neck".[47] Yosemite has not proven any detrimental impact to the park by BASE jumpers, and thus such expensive investment into BASE enforcement runs against the common policing principle of proportionality.

Animus against BASE jumpers is so old and so entrenched in Yosemite that evidence of discriminatory purpose can be traced as far back as 1979, when Yosemite rangers established a dedicated unit for developing intelligence on and tracking BASE jumper movements within the park, complete with their own dedicated t-shirts. *See* Dec. of Carol Moses ("a special BASE jumping patrol was formed under the acronym SPLATT - Stop Parachutists Leap At The Top. That patrol had t-shirts made. I still have mine and have attached a photo of it to this declaration.").[48]

In other words, the cruelty and subjugation is the sole point of the regulation. It is offered in lieu of any rational policy basis. Because there is no rational policy basis for the disparate treatment of two nearly identical air sports, and there is clearly admitted animus for the BASE community within NPS which motivates its anti-BASE posture, Yosemite is in violation of the equal protection clause of the U.S. Constitution, Amend. XIV, § 1.

### III.     CONCLUSIONS.

For the reasons set forth herein, Yosemite's denial of BASE Access, Inc.'s ASUP is arbitrary and capricious agency action. by violating its own policies and procedures with respect to ASUPs for the purpose of imposing a discriminatory prohibition on BASE jumping with no rational policy basis. Yosemite's decision herein failed to consider any important aspect of why BASE jumping poses a problem. It offers an explanation for the decision (the false claim that BASE *must* be subjected to a park planning process prior to any agency action on BASE ASUPs) that runs counter to the evidence, law, and policy of NPS. Further, Yosemite has never and will never include BASE jumping in any planning process as decades of ignored outreach and public comment from the parachuting community reveals. Finally, Yosemite's unexplained decision with respect to this BASE jumping ASUP is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Yosemite's failure to Act on this ASUP further violates 5 U.S.C. 706(2) by refusing agency action and delaying into perpetuity action required by NPS rules and guidance. Finally, because

---

[46] See https://www.sierrasun.com/news/squaw-man-found-dead-after-illegal-yosemite-base-jump/.
[47] See Valley Uprising 1:22:42.
[48] *See, Dec. of Carol Moses* (Feb. 27, 2023), ¶¶ 13.

discrimination and animus are the sole purposes for Yosemite's BASE regulations and policies, its denial (or refusal to act) upon BASE Access, Inc.'s ASUP likewise violates the equal protection guarantees of the 14th amendment. For the foregoing reasons, Yosemite should reverse its denial of the ASUP, grant BASE Access, Inc. a permit to conduct a BASE jump, or in the alternative conduct a planning process with the goal of evaluating BASE jumping's appropriateness for the park.

*Kendrick Dane*

Sincerely,
Kendrick W. Dane
*General Counsel*
BASE Access, Inc.

**EXHIBIT A-8.15**

1/3/24, 5:41 PM          BASE Access Mail - Fwd: The dreaded FOUR letter word.

Case 6:20-po-00742-HBK    Document 61-1    Filed 09/16/24    Page 50 of 99



**Brendan Weinstein <brendan@baseaccess.org>**

---

## Fwd: The dreaded FOUR letter word.
1 message

---

**Eric Kunkel** <erickunkel09@gmail.com>            Tue, Jan 2, 2024 at 11:10 AM
To: "brendan@baseaccess.org" <brendan@baseaccess.org>

Hope this helps! Thank you for all you do for our sport!

---------- Forwarded message ---------
From: **Eric Kunkel** <erickunkel09@gmail.com>
Date: Mon, Oct 29, 2018 at 4:54 PM
Subject: The dreaded FOUR letter word.
To: <Michael_Reynolds@nps.gov>

Hello Mr. Reynolds,
     My name is Eric Kunkel. I wanted to first of all commend you on your undeniable devotion to the parks over the past 31+ years, congratulate you on your recent homecoming/promotion, as well as introduce myself. I am a 33 year old outdoor enthusiast, business owner, father, Cal Poly graduate, and BASE jumper...If your face cringed to hear that last bit of information imagine how hard it was for me to type. I was born in Clovis, raised in Pismo Beach, and recently relocated to Chico. I am a California native with a passion for anything mother nature has to offer. I know that the Parks Service and BASE jumpers haven't always had the best relationship over the years but I wanted to reach out and extend a metaphorical olive branch in hopes of at least sitting down across from one another and getting a better understanding of the topic at hand.
     While I don't quite have the lineage you do in regards to our parks, my roots also run deep with an undeniable love for them. Some of my first memories were in Yosemite and Kings Canyon National Park and I hope that my sons first are as well. I spend much of my free time hiking, backpacking, and camping in the parks, and unfortunately BASE jumping outside of them. I have been fortunate enough to travel thousands of miles across the world BASE jumping in Panama, Canada, Italy, Switzerland, Austria, Spain, New Zealand, and much of the US, though never in my very own back yard of Yosemite. At each of these locations I have closely observed and experienced first hand that there can in fact be a middle ground where both parties benefit and coexist in harmony.
     I donate to the Yosemite foundation regularly, purchase an annual parks pass each year, enter the Half Dome lottery almost every year (though I have yet to win my friends fortunately have), stay in the canvas tent cabins at Yosemite Village, and eat at the Ahwahnee as well as Deanna's Kitchen. I practice the belief of take more out with you than you came with each and every visit. I introduce at least one individual to the park each year and make sure to take the time to practice what I preach and set them on the right path to preserve what we are all so blessed to have at our fingertips. My point being that not all BASE jumpers are the care free, law breaking, wild children they are made out to be. A lot has changed since the days of the "flat bed ten" in regards to both the equipment and the mentalities, and my hopes are that with the recent "changing of the guards" we can start fresh and look into why we are where we are along with exploring if there is a possibility of improving upon that relationship.
     While I am aware there are special use permits offered for activities within the park I am willing to go out on a limb and say that requests for a permit to BASE jump in the park within the past 38 years have been far and few between. I know that a lot of the BASE community has chosen to ask forgiveness rather than permission in regards to this topic however I would like to try and curve that by asking permission rather than forgiveness. If this is not something that is possible I would still greatly appreciate the opportunity to shake your hand and expand my understanding of the parks perspective on this matter. I realize that you have an inconceivable amount of responsibility on both your shoulders and plate, but I hope that you can find it in you to set aside a fraction of time for us to meet. Thank you for your consideration and I look forward to hearing from you.
~Eric Kunkel
Phone: (805)801-5270
Address: 1113 Admiral Lane
         Chico CA 95973
Email: Erickunkel09@gmail.com

---

**EXHIBIT A-8.16**

Cindy Orlando
Acting Regional Director, NPS
333 Bush Street, Suite 500
San Francisco, CA 94101

Cindy,

I hope you are well. My name is Graham Hall and I'm writing to you – in consultation with Leo Durant – on behalf of our nation's air sports community. Last year I communicated with Alma Ripps – Chief of the Office of Policy for the Department of the Interior – who encouraged me to reach out to you and involve myself in the visitor use planning process for our National Parks. My goal here is to begin a process of collaboration by which unpowered air sports athletes like wingsuiters, paragliders, and other parachutists and ultralight gliders, will begin to legally access some of our National Parks on a limited basis through a permitting system, in the same way that some ultralight gliders are permitted to launch from Yosemite's Glacier Point after applying for a permit. Our stance is that regulation rather than prohibition is the most fair and effective way of managing unpowered air sports access to our national parks. When I brought up the matter with Mrs. Ripps, she pointed out that though parachuting in the parks was once prohibited outright, the *current* edition of the National Park's *Management Policies* clarifies that "Parachuting (or BASE jumping), […] if determined through a park planning process to be an appropriate activity, […] may be allowed pursuant to the terms and conditions of a permit." I understand that some park officials believe that allowing unpowered air sports in our National Parks is inimical to the goals of the parks, so I want to briefly outline what I see as our separate and overlapping goals, and how I see us potentially satisfying all of these goals and serving mutual interests through fair and reasonable compromises.

The primary goal of responsible air sports athletes hoping to fly in our National Parks is to be allowed some degree of access to our nation's largest cliffs and most sublime natural resources, which are almost exclusively located within National Parks. Because these features represent the safest – and in some cases the only practical – means of practicing our sports in our home country, we believe it is only reasonable that we be allowed *some* degree of access. Perhaps the most important goal of our National Parks is to provide safe and sustainable public access to our most sublime natural resources for as much of the population as possible, without sacrificing the feeling of an experience of nature. Here we have a shared interest.

The park service's primary objection to allowing parachutists and ultralight gliders in the National Parks is that these activities distract from the natural beauty of the parks. However, I don't think the matter is quite that simple. We doubt seriously that a visitor to a place like Lauterbrunnen Valley in Switzerland, for example, feels that his or her experience of the beauty in that valley is in some way inhibited by the presence of a paraglider floating high above or a wingsuiter gliding into the valley, which is a daily occurrence there. If anything, our experience suggests that visitors to places like Lauterbrunnen find that the presence of such activities in moderation amplifies the beauty and grandiosity of nature and offers an experience of the sublime position of humanity in nature. In the same way, visitors to our National Parks already look on – often intently and in crowds – as climbers scale massive cliffs, and such visitors feel their place in nature placed into stark perspective by the simultaneous juxtaposition and melding of the grandiose and the human.

To draw on a recent example, we should look at the way the Academy Award winning film *Free Solo* highlighted the wonder of Yosemite's massive granite walls while also showcasing the misunderstood sport that is its subject. These goals were not mutually exclusive in that film, and they are not mutually exclusive for the air sports community either. Permitting the public to enjoy this human interaction with nature is not inimical to the objectives of the National Park Service. That being said, we recognize that parachutes filling the skies above Yosemite Valley or Kings Canyon at all hours of every day would be inconsistent with the goals of our National Parks – as well as our own goals – and with that in mind we'd like to propose some compromises and solutions:

**EXHIBIT A-8.17**

1) Utilize permits to ensure that there are not too many parachutes in the sky on any given day. This seems like it needs little further explanation. Because our sport is highly weather dependent, we think it would be most efficient to issue permits for anywhere from three days to one week, much like the park reservation system. Furthermore, permits can't involve excessive fees, since our sport attracts people from all income levels and favoring wealthy jumpers would be an unfair access issue.

2) Simply punish violators. Though I imagine some park officials might object that a number of jumpers would violate the permitting rules, this is not a reason to deny access. We don't, for example, deny people the right to fish in our public waters because some people fish without a permit. We simply punish violators and work to restrict their access. First time violators might receive a ticket and one year ban from permitted jumping. Repeat violators could receive a lifetime ban from permitted jumping and even a ban from park access. This seems simple and fair to both responsible parachutists and the parks.

3) If necessary, establish time windows for acceptable use of different mountains and features in order to avoid incidents and excessive interaction between other park visitors and parachutists during the busiest times of day or during the busiest seasons. This has been done successfully in places like Lauterbrunnen and parts of France, where wingsuiters and paragliders coordinate their flying times to avoid airspace conflicts. We suggest allowing the community to self-regulate times of access unless this proves untenable.

4) Support the formation of an association – much like the Yosemite Hang Gliding Association, though broader in scope – that acts as a liaison between the park and pilots, disseminates information, encourages responsible flying, and publishes pamphlets and newsletters.


The truth is, though you may think of ultralight gliding and fixed object parachuting as relatively thoughtless daredevil activities, and though our characteristically sensational media may do it's best to encourage this belief, the wild west days of our air sports are behind us. These sports are more widely practiced than you'd expect, and most people who engage in them do so safely and consistently. These are not stunts; they are sports, passions, and lifestyles that we undertake with care and a sense of ethics. We love flying silently through the mountains, and we love our parks. Please help us make our nation's mountains more accessible. We look forward to hearing from you by phone or email, and hopefully meeting with you in person someday.

Sincerely,
Graham Hall and Leo Durant

Graham Hall, Ph.D.
Lecturer, Analytical Writing Program
UC San Diego
407-907-7615
gthall@ucsd.edu

Leo Durant
Environmental Control Systems Engineering Technician
Joby Aviation
786-499-9779
leodurant@gmail.com

**EXHIBIT A-8.18**



Brendan Weinstein <brendan@baseaccess.org>

---

## Base Access Special Use Application

**ZION Commercial Services, NPS** <zion_commercialservices@nps.gov>        Wed, Feb 7, 2024 at 2:58 PM
To: Brendan Weinstein <brendan@baseaccess.org>

Dear Brendan Weinstein,

Thank you for your patience while we evaluated your special use application.

Zion National Park (Park) is unable to further process your special use application at this time.

Zion National Park, to date, has not formally evaluated whether base jumping is an appropriate activity within the park through a required park planning process. However, the Zion Wilderness Stewardship Plan (WSP), formalized in 2007, states (pages 39, 40) the following regarding base jumping.

Parachuting (Base Jumping)

During the scoping process BASE jumping was not identified as an activity the public would like to see allowed in ZION. Although during the comment period on the draft plan/environmental assessment over 50 comments we received asking the park to allow BASE jumping. The Backcountry management Plan (BMP) contained within the WSP covers areas within the park that are recommended wilderness and are within the General management Plan (GMP) management zones that are Primitive, Pristine, or Research Natural Areas. All of these areas are managed to preserve natural processes, where natural sights and sounds are all one sees and hears. Mechanized forms of recreation are not appropriate in these areas. Parachutes are considered a form of mechanized transport and therefore are not appropriate in these areas. BASE jumping will continue to be prohibited in ZION and will be subject to the regulations outlined in 36 CFR 2.17.

The following guidance contributed in the above decision:

36 CFR 2.17(a)(3) - Delivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit.

NPS Management Policies 2006 8.2.2.7 states: Parachuting (or BASE jumping), whether from an aircraft, structure, or natural feature, is generally prohibited by (36 CFR 2.17(a)(3). However, if determined through a park planning process to be an appropriate activity, it may be allowed pursuant to the terms and conditions of a permit.

NPS Management Policies 2006 1.5 states: An "appropriate use" is a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park. Not all uses are appropriate or allowable in units of the national park system, and what is appropriate may vary form one park to another and from one location to another within a park.

Zion currently has a moratorium on new activity planning while the Park works through a Visitor Use Management Plan (VUMP) addressing many management areas including exponential growth in visitation and challenges to park resources, including proposed wilderness. To preserve Congress's prerogative to designate wilderness, general management plans and other plans potentially affecting eligible wilderness resources will propose no actions that could adversely affect the wilderness characteristics and values that make them eligible for consideration for inclusion in the National Wilderness Preservation System.

Thank you for your interest and understanding.

Sincerely,

Larry Walter

**EXHIBIT A-8.19**

Concession Management Specialist
Zion National Park

Larry Walter for Commercial Use Authorizations and Special Use Permits: (435) 772-0210

Doug Dawson for Concessioner Operations and Commercial Services Planning: (435) 772-0231

**EXHIBIT A-8.20**



Brendan Weinstein <brendan@baseaccess.org>

---

## BASE Access -- Yosemite

---

**Brendan Weinstein** <brendan@baseaccess.org>                           Tue, Dec 12, 2023 at 7:50 PM
To: Jesse_McGahey@nps.gov
Cc: Cicely_Muldoon@nps.gov
Bcc: updates@baseaccess.org



Hey Jesse,

My name is Brendan Weinstein and I am reaching out on behalf of BASE Access, a non-profit representing
BASE jumpers.

I called the general information office today and was advised that either you or the superintendent would be
the best two people to reach out to for our inquiries.

BASE jumpers would like to start a dialogue with Yosemite National Park on re-introducing BASE jumping to
the park in a way that is in line with the park's mission to preserve Yosemite for future generations. We have
the understanding that parks partake in a regular planning process where new activities can be officially
integrated into the park, and we would like to be involved in Yosemite's process for this. And we'd like to
know what is the proper way for our group to participate.

Back in May we drafted a proposal for an initial set of rules that we believe could govern jumping in the
parks. You can view that proposal here. It was drafted with heavy consideration for minimizing impact to
park staff and its resources, and with the mentality that rules could be tightened or loosened based on the
outcome of a trial period.

We sent an inquiry back in May through the contact form on the Yosemite website asking about who to get
in touch with for discussing our proposal, and requested a meeting with the Superintendent, but did not hear
back.

Yosemite is the best place in the country for BASE jumping. It's the birthplace of BASE. It has a broad set of
greens and blues (ie high margin flights), whereas most of what is outside the national parks are blacks or
double blacks (ie low margin, high risk flights). As an aging father who loves flying wingsuits, I see that the
safest future for our activity is in the national parks. And when I think of the next generation of jumpers, the
only responsible way to help bring them into the sport in the United States is through a regulated path in the
national parks, with Yosemite being the park that offers the greatest amount of margin and safety.

In parallel we've sent a draft Memorandum of Understanding document to Krista Sherwood, National
Program Manager for Outdoor Recreation, in the hopes that our organization, BASE Access, can serve as
the functional equivalent of what the Access Fund is for climbers in managing the relationship between
BASE jumpers and the NPS.

**EXHIBIT A-8.21**

We've also submitted a special use permit application for a small group to complete a wingsuit BASE jump from Porcelain Wall in January. That application is scheduled to arrive tomorrow, but if you want to take a peek you can view it here. We are hopeful to get constructive engagement on that permit application and believe it can be the first step in building a fruitful relationship between jumpers and Yosemite National Park. If you think this letter would be better addressed to a different staff member, feel free to pass on. And please let me know who would be the correct person with whom to be in correspondence. If you or Cecily are the correct folks and are amenable, it'd be great to hop on a video call for 30 minutes to chat about our proposal.

Best,
Brendan Weinstein
BASE Access Board President

**EXHIBIT A-8.22**



Brendan Weinstein <brendan@baseaccess.org>

## BASE Access -- Yosemite

**Brendan Weinstein** <brendan@baseaccess.org>                    Tue, Jan 2, 2024 at 9:45 AM
To: Jesse_McGahey@nps.gov
Cc: Cicely_Muldoon@nps.gov

Hey Jesse and Cicely,

I hope y'all have had a nice holiday season. I haven't heard back from either of you yet. I would love to touch base on the Yosemite Proposal doc I shared with y'all.

Again, please let me know if there is someone else I should be getting in touch with. Your names and contact info were suggested and given when I called the park's ranger phone line a month ago inquiring about how BASE jumpers can get involved with the park planning process and establish a relationship with Yosemite National Park.

Best,
Brendan Weinstein
BASE Access Board President

[Quoted text hidden]

**EXHIBIT A-8.23**



Brendan Weinstein <brendan@baseaccess.org>

---

## Fwd: Response to your Yosemite BASE Jumping Proposal
1 message

---

**Kristian Geissler** <kgeissler1144@gmail.com>          Tue, Jan 2, 2024 at 3:58 PM
To: "brendan@baseaccess.org" <brendan@baseaccess.org>

---------- Forwarded message ---------
From: **YOSE Superintendent, NPS** <yose_superintendent@nps.gov>
Date: Tue, Jul 9, 2019 at 10:23 AM
Subject: Response to your Yosemite BASE Jumping Proposal
To: <kgeissler1144@gmail.com>

### OFFICIAL ELECTRONIC MAIL - NO HARD COPY TO FOLLOW

National Park Service
Yosemite National Park
P.O. Box 577
Yosemite, California 95389

In Reply Refer To
A3615(YOSE-PROT)

Kristian Geissler

kgeissler1144@gmail.com

Dear Mr. Geissler:

We are in receipt of your electronic correspondence dated June 6, 2019 and June 11, 2019. In this correspondence, you propose a trial or pilot project in which Para-Alpinism (or BASE jumping) would be permitted within Yosemite National Park.

Any conversation about this topic needs to be fully informed in regards to all applicable NPS Policy and law. One of our guiding documents in this regard is the NPS 2006 Management Policies. Section 8.2.2.7 states:

> Parachuting (or BASE jumping), whether from an aircraft, structure, or natural feature, is generally prohibited by 36 CFR 2.17(a)(3). However, if determined through a park planning process to be an appropriate activity, it may be allowed pursuant to the terms and conditions of a permit.

Although the Management Policies are a guiding document, we also have a duty and responsibility to consider other NPS policies within the discussion. In this case, we would need to incorporate NPS Policy regarding Wilderness. The vast majority (94%) of Yosemite is designated Wilderness, therefore it is reasonable to believe that parachuting (BASE jumping) would occur within this protected area. Decisions and actions would need to be in conformity with Section 6 of the NPS Management Policies, which provides direction for managing Wilderness.

Furthermore, Section 8.2.2.7 also directs attention to the process for determining the appropriateness of the activity in question. NPS 2006 Management Policies, section 8.1.1 states

**EXHIBIT A-8.24**

While providing opportunities for appropriate public enjoyment is an important part of the Service's mission, other park uses-unrelated to public enjoyment-may sometimes be allowed as a right or a privilege if they are not otherwise prohibited by law or regulation.

In accordance with policy we would examine applicable law on parachuting (BASE jumping). Two areas of law are taken into consideration including the Wilderness Act and applicable regulations. Section 4c of the Wilderness Act states, in part, that there shall be no other form of mechanical transport within any such area. The introduction of mechanical transport would therefore contradict the Wilderness Act. Similarly, regulatory authority for the NPS is derived from the Code of Federal Regulations (36 CFR 2.17) which prohibits BASE jumping and the use of a parachute to accomplish such jumps. This law has been upheld by the Tenth Circuit in a case at Lake Powell and affirmed on appeal. The Ninth Circuit agreed with the Tenth Circuit's findings (United States v. Albers, No. 99-10071 (9th Cir. 7/17/00)) and upheld a case from Yosemite. The act of BASE jumping is looked upon by the courts not only from the perspective of the participant but also the hazard created when exposed to the general public. To date all our actions have been consistent with the court's findings.

In specific regards to Yosemite National Park undertaking a planning process which would allow for parachuting (BASE jumping), no planning efforts are currently underway or anticipated in the foreseeable future. We are not taking any actions at this time to change current policy or practice at Yosemite on this matter.

Sincerely,

*/s/ Michael T. Reynolds* (signed original on file)


Michael T. Reynolds
Superintendent

Office of the Superintendent
Yosemite National Park
YOSE_Superintendent@nps.gov

**EXHIBIT A-8.25**

(NPS Form 10-930)
(OMB No. 1024-0026)
(NEW 10/00)
(Expires 3/31/2010)

**National Park Service**
**Yosemite National Park**
**P.O. Box 700**
**El Portal, Ca. 95318**



**209-379-1877**
**Application for Special Use Permit**

Please supply the information requested below. **Attach additional sheets, if necessary, to provide required information**. Allow **AT LEAST** 4 business days for processing (2 business days for First Amendment requests). A non-refundable processing fee should accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. Your permit may require the payment of cost recovery charges and proof of liability insurance naming the United States of America as also insured.

| | |
|---|---|
| Applicant Name:  Gregory L. Coates | Organization Name:  n/a |
| Social Security #: | Tax ID #    n/a |
| Street/Address: 2610 Stanford | Street/Address:    n/a |
| City/State/Zip Code: Houston | City/State/Zip Code: |
| Telephone #:        281-902-9233 | Telephone #: |
| Cell phone #:        832-488-0374 | Cell phone #: |
| Fax #: | Fax#: |
| E-mail:    epiphanybase@gmail.com | E-mail: |

Description of Proposed Activity (attach diagram, attach additional pages if necessary):

Backcountry Parachute Jumps from Half Dome    (see attached page)

Requested Location:   (Please see attached page)

Date(s):

| Event set up will begin: (date and time) | Event will begin: (date and time) | Event will end: (date and time) | Removal will be done: (date and time) |
|---|---|---|---|
| 10/04/2010 - 7:00 | 10/4/10 - 8:00 | 10/4/10 - 16:00 | 10/4/10 - 17:00 |

Maximum Number of Participants  2                                    (Please provide best estimate)

Maximum Number of Vehicles    0                                         (attach parking plan)

Support Equipment (list all equipment; attach additional pages if necessary)

None

**EXHIBIT A-8.26**

List support personnel (contractors, etc. including addresses and telephones attach additional pages if necessary) 2x Ground Crew with radios

Individual in charge of event on site (include address, telephone and cell phone numbers): myself

Is this an exercise of First Amendment Rights? ☐ Y ☒ N
Are you familiar with/ have you visited the requested area? ☒ Y ☐ N
Have your obtained a permit from the National Park Service in the past? ☐ Y ☒ N
    (If yes, provide a list of permit dates and locations on a separate page.)
Do you plan to advertise or issue a press release before the event? ☐ Y ☒ N
Will you distribute printed material? ☐ Y ☒ N
Is there any reason to believe there will be attempts to disrupt,
    protest or prevent your event?(If yes, please explain on a separate page.) ☐ Y ☒ N
Do you intend to solicit donations or offer items for sale? 
    (These activities may require an additional permit.) ☐ Y ☒ N

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.

Signature _____ Date _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Information provided will be used to determine whether a permit will be issued. Completed application must be accompanied by an application fee in the form of a cashiers check or money order in the amount of $100.00 made payable to **National Park Service**. Credit card payments may be accepted at some parks. Application and administrative charges are non-refundable. *This completed application should be mailed to _____ at the Park address found on the first page of this application.*

**Note** that this is an application only, and does not serve as permission to conduct any use of the park. If your request is approved, a permit containing applicable terms and conditions will be sent to the person designated on the application. The permit must be signed by the responsible person and returned to the park prior to the event for final approval by the Park Superintendent.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*The above application form is provided with the understanding that parks will insert appropriate park names and addresses and the amount of the application fee as desired.*

**Paperwork Reduction Act Statement:** This information is being collected to allow the park manager to make a value judgment on whether or not to allow the requested use. All the applicable parts of the form must be completed. A Federal agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

**Estimated Burden Statement:** Public reporting burden for this form is estimated to average 30 minutes per response including the time it takes to read, gather and maintain data, review instructions and complete the form. Direct comments regarding this burden estimate or any aspects of this form to the National Park Service, Special Park Uses Program Manager, 1849 C Street NW (2460), Washington, D.C. 20240

**EXHIBIT A-8.27**

DESCRIPTION OF PROPOSED ACTIVITY

This Special Use Permit application is being submitted for two parachutists to each make a single parachute jump from Half Dome. Parachuting from the cliffs in Yosemite National Park can be permitted through the issuance of a Special Use Permit and a Policy Waiver for the 2009 NPS Management Policy section 8.2.2.7.

A Special Use Permit for parachuting has been issued by the same park for 30 years now. During this time, there has been great success in protecting park resources, furthering jumper/ranger relations, and creating an enjoyable atmosphere for jumpers and park visitors.

Parachuting technology has come a long way in 30 years. Equipment, techniques and attitudes have changed for the better. Safety is my first priority, as it would be detrimental to have repeat of 1999. In addition, we've selected Half Dome because it is more remote than other cliffs in the park. Most park visitors will be completely unaware of and unaffected by any backcountry parachute jumps.

REQUESTED LOCATION

We will attain all appropriate Half Dome hiking permits. Our approach to the top of Half Dome will follow normal posted trails. Landings will take place on the valley floor beneath Half Dome and all park rules will be followed. The dates and times we've selected are off-peak in order to minimize anyone even seeing a parachute in the sky.

OTHER

Climbing, which is permitted within the park, causes more harm to park resources than backcountry parachuting. Hang gliding is also permitted at certain times of the year. As parachutists, we're not saying that our sport is completely safe. However, it is no more dangerous than any of the above mentioned activities. As taxpayers, we feel that we should have the same rights as others to recreate in our National Parks. Parachuting can be enjoyed in a manner that will benefit both jumpers, and rangers, as evidenced by the tens of thousands of cliff jumps made around the world and the many locations that support us (including Bridge Day).

I only ask that you extend your hand so that we can compromise on backcountry parachute jumps on Yosemite National Park. I and my fellow jumpers are fully willing to accept any and all reasonable rules and regulations. Please give me a chance to prove this by approving this Special Use Permit.

If you have any questions regarding backcountry parachuting, please don't hesitate to call or email me.

Greg Coates
2610 Stanford St. #1
Houston, TX 77006
epiphanybase@gmail.com

**EXHIBIT A-8.28**

HEATHER E. WILLIAMS, Bar #122664
Federal Defender

Kara R. Ottervanger
Assistant Federal Public Defender
Florida State Bar No. 10112110
Kara_Ottervanger@fd.org
2300 Tulare St., Suite 330
Fresno, CA 93721
(559) 487-5561
(559) 487-5950 (fax)
Benjamin A. Gerson
Assistant Federal Public Defender
New York State Bar No. 5505144
Benjamin_Gerson@fd.org
411 E. Bonneville Ave., Suite 250
Las Vegas, NV 89101
(702) 388-6577
(702) 388-5819 (fax)

Attorneys for Defendant
DAVID NUNN

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>DAVID NUNN,<br><br>    Defendant. | Case No. 6:20-PO-00742-HBK<br><br>**REPLY TO UNITED STATES'S OPPOSITION TO DEFENDANT'S MOTION FOR EVIDENTIARY HEARING** |

1

**EXHIBIT A-8.29**

1   **I.     Introduction.**

2          The United States opposes Mr. Nunn's motion for an evidentiary hearing on

3   three grounds. The United States asserts (1) that Mr. Nunn's motion is procedurally

4   defective because strict compliance with Local Rule 430.1(h) is necessary; (2) that

5   there is insufficient evidence to support the motion; and (3) that an evidentiary

6   hearing would be futile because in all cases the six–year statute of limitations for

7   challenging and administrative regulation applies.

8          First, while Rule 430.1(h) is intended to streamline courtroom procedures, it

9   does not supersede the trial judge's discretion, particularly in cases involving

10  complex questions that pertain to a defendant's liberty or a defendant's

11  constitutional right to present a defense. However, in an abundance of caution, and

12  to aid this Court and the parties, Mr. Nunn provides the Rule 430.1 information

13  herein. Second, for the reasons articulated by Mr. Nunn previously – which are

14  again briefly outlined below – there is ample support for the need for an evidentiary

15  hearing to further develop a record in support of Mr. Nunn's motion to dismiss.

16  Third, the six–year statute of limitations is wholly imported from civil suits brought

17  under the Administrative Procedures Act, and its application in criminal cases

18  would deprive the defendant of the quintessential constitutional right to present a

19  defense. Accordingly, the six–year statute of limitations is wholly inapplicable to

20  Mr. Nunn's case and an evidentiary hearing would not be futile.

21         Mr. Nunn's motion for an evidentiary hearing is not, as the United States

22  suggests, "last minute;" rather, the motion rests on questions that have developed

23  during the instant litigation. Specifically, how administrative decisions within

Yosemite National Park led to the ban on BASE jumping and continued

unavailability of permits to BASE jump in the park. At the hearings on October 12,

2021, and February 6, 2023, this Court specifically inquired of the United States as

to the availability of permits as noted in the Yosemite compendium, and any

available administrative appeals process should a permit be denied. At both

hearings the United States failed to produce any information germane to this

Court's questions. In addition, this Court raised concerns about the sources

proffered in Mr. Nunn's motion to dismiss.

## II. The local rules imply judicial discretion, which in this case favors an evidentiary hearing.

Local Rule 430.1(h) sets forth procedures to facilitate an evidentiary hearing

on a motion to dismiss. However, this Court has the authority to maintain its own

motion calendar. *See* Local Rule 430.1(a). The United States acknowledges this its

response. *See* ECF No. 50 at 1–2. This exercise of discretion allows a court to set a

hearing at a point most conducive to properly disposing of the issues at bar. This is

congruent with the Ninth Circuit's command in *United States v. Irwin*, 612 F.2d

1182, 1187 (9th Cir. 1980) (hearing required when material issues of fact that would

entitle movant to relief are *raised*). Exercising discretion in granting an evidentiary

hearing provides a vehicle for Mr. Nunn to vindicate his constitutional right to

present a complete defense, in this case challenging the validity of the agency

action. *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).

In accordance with Local Rule 430.1(h), Mr. Nunn requests a total of four

days for argument and the presentation of evidence at an evidentiary hearing.

1
2

**III.    Mr. Nunn has presented substantial evidence that Yosemite National Park's ban on BASE jumping is arbitrary and capricious sufficient to warrant an evidentiary hearing.**

3       In *Overton Park v. Volpe*, 401 U.S. 402, 415 (1971) the Supreme Court held

4   that agency decision making that is within the scope of the power delegated to the

5   agency is subject to substantial inquiry by the federal courts to determine if those

6   decisions were arbitrary and capricious. 5 U.S.C. § 706(2)(A). Because internal

7   decision making does not require a formal rulemaking record, *Overton Park*

8   authorized the lower federal courts to conduct evidentiary hearings to reconstruct

9   the administrative record. *Overton Park*, 401 U.S. at 415.

10       Yosemite National Park's staunch prohibition of BASE jumping and fervent

11   enforcement have been widely reported. *See* ECF No. 18 at 4–7. Of particular

12   importance are the media accounts of the uncontradicted statements of Chief

13   Ranger Bill Wendt, who in the early 1980s instituted, and then quickly revoked, the

14   permitting process for BASE jumpers. *See* ECF No. 18 at 17 (citing Sunshine

15   Superman (Magnolia Pictures 2014)); Exhibit A – Declaration of Carol Moses at ¶¶

16   10–11; Exhibit D – David Shonauer, *Fixed Object Jumping*, The Atlantic May 1983

17   at 22 ("From now on we're throwing the book at them"). Firsthand accounts

18   corroborate the policies implemented under Wendt and support Mr. Nunn's position

19   that the prohibition on BASE jumping was driven by animus with little to no

20   rational purpose.

21       Following the revocation of the permit system, BASE jumping continued in

22   the park, with jumpers sometimes going to great lengths for their sport, despite it

23

being facially illegal. Exhibit A at paragraph 12; Exhibit B – Declaration of Grady Bryant at ¶¶ 5–7; Exhibit C – Declaration of Matt Gerdes at ¶¶ 3–4.

Enforcement efforts were both strict and unrelenting. Exhibit A at ¶ 13; Exhibit B at ¶ 6; Exhibit C at ¶ 5. A divisive and toxic culture developed between BASE jumpers and Rangers. The devolution into guarded camps served as a self-reinforcing basis for Yosemite's ban on BASE jumping. Coupled with Wendt's statements, the culture of prosecuting BASE jumpers at the expense of all other enforcement options belies the notion that enforcement policies were developed with clearly developed goals meant to preserve the park. *See* 54 U.S.C. §10010 *et seq.*

While Yosemite has a mandate to regulate activities within the park, BASE jumpers were treated differently than other park users, even though other users had similar impacts on the park. In many other instances, a viable permitting process was eventually developed. For example, in the early 1980s, there was no permit system for rock climbers. Climbers caused measurable environmental damage to the cliffs of El Capitan. Exhibit D at ¶ 26. Yet rock climbing was allowed to continue because climbers could be helpful to the Rangers in search and rescue operations. Exhibit A at ¶ 9. Currently, a permit system exists for rock climbers to limit overcrowding and environmental damage. *See* National Park Service, *Wilderness Climbing Permits*, https://www.nps.gov/yose/planyourvisit/climbingpermits.htm (last accessed March 8, 2023).

Hang gliders, likewise, are permitted to recreate in the park upon showing certain qualifications. *See* ECF No. 18, Exhibit A. Requiring demonstrated competency undoubtedly reduces the strain on park resources Exhibit A at ¶ 15.

However, the option to develop a workable permit system was stripped from BASE jumpers in the early stages of the sport for reasons unrelated to park preservation. BASE jumpers were effectively locked out of a legal pathway to parachute.

The history of BASE jumping in Yosemite includes numerous BASE jumpers whose actions were detrimental to the park. However, this is undoubtedly true for many other park users including rock climbers, campers, and hang gliders. Exhibit A at ¶ 9. The correct solution is to cite or arrest those bad actors who abuse the park or refuse to comply with permitting requirements. A blanket prohibition that is unsupported by reasoned decision making and perpetuated for decades through inflexible policies is the definition of arbitrary and capricious. *See International Ladies Garment Workers Union v. Donovan*, 722 F.2d 795, 818 (D.C. Cir. 1983).

The information proffered by Mr. Nunn in prior documents and in the declarations attached hereto are more than sufficient to support his request for an evidentiary hearing.

## IV. The evidentiary hearing would not be futile, as the six–year statute of limitations cannot, as a constitutional matter, apply to a criminal defense.

The United States opposes Mr. Nunn's motion on the grounds that an evidentiary hearing is futile because a defense attacking the underlying regulation is time barred by a six–year statute of limitations. ECF No. 50 at 3–5. Despite the six–year statute of limitations applying only in civil cases brough against an administrative agency, the United States persists in trying to apply this limitation to an affirmative defense. Mr. Nunn has consistently opposed the application of the six–year statute of limitations as an infringement on his constitutional rights. *See*

1    *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 289 (1978) (Powell, J.,

2    concurring).

3    **V.    Evidentiary questions have arisen during the pendency of the**
         **instant litigation.**

4

5            The United States' opposition to an evidentiary hearing turns on the

6    contention that the instant motion is untimely and a dilatory tactic. ECF No. 50 at

7    2. That is not the case. Mr. Nunn proffered documentary evidence in his opening

8    brief to support the contention that Yosemite's enforcement policies were borne out

9    of animus towards the sport. *See* ECF No. 18 at 4–7. At the hearing on October 12,

10   2021, this Court specifically inquired of the United States about Yosemite's

11   permitting and administrative appeals processes. The United States did not provide

12   any factual information, and requested additional briefing, which this Court

13   granted. *See* ECF No. 37. The United States' supplemental briefing also did not

14   address this Court's question. This Court instructed the parties by minute order

15   prior to the February 6, 2023, hearing to discuss the requirements for permits set

16   forth in the Yosemite compendium. *See* ECF No. 47. This United States again did

17   not provide information on the availability of permits. At the February 6, 2023,

18   hearing Mr. Nunn relied largely on his prior proffer. This Court raised concerns

19   about the admissibility of Mr. Nunn's proffer. Mr. Nunn made the instant motion

20   for evidentiary development within a reasonable time to address this Court's

21   concerns.

22

23

**VI.   This Court should grant an evidentiary hearing to resolve important questions.**

>   **A.   An evidentiary hearing resolves important Due Process concerns.**

At the core of due process is the right to present a complete defense. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (citing *Crane v. Kentucky*, 476 U.S. 683 (1998)) (internal quotations omitted). Mr. Nunn is charged with violating a regulation that was promulgated by an unelected administrative agency. The Department of the Interior and the National Park Service were delegated the power to promulgate regulations to preserve Yosemite National Park for future generations. 54 U.S.C. §10010 *et seq*. That power is not unlimited and the regulations are not infallible. Mr. Nunn has raised serious questions about the intent and implementation of the administrative regulation under which he is charged. Should he be prevented from fully litigating these issues, there is a grave risk he may be deprived of his liberty based on arbitrary decision making that occurred nearly four decades before the instant allegations.

>   **B.   In the alternative, this Court should grant Mr. Nunn's motion to dismiss based on the existing record.**

In the alternative, if this Court denies the instant motion, this Court should rule in Mr. Nunn's favor as the United States has not objected to the admissibility of Mr. Nunn's proffer, and has failed to proffer any evidence to contradict or rebut Mr. Nunn's claims.

1

**VII.   Conclusion.**

2

  For the forgoing reasons Mr. Nunn respectfully moves this Court to grant the

3

instant motion for an evidentiary hearing in support of his motion to dismiss.

4

  Dated this 8th day of March, 2023.

5

              Respectfully submitted,

6

              Heather Williams
              Federal Public Defender

7

              */s/ Benjamin A. Gerson*

8

              Benjamin A. Gerson
              Assistant Federal Public Defender

9

              */s/ Kara R. Ottervanger*

10

              Kara R. Ottervanger
              Assistant Federal Public Defender

11

12

13

14

15

16

17

18

19

20

21

22

23

**EXHIBIT A-8.37**

I, Carol Moses, declare as follows:

1. I am currently an attorney in private practice. I live and work in Fresno, California.
2. I previously worked as a Law Enforcement Ranger for the National Park Service from 1974 through 1992. During that time I worked in the Protection Division and was primarily stationed in Yosemite Valley, in Yosemite National Park.
3. My duties as a law enforcement ranger were to enforce laws, provide emergency medical care, perform search and rescue operations, fight structural and wildland fires, collect campground and entrance station fees, and otherwise perform duties necessary to promote the smooth operation of Yosemite National Park.
4. I was a field supervisor for six years, from approximately 1980 to1986. I was supervised and took direct orders from the Valley District Ranger and the Chief Ranger. The Valley District Ranger was supervised by the Chief Ranger, who was in turn supervised by the Superintendent of the Park.
5. From the late 1970s through the mid-1980s I worked on the Front Country Horse Patrol. During this time I encountered many BASE jumpers in Yosemite Valley, in particular in El Capitan Meadow, where BASE jumpers would land after parachuting from El Capitan.
6. In the early 1980s BASE jumping, led by Carl Boenish, became popular in Yosemite. The Chief Ranger, Bill Wendt, initially allowed BASE jumping with a permit. BASE jumpers could apply for a permit by filing a form with the Valley District Ranger. I am not aware of the contents of the form, or if it required certain qualifications. Rangers would check the permit when a BASE jumper landed.
7. To the best of my knowledge BASE jumping permits were an invention of the Chief Ranger as a law enforcement function. I am not aware that the permit process ever involved the Superintendent, or if the permit system was implemented following an environmental impact study. The Chief Ranger had the final say in approving or denying a permit.
8. During the period when permits were available to BASE jumpers in Yosemite there were several problems. First, some BASE jumpers were resistant or resentful at having to obtain or show a permit. Second, the landing areas drew large crowds, which resulted in damage to the meadow and the accumulation of litter. Third, BASE jumpers required medical and rescue resources if they were injured upon landing.
9. These problems also existed with other park users, for example rock climbers and "big wall" climbers who used Camp 4 as a staging area. The rangers disliked both the climbers and BASE jumpers, but were more tolerant of the climbers because the rangers needed the climber's skills for search and rescue operations. Because the rangers found the climbers useful, they allowed them to co-exist in the Valley and continue climbing there, but were still disdainful of them.
10. The permit system that the Chief Ranger implemented existed for only a few months. Bill Wendt, the Chief Ranger, decided to shut down the BASE jumping permit system and I recall instructions that all BASE jumpers parachuting after the permit system was shut down be arrested. I do not believe the Park Superintendent was involved in that decision and the Chief Ranger acted unilaterally.
11. Bill Wendt's explained his reasons for shutting down the BASE jumping permit system at one of the ranger's daily 7:30 AM briefings. First, he did not like BASE jumpers, and unlike the climbers they did not serve a useful purpose. The Chief Ranger was clear about his dislike of BASE jumpers. The Chief Ranger felt that BASE jumpers were disrespectful to the park and that it was

not an appropriate activity. Second, enforcement was costly. I do not remember any fatalities during that time, but BASE jumpers would land on steep scree slopes or get hung up in trees, which required ranger rescue or medical assistance.

12. Revoking the availability of permits did not inhibit BASE jumping. In fact it seemed there was an increase of BASE jumping and jumps occurred at many different locations in the Valley at all times of the day and night. After the permit system was revoked BASE jumpers continued to jump illegally. Special patrols were formed to catch BASE jumpers. Apprehending BASE jumpers became a "cat and mouse" game for the rangers. David Neid, a ranger at the time, went to particular lengths to gather "intelligence" about upcoming BASE jumps and would schedule and organize rangers to patrol BASE jumping areas.

13. Rangers often engaged in subterfuge to try and catch BASE jumpers. For example, a special BASE jumping patrol was formed under the acronym SPLATT – Stop Parachutists Leap At The Top. That patrol had t-shirts made. I still have mine and have attached a photo of it to this declaration. Rangers would hike to the top of the cliffs without uniforms and dressed as campers to try and catch BASE jumpers before they launched. In one incident, Rangers attempted to arrest a BASE jumper named Robin Heid at the edge of the cliff, who then jumped in an effort to escape the rangers. The apprehending ranger tried to grab him, as Mr. Heid jumped, a dangerous situation for both the ranger and the BASE jumper.

14. I worked on the "Base Jump Patrol" and apprehended BASE jumpers. During these apprehensions I frequently heard BASE Jumpers complain that there was no permit system to jump lawfully. The discussion would revolve around comparing hang gliding to BASE jumping. Even though they are similar activities there was a lawful permit system for hang gliding.

15. I believe that many of the impacts on the park could have been managed by a better permit system. For example the hang gliding system limits the activity to reduce impact on the landing areas. The park has also proven it has the ability to mitigate the impact of large crowds in the meadows with a reservation system, such as the one currently used for the "water fire fall".

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

February 27 2023

_____

Carol Ann Moses

**EXHIBIT A-8.39**



I, Grady Bryant, declare as follows:

1. I am currently a court security officer employed by the United States District Court for the Eastern District of California. I live in Oakhurst, California and work in Fresno and Yosemite, California.

2. On February 6, 2023, I approached Assistant Federal Defender Benjamin Gerson at the Yosemite Courthouse because I am interested in the BASE jumping case and had information that I thought was important.

3. I previously worked as a Law Enforcement Ranger for the National Park Service from 1985 through 2005. During that time, I worked in the Valley District and did front country patrol in Yosemite Valley. The Chief Ranger was Roger Rudolph.

4. During my time as a ranger, Yosemite National Park prohibited BASE jumping. Apprehending BASE jumpers was part of my duties as a ranger.

5. Early on in my career as a ranger I remember there was talk of trying to work with BASE jumpers so that they could get a permit to jump legally. However, those ideas faded and quickly and a rivalry between the BASE jumpers and the rangers developed. Yosemite National Park assumed that BASE jumpers would not comply with a permit system. Rather than working to develop a permit system, the rangers assumed BASE jumpers would never be open to it and that they would continue to break the law.

6. Yosemite National Park adopted an aggressive policy of arresting and citing BASE jumpers. Many rangers considered it a "challenge" to outsmart BASE jumpers. The base jumpers also tried to evade law enforcement rangers. A culture of division developed.

7. BASE jumpers would parachute at night or in marginal conditions to evade rangers. They would also use flashlights and walkie-talkies to signal that the coast was clear of rangers before a jump. Similarly, the rangers would try to outsmart the BASE jumpers. David Neid, who worked on horse patrol, was instructed by his superiors to set up nighttime patrol in the Meadow at specific time and locations for the express purpose of catching BASE jumpers.

8. Yosemite National Park's approach to BASE jumping was very different than its approach to hang gliding or rock climbing. ~~I tried to get to know rock climbers because rangers would need their help for search and rescue operations. While I did not agree with everything climbers did, we~~

1



~~had a good rapport for the most part.~~ Hang gliders were allowed a permit but they had to demonstrate some proficiency and use approved equipment. The BASE jumping community was never able to comply with the requirements of the Park service and the Park service never was able to establish the same rapport or common ground with the BASE jumpers in the same way.

9. I did not take apprehending BASE jumpers as a personal mission, but it was the park's enforcement policy at the time. Over the years I watched the climbing and BASE jumping communities change. I believe both sports have matured and they are no longer as rowdy or stubborn as they once were. In addition, BASE jumping and rock climbing are well known now, and they are not the same spectacle that they were when they were new sports.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

March 7, 2023

Grady Bryant

2

**EXHIBIT A-8.42**

I, Matt Gerdes, declare as follows.

1. I have been an active BASE jumper since 1997. I was introduced to BASE Jumping by Frank Gambalie in the winter of 1997. Since then I have accumulated over 1200 injury free BASE jumps in locations from Baffin Island in the Canadian arctic, Southeast Asia, the Alps, and the western United States.

2. I am the author of The Great Book of BASE, which details many of the technical aspects of BASE jumping and the development of the sport. BASE jumping is a highly technical sport. Proper preparation is key and requires extensive training as a parachutist and knowledge of specialized equipment. I do not consider myself to be a reckless or unprepared jumper, nor do I consider myself to be a scofflaw.

3. Through my research and participation in the sport I have been deeply involved with the broader BASE jumping community for many years. I have personally known several in our community who have been arrested or killed in Yosemite National Park, including Dean Potter, Graham Hunt, and Frank Gambalie.

4. Throughout my BASE jumping career I have often asked the obvious question of why it was "illegal" to BASE jump in Yosemite National Park when so much other recreation occurs there daily. Through conversations with many BASE jumpers, including jumpers older than myself, and Park Rangers, I learned that permits were no longer being issued early in my BASE jumping career, and that permits had not been issued for many years. This was always described to me as a hard and fast rule, but with little explanation.

5. Furthermore, the fervor with which BASE jumpers are pursued by rangers in Yosemite was, even twenty years ago, world famous. The dynamic between BASE jumpers and rangers did not in any way resemble people who had failed to get a recreation permit – it always has been more along the lines of cops and robbers. BASE jumpers assume that the Rangers are out to get them, as though it is a personal vendetta, and always assume that any BASE jumping in the park will be met with hostility.

6. Over the years so many permits have been denied, so many jumpers arrested, and so much violence and injury have resulted from BASE jumpers trying to avoid rangers that it would never even occur to a modern day BASE jumper to apply for a permit. In my experience with the BASE jumping community, the prevailing wisdom is that one would be far more likely to win the lottery or get struck by lightning while being eaten by a shark than to ever have a permit issued to BASE jump in Yosemite. Apart from the fact that people do still actually win the lottery.

7. The understanding that Yosemite National Park will never issue a BASE jumping permit has led many BASE jumpers to take unnecessary risks, parachuting in marginal conditions, such as low light at dusk or dawn, or being driven into dangerous or even fatal situations to avoid the Rangers.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

March 6 2023

Matt Gerdes

**EXHIBIT A-8.43**



YOSEMITE VALLEY
# FIXED-OBJECT JUMPING

*A dangerous, sometimes deadly, new pastime exists in a vague region between sport and stunt*



. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Yosemite valley, in California's Yosemite National Park, is surrounded by huge gray granite cliffs, some smooth and sheer, some topped with domes or spires. El Capitan, which rises about 3,000 feet above the valley floor, is the most famous of the cliffs. Half Dome, about 1,800 feet high, dominates the upper end of the valley. The cliffs have a particular kind of allure. The first white men to ascend the mountains around Yosemite often compared them to the Swiss Alps; one mountaineer remarked in 1863 that Yosemite lacked the "picturesque beauty" of the Alps but possessed a desolation and starkness that imparted a "sublime grandeur." John Muir, the nineteenth-century naturalist and conservationist, did some climbing among the rugged walls, and after one adventure he wrote, "We little know until tried how much of the uncontrollable there is in us, urging us across glaciers and torrents, and up dangerous heights, let judgment forbid as it may."

Last August, a thirty-five-year-old man named Jim Tyler was killed on Half Dome, having given in to one of his own uncontrollable urges. Tyler was not climbing the cliff, however; he was parachuting from its summit. In fact, he was trying to become the first person to jump consecutively from three cliffs in the park. For Tyler the goal wasn't unusual. Tyler was "a real pioneer," according to one of his friends. "He had to be first, but at times he could be hasty and impatient." He was an experienced parachutist who had done some stunt work—his greatest feat being a chuteless dive from an airplane, in which he had to link up with another sky-diver's canopy in midair. In Yosemite last summer, he successfully jumped from El Capitan and another cliff named Glacier Point. He had two companions with him for the Half Dome jump, which he made in the late evening of August 4. As usual, Tyler went first. During his free fall—he waited for three seconds before deploying his parachute—he reached a speed of about 100 miles an hour. Using his body as an airfoil, he was supposed to glide away from the cliff. He didn't glide far enough. When his chute opened, its lines were twisted, and Tyler was spun around into Half Dome's granite face. His canopy snagged on the cliff and collapsed.

What Tyler was doing, strictly speaking, is called fixed-object jumping. It's one of those activities that exist somewhere in a vague region between stunt and sport, less conspicuous than jumping over parked cars with a motorcycle but not considered legitimate in the way that mountain climbing is. It is certainly dangerous; in fact, the premise of fixed-object jumping is risk. Its participants parachute from bridges, cliffs, skyscrapers, and other platforms too low to allow adjustments for equipment failure or errors of judgment. They must also some-

how avoid the objects they've jumped from. Obviously, the people who do this are looking for experience of an unusual sort; they say the effect is like no other, a thrill so intense that even ordinary sky-diving becomes mundane in comparison. "It's just the best feeling I've ever had," one fixed-object jumper told me recently. "It's frightening, yes, but the moment you jump there is a quietness and peace and control. You end up with a feeling of clarity and power. After I did it, it's the only thing I ever really wanted to do again."

Unlike sky-diving or mountain climbing, however, what fixed-object jumpers do is almost always illegal. When they do it, they risk being arrested. And the consequences of that fear of arrest can mean trouble. It meant trouble in Yosemite last August, when Jim Tyler died, and afterward, when authorities found out what happened.

As near as anyone can determine, what happened is this: After Tyler jumped from the cliff, his two companions, Howard Dunklin and Pat Tierney, did the same, both landing safely. Meanwhile, a team of mountain climbers nearby notified some rangers that they thought they had witnessed a parachuting accident. The rangers went to the base of Half Dome and found Dunklin and Tierney hiking away. According to Dick Martin, a Yosemite Valley district ranger, the two men denied having jumped and refused to say whether an accident had occurred. "After some time," says Martin, "the rangers asked them whether they thought it would be a good idea to launch a rescue effort. They said yes, they thought it would be a good idea." In other words, Dunklin and Tierney had apparently tried to sneak away from Half Dome to avoid arrest, even though they knew their friend had been hurt.

In the dark, the rangers needed several hours to find Tyler. He was given cardiopulmonary resuscitation, although Dick Martin says that he may already have been dead. But for the rangers, the question of when Tyler died was irrelevant. The accident came only weeks after another jumper, Larry Wolfe, was seriously injured diving from Half Dome. According to an unofficial count, those two were the only casualties after twenty parachute jumps from the cliff. But many other jumps have been made in Yosemite, including at least 550 from El Capitan. In all, nine jumping-related

**EXHIBIT A-8.44**

**THE INDIANS THOUGHT
THIS PLACE THE CENTER
OF THE UNIVERSE;
WE STILL DO.**

Join us on a pack trip into the mountains of the Washakie Wilderness in Northwest Wyoming.

Experienced horses, a local guide, wrangler & cook will take you to a place few have ever been. Fish the mountain streams, photograph small & big game or simply walk in meadows of wildflowers.

We want to keep this small, and are looking for only a limited number of reservations.

For details and referrals, contact:

Jerry Hodson
Mike Patrick
The Patrick Ranch
Southfork
Cody, Wyoming, 82414

(307) 587-2839
(307) 587-3956



**Better Than
Jogging,
Swimming
or Cycling**

# NordicTrack

**Jarless Total Body
Cardiovascular Exerciser**
Duplicates X-C Skiing For The
**Best Way To Fitness**

**NordicTrack** duplicates the smooth rhythmic total body motion of XC Skiing. Recognized by health authorities as the most effective fitness building exercise available. Uniformly exercises more muscles than jogging, swimming, cycling and rowing.

**Does Not** cause joint or back problems as in jogging. Highly effective for weight control and muscle toning.

**Easily Adjustable** for arm resistance, leg resistance and body height. Smooth, quiet action. Folds compactly to require only 15 by 17 inches of storage area. Lifetime quality.

**Used In** thousands of homes and many major health clubs, universities, and corporate fitness centers.

**Call or Write for FREE BROCHURE**
**Toll Free 1-800-328-5888**    MN 612-448-6987
**PSI**    124 R Columbia Crt.,    Chaska, Minn. 55318

injuries have occurred in the Park; Tyler's was the first that resulted in death. Rangers describe the covert jumping as a dangerous cat-and-mouse game, and after last August they were clearly tired of playing along. "There were so many injuries that it seemed like an open invitation for unqualified people to jump," says Dick Martin. "This time the results were tragic."

"From now on we're throwing the book at them," Bill Wendt, the chief ranger of Yosemite, said after the accident. "This is going to stop." Howard Dunklin and Pat Tierney eventually pleaded guilty to misdemeanor charges of unlawful flight (a violation of federal park regulations), were fined $500, and were placed on six months' probation.

Many at Yosemite doubt, however, that severe punishment will be enough to stop fixed-object jumping. The jumpers have their own ideas about the Jim Tyler incident and why it happened. Carl Boenish, a well-known sky-diver who has made several jumps in Yosemite, told me recently that the law was partly to blame for what happened to Tyler. "He shouldn't have been jumping in the evening," Boenish said. "The air is more turbulent then, and more dangerous. But he didn't want to be seen. We're always taking chances that we shouldn't, because of the law. How can the rangers expect us to cooperate when they want to put us in jail?" Another climber I spoke with put it more bluntly: "I have a right to be in the Park," he said. "And I have a right to die there."

A FTER JIM TYLER died, several newspaper reporters began to question whether fixed-object jumpers had gone too far in pursuit of their right to die. But going far is part of the point of fixed-object jumping, and drawing a line between far and too far is hard to do. What is considered difficult or dangerous one day becomes routine later on. Skydiving, for instance, evolved from a military skill to an accepted sport in the early 1960s. It has since been pushed in new directions. At first, accuracy was the goal of sky-divers; they wanted to land on targets. In the 1970s, more sophisticated equipment led to tougher challenges, such as "building" formations of sky-divers in midair, an activity known technically as "relative work."

Carl Boenish says that jumping from buildings and cliffs is just another level of sophistication—part of the natural evolution of sky-diving. Boenish is a tall man with thick brown hair, and looks younger than his age, which is forty-one. He lives in Hawthorne, California, with his wife, Jean, also a sky-diver, and works out of a studio in his home as a sky-diving photographer. He is a soft-spoken, pleasant man, and is considered the unofficial historian of fixed-object jumping. When I met him, I asked why he thought the sport got started. "After you make about 500 jumps," he said, "you start to get jaded. You start looking for new challenges." Fixed-object jumping began getting popular in the late 1970s. By 1978, sky-divers had leaped from El Capitan, the Dolomite Alps in Italy, the World Trade Center, in New York City, and Seattle's Space Needle. In 1979, Boenish and three other sky-divers took a new tack by jumping from Colorado's 1,053-foot Royal Gorge Bridge. But the jumpers seemed to keep coming back to Yosemite.

Boenish was the one who thought he could organize the activity into a real sport. He came up with the acronym BASE—for Building, Antenna Tower, Span (meaning bridges), and Earth (meaning cliffs). Under his system, anyone who jumps from each kind of platform qualifies for a BASE award, which is issued by the U.S. BASE Association, another invention of his. Boenish says that forty people have qualified for patches so far, and another 2,000 have made at least one qualifying jump.

To date, the lowest BASE jump probably belongs to Phil Smith—a 190-foot drop from the ceiling of Houston's Astrodome (a publicity stunt). "That's about as low as possible," says Phil Mayfield, another BASE jumper. "You might be able to jump from 150 feet. Certainly 100 is too low. Our knowledge is gained through trial and error. Unfortunately, someday someone is going to find out how low is too low." In the meantime, new forms of risk-taking evolve. A separate BASE patch is now given for making jumps at night. And, in 1980, a young man from Los Angeles named Randy Leavitt combined his skills as a rock-climber and a parachutist, scaling the face of El Capitan, and then turning around at the top and jumping back off. Two other people have done it since, and Leavitt has named his new sport "cliffing." "Compared to just parachuting from the top," he says, cliffing, which combines risk and aesthetics, "is a much purer experience."



## SOME COFFEES YOU SAMPLE. OURS, YOU LOVE.

That sample costs only $10.50, a remarkable price for a selection of three one-pound packages of one of the world's finest gourmet blends and roasts, Cap Saurage's Community Coffee—a taste that has led three generations of customers to savor and enjoy particularly flavorful lives. It is now available at selected gourmet food stores.

If you wish, we will send you this selection along with our gourmet coffee book and the name of your nearest retailer, so you may experience the finest blends of Brazilian Santos, Colombian Medellin-Armenia and Mexican Altura coffees: an introduction to the pleasures of different roasts from a subtle light medium to the peak flavor in our dark roasted coffees.

Call Toll Free 800-535-9901 (with your credit card ready) or send $10.50 with your name and address to Community Coffee Company, P.O. Box. 3778, Dept. AT2, Baton Rouge, Louisiana 70821-3778. Specify choice of whole bean, regular or filter grind.

## Community Coffee
BRAND®

A Public Service of this magazine & The Advertising Council

# We just can't do the job without you.

We're counting on you.

Red Cross. The Good Neighbor.



## There's a lot worth saving in this country.

Today more Americans who value the best of yesterday are saving and using old buildings, waterfront areas and even neighborhoods.

Preservation saves energy, materials and the artistry of these quality structures.

Help preserve what's worth saving in your community. Contact the National Trust, P.O. Box 2800, Washington, D.C. 20013.



## National Trust for Historic Preservation
Preservation builds the nation

**EXHIBIT A-8.46**

Pure or not, it can still get you arrested. For BASE jumpers, staying out of jail is something of a preoccupation. Except for a few publicity stunts, arranged by radio stations and television shows such as *That's Incredible*, BASE jumpers have seldom been able to do legally to do what they want to do most. Jumps are almost always made in the early morning or in the late evening, when no one is around. "We're outlaws," Carl Boenish told me, "but that doesn't mean we're wrong. The law is wrong." Phil Mayfield passed along this advice to other BASE jumpers when I spoke with him: "Don't check in with local police to see if it's okay to jump. Just go ahead and do it."

THE CLIFFS OF YOSEMITE are where the problem has been most clearly defined. The National Park Service says that cliff-divers simply will not cooperate with authorities. "At issue is our ability to manage the safety of our parks," says Bill Wendt. Providing a measure of safety in places as wild as Yosemite is a growing problem for rangers. In 1980, more than 300 million visits were made to the national parks, nearly double the number made ten years ago. Not surprisingly, the number of accidents and deaths has gone up. In 1980, 209 deaths were recorded in national parks, up from 165 in 1970. Relatively few of these deaths resulted from high-risk sports such as rock climbing or parachuting (the leading cause of death in national parks is drowning), but rock-climbers and parachutists tend to get noticed. In the past few years, rangers have resorted to a tactical warfare of sorts to stop cliff-jumpers. They have dressed as backpackers to keep an eye on the trails leading to the tops of the cliffs, and they have staged surprise raids. Those arrested have had to submit to strip searches and have had to spend up to a week in the Park's jail awaiting arraignment. One jumper was charged with a felony offense—stealing state's evidence—when he tried to walk away with his own parachute after it had been seized by rangers.

The rangers did try to work out a compromise with jumpers, in the summer of 1981, by setting up a program for legal cliff-diving in the Park. The program was modeled after one already established for hang-gliders, people who jump from the cliffs wearing large, kite-like airfoils. The hang-gliders in Yosemite are strictly regulated as to when and

where they can jump; in five years no one has been killed or seriously injured.

The program for the cliff-jumpers didn't work as well. Nearly 400 jumps were made legally during the period, but almost as many illegal jumps occurred. "Many jumpers didn't cooperate at all," says Dick Martin, the ranger from Yosemite. After only one month, the United States Parachuting Association, which governs the sport of sky-diving, ruled that cliff-jumping was "a stunt activity," which could not be endorsed. (The USPA says that 2,000 feet is the lowest altitude at which a sky-diver should open his parachute; most cliff-divers in Yosemite open at about 1,200 feet.) After that decision, the Park rangers ended the program. Besides being too dangerous, they said, cliff-jumping was drawing crowds that were destroying the meadow below El Capitan. The rangers also complained that money being spent on occasional rescue attempts could better be used elsewhere in the Park budget.

Canceling the legal-jumping program put the rangers in the precarious position of judging the competing merits of various risk-takers. Rock-climbing is allowed in all the national parks. In Yosemite, no permit is required for climbers, and registration is voluntary. Consequently, rangers can't say how many climbers were in Yosemite last year; they do know, however, that eight people suffered climbing-related injuries. Most climbers agree that their sport is as dangerous as cliff-diving, if not more so. It is also destructive to the environment: Bill Wendt says that climbing equipment, such as pitons and bolts, has "literally rubbed the face off of El Capitan."

"The National Park Service position is completely arbitrary," says Robin Heid, a parachutist who was arrested four years ago after jumping off of El Capitan. Heid, who is twenty-nine years old, and a writer in Denver, is intensely committed to his jumping and to the idea of risk. Last summer he broke his back, a leg, and an ankle while parasailing (being pulled along wearing a parachute) behind a car. When I met him, in December, he was having the last pins removed from his ankle, and planning a jump from Denver's 700-foot United Bank Building. (He made the jump on New Year's Day.) Heid told me that the right to make fixed-object jumps is like the right of self-expression. "Society is so structured and ordered," he told me, "that we need an outlet—to have challenges. But that is a frightening thought for authorities. Ultimately, what the rangers are trying to do is to stop not just BASE jumpers but rock-climbers, and other people who do things that differ from society's norms."

Bill Wendt, the chief ranger at Yosemite, is a skier and a fine mountaineer, a man who can appreciate challenges. A friend of Wendt's told me that he tends to see issues in black and white. He has certainly had a lot to say about fixed-object jumping, and not much of it has been good. But he can see some gray areas. After the legal jumping was canceled, Wendt told a reporter that the matter was part of a larger problem of aesthetics—a question of what should be allowed in the national parks. "Does the automobile belong in the park?" Wendt said. "The answer is obviously no, but we allow them. And what's the difference between watching a mountain climber, a hang-glider, or a sky-diver—especially if the observer is watching over the roof of a Winnebago? Some say it's beautiful to watch, others say no. It's all in the eye of the beholder."

For most of us—for this beholder, at least—what fixed-object jumpers do is nearly incomprehensible. Parachutists have a term for those who never take up the sport—they call them "Whuffos," short for the question they are most often asked, which is, "Whuffo you jump out of airplanes?" When you risk your neck on purpose, no one can understand. Usually, you're better off not trying to explain.

Robin Heid touched on this issue in an article he wrote last year for the *Denver Post*, in a section the newspaper calls "Adventure." The story was about an incident that had occurred one morning in the Black Canyon of Gunnison National Monument, in Colorado. Heid was with a group of parachutists who continued to jump from the canyon's edge even though the second man off, Larry Jackson, had crashed and been hung up halfway down the cliff. "No one could tell if he was moving, and there was nothing we could do but fly by and see if a better determination could be made," wrote Heid. The jumpers didn't notify the rangers until they had finished jumping. A rescue team had to wait until the next morning to get to Jackson, who was dead. I asked Robin Heid about the incident. "It's easy to misunderstand what happened," he said. "The Black Canyon is very remote. Larry couldn't have been rescued that night anyway. We'd done a lot of planning to get there. We weren't going to stop because Larry made a mistake."

No criminal charges were brought against any of the jumpers, but, like Jim Tyler's death, the incident in the Black Canyon caused some people to wonder whether the jumpers, exercising their rights, had lost sight of other responsibilities. One of those people is Will Oxx, Jr., a Naval Academy midshipman who has taken up cliffing; last summer he climbed Half Dome and parachuted off only a few days before Jim Tyler died. "Jim's death and the Black Canyon thing, they're both the same," Oxx told me. "I believe that jumpers have the right to break the law if they have to, because the law is wrong. But if I were with someone who got hurt, I'd feel I had to do whatever I could to help. Both accidents should have been reported sooner than they were. If you're more worried about getting arrested than anything else, you shouldn't be jumping." Randy Leavitt, the man who invented cliffing, told me that fixed-object jumpers need more time to develop a background of informal rules and traditions that might temper the passion behind their sport. "BASE jumpers aren't like rock-climbers," he said. "They aren't humble. It will take time for them, because they've got to create a respect for death." I think he meant respect for the presumed aesthetics of risk-taking. But BASE jumpers aren't always clear.

Carl Boenish predicts that BASE jumping will one day be a socially accepted sport. He points out that last October parachutists were allowed to jump from West Virginia's New River Gorge Bridge, which is 900 feet high, and that onlookers were delighted. Boenish talks about regulating his sport the way the United States Parachuting Association regulates sky-diving, and about safer BASE jumping. But, after talking with Robin Heid, I doubted that such a plan could be put into effect soon. "It's not what the sport is about," Heid told me. "The idea is not to have to obey a lot of rules. The idea is to have fun."

— *David Schonauer*

*David Schonauer is senior editor of* Outside *magazine.*

Copyright of Atlantic Magazine Archive is the property of Atlantic Monthly Group LLC and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.



# United States Department of the Interior

## NATIONAL PARK SERVICE
1849 C Street, NW
Washington, DC 20240

IN REPLY REFER TO:
10.A (2400)

Memorandum

To:         Associate and Assistant Directors
            Regional Directors

From:       Associate Director (A), Visitor and Resource Protection

Subject:    Managing BASE Jumping

**Background**

BASE jumping is the recreational sport of jumping from fixed objects, including artificial structures and natural features, using a parachute to descend to the ground. Additional equipment, like wing-suits, may be included in a BASE jump, however a parachute is still required for landing. Recently, several National Park System units have received inquiries about BASE jumping, including permit applications for BASE jumping at specific times, dates, and locations. The National Park Service (NPS) also has received several requests for information pursuant to the Freedom of Information Act about its management of BASE jumping.

In response to renewed interest in this recreational activity, the NPS is issuing guidance reaffirming NPS regulations and policies about how BASE jumping should be managed.

Legal and Policy Framework

NPS regulations at 36 CFR 2.17(a)(3) prohibit delivery of a person by airborne means, except pursuant to the terms and conditions of a permit. This regulation is not limited to BASE jumping, and includes activities such as hang gliding and paragliding. Several parks have special regulations, similar to the general regulations, that also require a permit for powerless flight.[1]

NPS regulations at 36 CFR 1.6 state that activities authorized by a permit must be consistent with applicable legislation, Federal regulations and *administrative policies*, and based upon a determination that public health and safety, environmental or scenic values, natural or cultural

---

[1] See special regulations for Shenandoah National Park (36 CFR 7.15(b)), Yosemite National Park (36 CFR 7.16(c)), Blue Ridge Parkway (36 CFR 7.34(c)), Delaware Water Gap National Recreation Area (36 CFR 7.71(a)), Sleeping Bear Dunes National Lakeshore (36 CFR 7.80(a)), Point Reyes National Seashore (36 CFR 7.81(a)), Indiana Dunes National Park (36 CFR 7.88(b)), Whiskeytown National Recreation Area (36 CFR 7.91(c)), Golden Gate National Recreation Area (36 CFR 7.97(b)), and Appalachian National Scenic Trail (36 CFR 7.100(c)).

**EXHIBIT A-8.49**

resources, scientific research, implementation of management responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor use activities will not be adversely impacted. (Emphasis added.)

Although there are no NPS regulations that specifically address BASE jumping, the NPS has a specific policy for BASE jumping in section 8.2.2.7 of NPS *Management Policies* (2006). This policy states that – although generally prohibited by NPS regulations – BASE jumping may be allowed by permit, but only after it is determined to be an appropriate activity through a park planning process.

**Guidance**

The NPS must manage BASE jumping consistent with applicable regulations and policy as follows:

1.  A planning process that considers whether BASE jumping is an appropriate activity in the system unit must be completed before the superintendent can consider a permit application. If the planning process has not been completed, superintendents should neither approve nor deny applications for BASE jumping. Instead, they should acknowledge receipt of the application and state that it cannot be considered because the system unit has not completed the required planning process. Superintendents have discretion to decide whether to begin or complete the required planning process taking into account other management responsibilities and priorities.

    Exhibit A to this Memorandum is a template that superintendents can use when responding to permit applicants if the required planning process has not been completed. NPS employees should not make any statements to permit applicants about the appropriateness of BASE jumping until completion of the planning process.

    Note: The only exception to the planning requirement is if a Federal statute or NPS regulation applicable to a system unit does not require a permit for BASE jumping. For example, system units with special regulations that do not require a permit for BASE jumping should manage this activity pursuant to the special regulations.[2]

2.  The required planning process should consider potential impacts, both positive and negative, to park values, resources, and visitors from BASE jumping. Determinations about whether BASE jumping is appropriate must comply with NPS policies about use of park areas.[3] The planning process may result in a determination that BASE jumping is appropriate in some, but not all, locations within a system unit.

---

[2] See special regulations for Lake Mead National Recreation Area that allow for powerless flight except in harbors, swim beaches, developed areas, and in other locations designated as closed to this activity (36 CFR 7.48(b)); and special regulations for Lake Meredith National Recreation Area (36 CFR 7.57(c)) that allow for powerless flight except in locations closed to this activity (although a permit may be required under the superintendent's discretionary authority, in which case permits may not be considered until the planning process is complete consistent with the guidance in this Memorandum).

[3] See *Management Policies*, chapter 8.

**EXHIBIT A-8.50**

3.   If a planning process has been completed, the superintendent may consider permit applications for BASE jumping. Permit applications for BASE jumping in locations determined to be inappropriate for this activity must be denied, with an explanation that refers to the determination. Superintendents may issue or deny permit applications for BASE jumping in locations determined to be appropriate for this activity, consistent with the criteria stated in 36 CFR 1.6.

4.   The required planning process and all permitting decisions must comply with all applicable laws including, but not limited to, the NPS Organic Act, the National Environmental Policy Act, and the Wilderness Act.

**Further Information**

Please contact the following individuals if you have questions about the guidance in this Memorandum:

- For questions about the required planning process, please contact Amanda Jones, Deputy Division Manager, Park Planning & Special Studies; amanda_jones@nps.gov; 771-215-7907.

- For questions about evaluating permits for BASE jumping, please contact your regional Special Park Use Coordinator or Maggie Tyler, Special Park Uses Program Manager; maggie_tyler@nps.gov; 202-513-7092.

**EXHIBIT A-8.51**

Exhibit A – Template Response to Permit Applicants

Dear [applicant]:

We have received your application for a permit for BASE jumping at [insert name of system unit]. National Park Service (NPS) policy requires a determination through a planning process that BASE jumping is an appropriate activity at [insert name of system unit] before the Superintendent can authorize it under a permit. 2006 NPS Management Policies, Section 8.2.2.7.

We have not completed the required planning process for [insert name of system unit] and therefore cannot consider your application at this time.

Thank you for your interest in [insert name of system unit] and the National Park System.

Sincerely,

**EXHIBIT A-8.52**



United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

JUL 0 1 2004

Honorable Thomas G. Tancredo
House of Representatives
Washington, DC 20515-0606

Dear Mr. Tancredo:

This is in further response to your letter of March 18, 2004, which referred to an April 21, 2003, letter you had written to the National Park Service concerning backcountry parachuting. Your April 21 letter included a proposed process by which more access would be granted to those who wish to parachute in backcountry areas of various units of the national park system. Although Mr. Loran Fraser of the NPS had sent you an interim response, this more complete response is long overdue.  For that we sincerely apologize.

As NPS Associate Director Richard Ring had pointed out in a July 2002 letter to you, the general NPS regulation governing parachuting is published in section 2.17 of Title 36 of the Code of Federal Regulations.  That regulation prohibits "Delivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit." While the regulation (promulgated in 1983) authorizes superintendents to permit parachuting, superintendents over the years have tended not to exercise that authority, due to general concerns about safety and conflicts with other park uses.

A key reason why superintendents have not been inclined to permit parachuting is because the NPS has had some unpleasant past experiences with this activity—especially at Yosemite National Park.  The Yosemite superintendent in 1980, following a request by the U.S. Parachute Association (USPA), allowed a test period for jumping from El Capitan. Conditions under which the jumps would occur were agreed to and the test period began. However, it had to be ended prematurely after five weeks as problems became apparent.  In the superintendent's view, the accident rate was excessive and the rules were blatantly disregarded by too many of the jumpers.  The park also had difficulty managing the traffic and crowds drawn by the spectator atmosphere that was encouraged and promoted by some of the jumpers.  The USPA acknowledged the need to discontinue the activity, withdrew its sanction, and branded the sport as a dangerous stunt.

**EXHIBIT A-8.53**

As you have noted, the NPS's general concerns about BASE jumping are reflected in section 8.2.2.7 of our 2001edition of *Management Policies*, which states:

> BASE (Buildings, Antennae, Spans, Earth forms) jumping—also known as fixed object jumping—involves an individual wearing a parachute jumping from buildings, antennae, spans (bridges), and earth forms (cliffs). This is not an appropriate public use activity within national park areas, and is prohibited by 36 CFR 2.17(a)(3). [36CFR2.17(a)(3)]

Under the NPS regulations in 36 CFR 2.17(a)(3), delivering or retrieving a person or object by parachute is prohibited "except…pursuant to the terms and conditions of a permit." As with other discretionary NPS policies, this policy may be waived by the Director, and was indeed waived in the case of "Bridge Day" at New River Gorge National River. A permit was issued to Vertical Visions of West Virginia, an organized BASE jumping group, for parachuting activities during that event. The NPS perceives parachuting on Bridge Day as an exceptional situation. It is a once-a-year special event that originates on State property and is part of a major festival. In making the decision to grant a policy waiver, the Director considered these factors, plus the park's enabling legislation, management plans, other visitor uses, park values, and various resource issues before concluding that the activity could be sustained without causing unacceptable impacts to park resources or values. In addition, the Director took into account that the activity would be tightly managed, there would be ample emergency personnel on hand to cope with the hundreds of BASE jumpers and the many thousands of spectators, and the parachutists would pay for rescue/pickup boats on the river.

Given this background, the NPS does not view the Bridge Day event as a precedent or model for parachuting in other areas of the national park system. However, Director Mainella is committed to providing the public with appropriate opportunities for enjoyment of park resources and values, and to thoughtfully reviewing our policies and procedures when they are called into question. I am confident that she would expect park superintendents and other NPS decision-makers to give serious consideration to parachuting and similar activities as part of their normal responsibilities for managing recreational uses. The NPS does not think, however, that the process proposed in the attachment to your letter is the best approach to take at this point.

While the proposal recognizes that some NPS units and areas will necessarily be more restricted and regulated than others, it contains a presumption that certain categories of park units, by dint of nomenclature, may be inherently more suitable for parachuting than others. The NPS is compelled to apply a more comprehensive planning approach that includes public involvement and takes into account the park's resources; the 1916 NPS Organic Act; other relevant statutes, Executive orders and regulations; and many other factors. The legislation or Presidential Proclamation establishing a particular park unit is often especially important in helping us make planning and management decisions.

Another concern the NPS has with the approach outlined in the attachment to your letter is that it relies exclusively on one particular user group to advise park managers on matters that could be quite controversial. In addition to being contrary to long-standing NPS planning practices and the Director's commitment to more broadly engaging the general

public, it would likely violate provisions of the Federal Advisory Committee Act and regulations implementing the National Environmental Policy Act.

The approach we would suggest instead is that representatives of the parachuting community involve themselves in the planning process that takes place at each park. Each park is required to have a general management plan to provide a clearly defined direction for resource protection and visitor use. Citizens are encouraged to help define that direction by participating in the planning process.

Visitor use management plans are another form of plan that is required, and in which the public is encouraged to participate. These plans may be addressed as action plan components within a general management plan or a resource management plan, or as coordinated activity-specific documents (such as a backcountry use plan), or as a single integrated plan that addresses a broad spectrum of recreational activities. The approach taken by each park will depend on local park needs and circumstances.

During the preparation of planning documents, park managers invite everyone who may be interested to offer their ideas and perspectives regarding appropriate recreational uses of the park. The planning process is a forum for the exchange of ideas, for determining areas of agreement and conflict, and for finding solutions to problems. Because the planning is performed in a comprehensive way, it reduces the likelihood of unintended consequences. Decisions that are made at the conclusion of the planning process take into consideration a park's purposes and the effects that a decision may have on park visitors and resources. They also take into account the park's capability to properly manage an activity. If an activity cannot be accommodated within a park, the planning process will often help to identify appropriate alternative locations.

If, at the end of the planning process, a superintendent were to conclude that parachuting was an appropriate use of the park, the superintendent could apply for a policy waiver from the Director (as was done at New River). The Director would consider the justification offered by the superintendent, as well as any Servicewide implications of granting the waiver request. The request would address whether the activity would result in a significant alteration in the public use pattern of the park or be highly controversial. If so, and the waiver were to be granted, the Service would have to promulgate a special regulation to authorize the activity, in accordance with regulations published at 36 CFR 1.5.

In closing, we appreciate your calling this matter to our attention and offering ideas to consider. Although we cannot accommodate all of your suggestions, the process outlined above provides for the case by case, park by park approach that you had recommended. We hope that members of the parachuting community will avail themselves of the many opportunities that the parks offer for involving them in the planning and decision-making process, as outlined above. Because there are 388 national park units, different parks will be at varying stages in their planning processes—anywhere from just beginning, to already completed. Since the planning process is cyclic, even parks that have recently completed their plans will be revisiting them from time to time.

**EXHIBIT A-8.55**

Anyone who has internet access may obtain comprehensive information about specific parks (including the status of planning projects) by accessing the individual park websites through www.nps.gov.   Timely information about ongoing planning activities within park units may also be accessed through the NPS's planning website at www.planning.gov.  These websites generally contain information on when and how the public may become engaged in the planning process.  If someone's information needs cannot be satisfied at one of these websites, then communication should be initiated with the park superintendent's office.  As an alternative, if we were given a list of parks they are interested in, we could then provide information on the status of planning in those parks.

Please let me know if there is any further information we can provide you on this matter.

Sincerely,

P. Lynn Scarlett
Assistant Secretary - Policy, Management
  and Budget



NOV 2 2 2019

Mr. Graham Hall
3635 Chesnut Street
Apartment 4
Riverside, California 92501

Dear Mr. Hall:

Thank you for your recent letter to Deputy Director David Vela, which has been forwarded to this office for a response.

When you mention "an old law prohibiting air delivery of supplies by parachute," I believe you are referencing section 2.17 of title 36 of the Code of Federal Regulations (36 CFR 2.17). In particular, subsection (a)(3) prohibits:

(3) Delivering or retrieving a person or object by parachute, helicopter or other airborne means, except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit.

This regulation was issued in 1983.

In 2001, National Park Service *Management Policies* addressed the subject of BASE jumping for the first time, in section 8.2.2.7, as follows:

BASE (Buildings, Antennae, Spans, Earth forms) jumping—also known as fixed object jumping—involves an individual wearing a parachute jumping from buildings, antennae, spans (bridges), and earth forms (cliffs). <u>This is not an appropriate public use activity within national park areas, and is prohibited by 36 CFR 2.17(a)(3)</u>. [Emphasis added.]

However, in the 2006 edition of *Management Policies* (still in effect), section 8.2.2.7 was amended significantly. The language was changed to read:

Parachuting (or BASE jumping), whether from an aircraft, structure, or natural feature, is generally prohibited by 36 CFR 2.17(a)(3). <u>However, if determined through a park planning process to be an appropriate activity, it may be allowed pursuant to the terms and conditions of a permit</u>. [Emphasis added.]

During the preparation of planning documents – such as general management plans, resource management plans and visitor use plans – parks managers invite everyone who may be interested to offer their ideas and perspectives regarding appropriate recreational uses of a park. The

planning process is a forum for the exchange of ideas, for determining areas of agreement and conflict, and for finding solutions to problems. Because planning is performed in a comprehensive way, it reduces the likelihood of unintended consequences. Decisions that are made at the conclusion of the planning process take into consideration a park's purposes and the effects that a decision may have on park visitors and resources. They also take into account a park's capability to properly manage an activity. If an activity cannot be accommodated within a park, the planning process will often help to identify appropriate alternative locations. The planning process is done on a park-by-park basis, realizing that no two parks are the same.

If, at the end of the planning process, a superintendent were to conclude that parachuting was an appropriate use of a park, he/she could then issue permits allowing such activity pursuant to 36 CFR 2.17(a)(3) and section 8.2.2.7 of *Management Policies*. In short, there is no Service-wide policy preventing BASE jumpers from accessing our national parks.

Deputy Director Vela is committed to providing the public with appropriate opportunities for enjoyment of park resources and values, and expects park superintendents and other NPS decision-makers to give serious consideration to parachuting and similar activities as part of their normal responsibilities for managing recreational use.

I hope that this information is helpful to you.

Sincerely,

Alma Ripps
Chief, Office of Policy

***United States v. David Nunn***

**Case No. 6:20-po-00742 HBK**

**Exhibit A -9**

| | |
|---|---|
| **From:** | Brendan Weinstein |
| **To:** | Vincent Lee |
| **Subject:** | Fwd: BASE Access application fee check returned to Christopher W. Ludlow |
| **Date:** | Wednesday, August 7, 2024 12:53:37 PM |

EXTERNAL SENDER

---------- Forwarded message ---------
From: **Kunz, Alan J** <Alan_Kunz@nps.gov>
Date: Wed, Jul 24, 2024 at 5:14 PM
Subject: BASE Access application fee check returned to Christopher W. Ludlow
To: Brendan Weinstein <brendan@baseaccess.org>


Hi Mr. Weinstein,

I wanted to let you know that I have returned the $100 check for the BASE Access special use permit application fee to Christopher Warren Ludlow via FedEx.

It will most likely go out today. The FedEx tracking number is 7775 6421 0192.

Respectfully,


Alan Kunz
Permit Program Manager
Special Park Uses Office
209-379-1434

**EXHIBIT A-9**

***United States v. David Nunn***

**Case No. 6:20-po-00742 HBK**

**Exhibit A -10**

| | |
|---|---|
| **From:** | Brendan Weinstein |
| **To:** | Vincent Lee |
| **Subject:** | Fwd: BASE Access application fee check returned to Christopher W. Ludlow |
| **Date:** | Wednesday, August 7, 2024 12:54:03 PM |

**EXTERNAL SENDER**

---------- Forwarded message ---------
From: **Brendan Weinstein** <brendan@baseaccess.org>
Date: Thu, Aug 1, 2024 at 12:32 PM
Subject: Re: BASE Access application fee check returned to Christopher W. Ludlow
To: Kunz, Alan J <Alan_Kunz@nps.gov>

Hi Mr. Kunz,

The attorneys in the US vs Nunn case in Yosemite argued that the government would welcome permit applications from BASE jumpers. We thus assumed there must have been a mistake when we received the permit application and check back in the mail, so we have sent them back to you with fedex tracking number #277692541486. The permit materials should re-arrive at your office today.

We're awaiting a response to our administrative appeal that came as the result of Yosemite's rejection to our permit application. Please respond to the administrative appeal before October 12, 2024.

Superintendent Muldoon has not responded to our organization's prior requests for a meeting to discuss park planning, but we as always leave the door open for productive discussion when Superintendent Muldoon is ready to engage us. Myself or another board member would be happy to participate in a call anytime this week or next.

Respectfully,
Brendan Weinstein
BASE Access Board President

On Wed, Jul 24, 2024 at 5:14 PM Kunz, Alan J <Alan_Kunz@nps.gov> wrote:

> Hi Mr. Weinstein,
>
> I wanted to let you know that I have returned the $100 check for the BASE Access special use permit application fee to Christopher Warren Ludlow via FedEx.
>
> It will most likely go out today. The FedEx tracking number is 7775 6421 0192.
>
> Respectfully,
>
> Alan Kunz

**EXHIBIT A-10.1**

Permit Program Manager
Special Park Uses Office
209-379-1434

*United States v. David Nunn*

**Case No. 6:20-po-00742 HBK**

**Exhibit A -11**



# United States Department of the Interior

NATIONAL PARK SERVICE
Interior Regions 8, 9, 10, and 12
555 Battery Street, Suite 121
San Francisco, CA 94111

IN REPLY REFER TO:
DRS3.1.03 (PW-VP)

Mr. Kendrick W. Dane
General Counsel
BASE Access, Inc.
kendrick@baseaccess.org

Dear Mr. Dane:

Your email titled "A9031b (SUPT) – Administrative Appeal of Superintendent's Denial of BASE Access, Inc. Application for Special Use Permit" was forwarded to my office from Yosemite National Park (YNP) on April 17, 2024. While National Park Service (NPS) regulations do not provide for any formal administrative appeal of this sort of decision, I have reviewed and carefully considered the points made in your email and your request for a permit to BASE jump in Yosemite National Park.

While you provide a lengthy history of BASE Access, Inc., its requests, and its interactions with NPS and YNP offices specifically, nothing in your email or its exhibits suggests that the permit denial was improper. BASE jumping is generally prohibited in the National Park System under 36 C.F.R. § 2.17(a)(3). While it may be allowed under a permit, section 8.2.2.7 of the NPS's system-wide Management Policies 2006 states that such permits may only be issued if the park has undertaken a planning process and determined that it is an appropriate activity in the park. Nor does that section somehow discriminate against BASE jumping, as your email argues; it simply applies the NPS's broader policies on appropriate uses to it. As stated in sections 1.5 and 8.1.1 of NPS Management Policies, parks cannot allow new uses until they are properly determined to be an appropriate use under the processes described there.

Since no such planning process has occurred for BASE jumping at YNP, the park may not issue a permit. This is also fully consistent with the NPS's general regulation on permits, 36 C.F.R. § 1.6, which states that a permit may be issued only if it is consistent with "administrative policies."

Based upon the submitted appeal package from BASE Access, Inc., the December 9, 2023, application to YNP, and YNP's January 9, 2024, letter to Mr. Weinstein, I agree with YNP's decision not to issue a permit for BASE jumping because the park has not determined if it is an appropriate use, as required per management policies.

Sincerely,

DAVID
SZYMANSKI

Digitally signed by DAVID
SZYMANSKI
Date: 2024.08.08
09:57:13 -07'00'

David Szymanski
Regional Director

cc:     Superintendent, Yosemite National Park
        NPS Special Park Uses Program Manager, WASO

INTERIOR REGION 8 ● LOWER COLORADO BASIN*
INTERIOR REGION 9 ● COLUMBIA—PACIFIC NORTHWEST*
INTERIOR REGION 10 ● CALIFORNIA—GREAT BASIN
INTERIOR REGION 12 ● PACIFIC ISLANDS

AMERICAN SAMOA, ARIZONA*, CALIFORNIA, GUAM, HAWAII, IDAHO, MONTANA*,
NEVADA, NORTHERN MARIANA ISLANDS, OREGON, WASHINGTON
*Partial

**EXHIBIT A-11**